**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Davina Hurt, et al.,** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 1:12-CV-00758 |
| v. | : | |
| | : | Judge James Gwin |
| **Commerce Energy, Inc.,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

## UNSWORN DECLARATION AND EXPERT REPORT OF MICHAEL AHEARNE, PH.D

I, Dr. Michael Ahearne, declare and state as follows and submit the following expert report in this matter:

## Professional Background and Experience

I am the C.T. Bauer Chair in Marketing at the University of Houston, Executive Director of the Sales Excellence Institute, and a former Editor of the Journal of Personal Selling and Sales Management. The Sales Excellence Institute is widely recognized as the worldwide leader in sales education and research, and the Journal of Personal Selling and Sales Management is the premier outlet for sales force research.

I was recently recognized by the American Marketing Association as one of the ten most research productive scholars in the field of marketing, and I was also recently honored with the inaugural *Sales Education Foundation Research Dissemination Award* for acting as a bridge between sales academia and practice.

My textbook *Selling Today: Partnering to Create Customer Value* is the highest grossing professional selling textbook worldwide, with copies distributed in over forty countries.

1

My research can be parsed into two general areas of interest: (1) sales force effectiveness and (2) internal/relationship marketing. The former of these areas can further be classified into three sub-categories: (1) sales force control systems, (2) sales leadership within individual and team contexts, and (3) salesperson behaviors and performance. I rely on this breadth of knowledge while interfacing with sales organizations.

Over my career, I have worked on hundreds of customized research projects with sales organizations. This interaction can largely be attributed to my position as the Executive Director of the Sales Excellence Institute. At any given time, we have between twenty-five and forty partners who hire our sales students and work with my academic team on research projects.

A more complete listing of my education, experience, publications, affiliations, and background is included in my curriculum vitae, which is attached as Exhibit A.

In the last four (4) years, I have served as a testifying expert in the following case: *Anthony Charlot, et al. v. Ecolab, Inc.,* Case No. 12-CV-4543 in the United States District Court for the Eastern District of New York.

I am being compensated at the rate of $650 per hour for my study, preparation of a report, and testimony in this case.

I have been asked by counsel for Defendants, Commerce Energy, Inc., Just Energy Marketing Corporation and Just Energy Group, Inc. ("Defendants" or "Just Energy") to evaluate the role of independent contractors ("ICs")[1] in their sales process and render an opinion as to whether their duties and responsibilities bear the indicia of sales and whether they are engaged in making "sales," as the term is used and understood in the sales industry.

---

[1] I understand that Defendants engage ICs in every state in which Commerce Energy operates, except for Pennsylvania, where it employs sales representatives.  For purposes of this Report, I do not make a distinction between sales representatives and ICs.  For ease of reference, I will use the term "IC" throughout this report, with the understanding that their classification as contractors is in dispute.

My opinions expressed in this Report are based upon my education, training, experience, as well as my observations and other materials identified in this report.

While preparing this declaration, I studied all of the materials sent to me. These files include: (1) the deposition transcripts (and all exhibits) of Richard Teixeira, Dominic Hill, Davina Hurt, Arnold Black, Stayce Fitzpatrick, Tyelynn White, Phillip Scott, Dennis Piazza, Kimberly Starks, Candice Avery, Denise Williams, Tierra Coleman, Wayne Dancie, Jr., Darryl Blair, Cindy Coreus, Robin Lewis, Chad Chappie, and Pete Potje; and (2) the following additional documents produced by Defendants in this case:

> Davina Hurt's independent contractor agreement, commission cheque summary and independent contractor status report (labeled Just Energy 000001-000004, 000018-000022 and 000027-000035);
>
> Sales scripts (labeled Just Energy 000356-000377);
>
> Third party verification scripts (labeled Just Energy 002870-002876 and 002976-003036);
>
> Training and orientation materials (labeled Just Energy 000222-000521); and
>
> Recruiting advertisements and postings (labeled Just Energy 003084-003364 and 004301-004309).

**<u>Opinion</u>**

It is my opinion that ICs' duties bear a number of indicia of sales positions in the direct sales industry and that they play a central role in the sales process used by Just Energy. ICs have the same job characteristics as other occupations that are well recognized in sales academia as sales positions. Indeed, these characteristics are consistent with the sales techniques taught at business schools around the country, including mine. They are further consistent with the sales

principles advanced in major textbooks, such as my own, *Selling Today: Partnering to Create Customer Value*, Robert Jolles' *Customer Centered Selling*, and Neil Rackham's *SPIN Selling*.

Consistent with these well-recognized selling principles, it is further my opinion that the IC position is designed to further Just Energy's sales efforts and to obtain new customers for Just Energy.

The "verification" process performed after the point of sale is a good business practice, which is required by regulation or condition of license in many jurisdictions and is consistent with that which many companies use to (a) qualify sales and (b) ensure that regulatory requirements are upheld.

Further, I am of the opinion that the verification process is within ICs' control to the extent that they select and engage potential customers in a thoughtful and diligent manner.

My opinions are based on all of the information I have obtained pertaining to the IC role in this case as described above, my education, and my experience in the sales profession, both as a sales consultant and as a professor of sales. My assessment is also informed by my evaluation of the following stages of career progression for ICs: (1) Recruitment and Selection, (2) Orientation and Job Training, and (3) Compensation and Job Activities.

As discussed in greater detail in the following paragraphs, it is further my opinion that the work performed by the plaintiffs while working in their field sales roles at Just Energy was aimed at making sales for Just Energy. While they claim to have been constrained by the sales presentation script and inhibited by the sales call verification process, these tools are unavoidably incidental to, and in furtherance of, their selling duties, responsibilities, and ultimate success.

**Recruitment and Selection**

Starting from the advertisement of the IC position (Just Energy 004301-004309), Just Energy often sends signals to potential applicants that establish ICs as sales representatives who will be responsible for selling Commerce Energy's products and services.

Indeed, Just Energy's ads are often titled with the words "entry level sales openings" to describe the IC opportunity, and the job type is often described as "sales" (Just Energy 004301-004309). However, given the proliferation of job titles in sales, it is not uncommon for sales roles to be given titles such as territory manager, route manager, or registration agent in the case of some Just Energy ads.

Crucially, given the entry-level nature of the position, it is not a concern that Just Energy does not ask for prior sales experience, since asking for prior sales experience is not a prerequisite for a position to be in the realm of sales within the sales industry. Some companies offer in-house training and prefer to train salespeople with their own methods from a clean slate. Other companies "target people who are currently employed in…nonsales positions as new hires. Many of these people, despite being well qualified, are burned out in their current positions and interested in the variable component of pay in…sales" (p. 102).[2]

Further, using an "average hourly wage" to represent earnings potential is a common way to communicate expected income to prospective applicants of commissioned sales positions. The use of an "average hourly wage" indicates that pay varies across workers and across time (e.g., weeks), suggesting that a variable pay compensation plan (e.g., commission-based system) is in place.

---

[2] Boichuk, Jeffrey P., Willy Bolander, Zachary R. Hall, Michael Ahearne, William J. Zahn, and Melissa Nieves (2014), "Learned Helplessness Among Newly Hired Salespeople and the Influence of Leadership," 78(1), 95-111.

In these ways, the job postings that Just Energy uses to advertise IC positions often signal to job candidates that Just Energy is a sales organization in search of applicants to fill sales positions. Accordingly, I deem this recruitment and selection process to be consistent with the current standards and practices in sales management.

**<u>Orientation and Job Training</u>**

Upon signing an independent contractor agreement (ICA), ICs are exposed to an orientation, extensive role-play opportunities, and up to a week of job shadowing with an experienced IC.

My thorough review of Just Energy's orientation files confirms that this process communicates a significant amount of sales-based material to new ICs (Just Energy 000222-000521). Particularly, Just Energy develops essential sales skills when it trains ICs on (a) the energy services Commerce Energy offers and (b) the deregulation in the industry itself. It is critical for ICs to understand the services they offer potential customers and the industry from within which these services emanate.

Further, the "Customer Interaction" cycle in Just Energy's Independent Contractor Manual (Bates 000469-000519) parallels the sales processes used in many other major companies as well as the sales process outlined in the professional selling field's major textbooks, such as my own, *Selling Today: Partnering to Create Customer Value*, Robert Jolles' *Customer Centered Selling*, and Neil Rackham's *SPIN Selling*. It is also in line with the sales process that I teach and that is also taught in business schools around the United States.

This sales process I teach follows five steps.[3] First, salespeople *approach* potential customers with an aim to build rapport, capture attention, and transition to step two of the sales process, *need discovery*. During this step, salespeople uncover prospects' needs and establish a primary reason to act. Next, in step three, the *presentation*, salespeople relay factual information to prospects in an effort to inform them about an offering. What follows is often a *negotiation*, which is the fourth step in the sales process. Here, salespeople work to understand prospects' concerns, address misunderstandings, and overcome objections. Finally, salespeople *close* in the fifth stage of the sales process, which means they ask for some form of commitment, whether it be another meeting or a purchase.

When trained to sell according to Just Energy's sales process, ICs are instructed to:

1) Make an introduction following seven tips that are classic sales *approach* techniques (Just Energy 000473).

2) Attain homeowners' bills to qualify prospects, which epitomizes *need discovery* (Just Energy 000474-000483).

3) Explain the benefits of Just Energy to qualified prospects in five areas, which constitute the sales *presentation* (Just Energy 000484).

4) Handle qualified prospects' objections, especially commonly raised objections, during the *negotiation* (Just Energy 000970-000971).

5) Ensure that prospects' are fully sold and initiate the verification call, which represents the *close* (Just Energy 000500).

---

[3] Manning, Gerald L., Michael Ahearne, and Barry L. Reece. *Selling Today: Partnering to Create Value*. Pearson Higher Ed, 2014.

From my review of all the training materials included in this case (e.g., Just Energy 000222-000521) and the depositions listed at the beginning of this report, Just Energy's orientation and training period is undoubtedly geared toward developing new ICs' selling skills and preparing them for what we would consider in the sales industry to be a sales job.

As a prime example, the testimony of Chad Chappie, a former regional distributor for Just Energy, on pages 36-41, walks the court through Just Energy's sales process, from "establishing a rapport" (approach) to "identifying a need" (need discovery) to "giving a pitch" (presentation) to "persuading" (negotiation) to "getting [customers] to commit" (close).

Furthermore, Just Energy's training also involves a knowledge review during ICs' orientation sessions in order assess their comprehension of the material being trained and the information they are required to communicate to potential customers (Just Energy 000961-000967). New ICs must, therefore, expect to be entering a sales position when they enter the field.

**Compensation**

In field sales positions, sales organizations often use variable pay to motivate sales representatives to exert selling effort (e.g., go door-to-door). The reason being, of course, stems from the inability of firms to monitor effort precisely.[4] These compensation plans tend to tie sales performance (e.g., the attainment of customer contracts) to such forms of variable pay as bonuses and commissions.[5] Within the Just Energy compensation plan for ICs (Just Energy 000034-000035), both of these facets are indeed included. In other words, ICs' compensation is dependent upon their productivity, resulting commission earnings, and performance bonuses.

---

[4] Basu, Amiya K., Rajiv Lal, V. Srinicasan, and Richard Staelin (1985), "Salesforce Compensation Plans: An Agency Theoretic Perspective," *Marketing Science*, 4 (4), 267-291.
[5] Chung, Doug J., Thomas Steenburgh, and K. Sudhir (2014), "Do Bonuses Enhance Sales Productivity? A Dynamic Structural Analysis of Bonus-Based Compensation Plans," *Marketing Science*, 33 (2), 165-187.

Some of the deposition testimony tells that a few of the plaintiffs earned nothing in particular weeks, either because they failed to attain signed contracts or because the contracts they did attain were otherwise cancelled. Richard Teixeira's testimony, for instance, acknowledges that it is conceivable for a Just Energy IC to work long hours or days in a week and earn nothing if they fail to attain contracts. This possibility of earning zero dollars is consistent with and plausible in light of highly leveraged (i.e., variable-pay heavy) sales commission plans due to the cyclical nature of sales and/or ineffectiveness of a given salesperson, for example.

Likewise, sales organizations regularly have recognition programs and annual sales contests in order to motivate performance.[6] Just Energy's Training and Orientation materials clearly demonstrate that the Just Energy awards night, millionaire's club, and comma club are directly in line with this culture (Just Energy 000222-000521).

## Job Activities – Role-Playing

According to deposition testimony, ICs who report to Just Energy's regional sales offices begin each day with role-plays, which effectively reenact customer visits and give ICs the opportunity to practice their presentation skills. Importantly, sales training has long relied on role-plays, which offer many pedagogical benefits associated with vicarious/active learning, to teach salespeople how to sell.[7]

Indeed, my research also shows that peers have a significant effect on salespeople's sales performance.[8] Evidently, learning vicariously from peers in the sales profession improves

---

[6] Steenburgh, Thomas J. and Michael J. Ahearne (2012), "Motivating Salespeople: What Really Works," *Harvard Business Review*, 90 (7/8), 71-75.

[7] Leigh, Thomas W. (1987), "Cognitive Selling Scripts and Sales Training," *Journal of Personal Selling and Sales Management*, 7 (2), 39-48.

[8] Lam, Son K., Florian Kraus, and Michael Ahearne (2010), "The Diffusion of Market Orientation Throughout the Organization: a Social Learning Theory Perspective," *Journal of Marketing*, 74 (5), 61-79.

salespeople's selling behaviors and, in turn, increases productivity. In the context of Just Energy, this finding suggests that new ICs would be worse off if they did not have other, more experienced ICs with whom they could practice their presentations.

**Job Activities – Using Sales Scripts to Structure Customer Interactions**

The use of sales scripts is prevalent in the sales profession, especially when sales interactions are repetitive and predictable like they are in door-to-door sales.[9]

My extensive review of the Just Energy sales presentation scripts (Just Energy 000356-000377) – which includes four steps: (1) introduction (approach), (2) qualifying and explaining the program (need discovery and sales presentation), (3) essential agreement information and signatures (negotiation), and (4) reaffirmation, verification code, and wrap up (close) – confirms that it provides valuable structure to ICs' customer interactions and follows the basic steps (in parentheses above) that major textbooks, such as my own, *Selling Today: Partnering to Create Customer Value*, include in standard sales process models.

Nevertheless, sales presentation scripts are simply guides. No document can cover all iterations that arise in the field, which makes ICs' roles as boundary spanners imperative to Just Energy's sales success. An IC, as a company representative, "interacts directly with a customer or prospective customer to present information about a product or service."[10] ICs must adapt the script to match different customers' needs and adapt the script within interactions to successfully navigate through the process.[11]

---

[9] Leigh, Thomas W. and Patrick F. McGraw (1989), "Mapping the Procedural Knowledge of Industrial Sales Personnel: A Script-Theoretic Investigation," *Journal of Marketing*, 53 (1), 16-34.

[10] Manning, Gerald L., Michael Ahearne, and Barry L. Reece. *Selling Today: Partnering to Create Value*. Pearson Higher Ed, 2014.

[11] Weitz, Barton A., Harish Sujan, and Mita Sujan (1986), "Knowledge, Motivation, and Adaptive Behavior: A Framework for Improving Selling Effectiveness," *Journal of Marketing*, 50 (4), 174-191.

Note that the quote in the preceding paragraph does not limit "personal selling" to situations where money is exchanged for a product or service. This narrow scope does not apply to a majority of sales roles in today's economy, which are focused not on facilitating a transaction but instead on persuading, convincing, and influencing others.[12]

Therefore, it is my position that money does not need to change hands at the door for a "sale" to occur. If ICs' intent is to influence prospects to sign a customer agreement and, in so doing, to become Just Energy customers, then I would describe the activity at issue as "sales."

Relatedly, although some of the plaintiffs' deposition testimony tends to classify "customer agreements" as "applications" or "enrollment forms," such terminology is irrelevant. Regardless of the name placed on the document, ICs' ultimate aim is to influence prospects to become Just Energy customers, and customers' intent is evidenced by their signature on the customer agreement.

## Job Activities – The Role of Sales Territories

According to deposition testimony, crew coordinators transport groups of 6-8 ICs to various locations outside the sales office each day for the purpose of going door-to-door. In turn, ICs are given the opportunity to call on different, exclusive sets of houses each day.

The terminology used in the sales literature for a devoted geographical region of customers is a sales territory.[13] These segments are demarcated on maps in order to maximize the earnings potential of individual salespeople and to eliminate sales efforts between a company's salespeople.

---

[12] Pink, Daniel H. *To Sell Is Human: The Surprising Truth About Persuading, Convincing and Influencing Others.* Text Publishing, 2013.

[13] Zoltners, Andris A. and Prabhakant Sinha (2005), "Sales Territory Design: Thirty Years of Modeling and Implementation," *Marketing Science*, 24 (3), 313-331.

It is my evaluation after reading the depositions in this case that ICs are at a significant advantage as a result of this service provided to them and the ultimate customer base they are able to reach. Without such transportation, many ICs would not be able to maximize earning potential, nor would they be able to ensure that overlap in their sales efforts with other ICs is nonexistent on a given day. Accordingly, I deem the sales territories made possible by crew coordinators in line with standard practices in sales management and to the benefit of ICs.

Furthermore, it is important to note that field sales positions receive various levels of supervision from managers. Demarcating territories and specifying sales duties are widely accepted sales management practices that fall under the umbrella of behavior-based control.[14] Therefore, it is my opinion that behavior-based control does not disqualify a field position from being a sales position.

**Job Activities – Verification as an Essential Step in the Process**

In many companies, sales are "conditional" on the approval of corporate or finance departments. In the case of Just Energy, customer agreements are "conditional" insofar as they are subject to Just Energy's approval. This approval process spans two steps: first, a verification call is made to ensure that ICs adhered to good business practices during a sale and, second, Just Energy or the relevant utility may conduct a credit check to ensure that prospects are credit worthy.

As I wrote earlier in this report, it is clear that the ICs have sufficient control over the conditional nature of customer agreements to the extent that they select and engage potential customers in a thoughtful and diligent manner. For instance, if an IC has properly explained the product and service being offered and the terms of the agreement to a potential customer, it is

---

[14] Anderson, Erin, and Richard L. Oliver (1987), "Perspectives on Behavior-Based versus Outcome-Based Salesforce Control Systems," *Journal of Marketing*, 51 (4), 76-88.

more likely that the third-party verification call will be completed successfully or less likely that the customer will cancel the agreement.

In regards to other companies' practices, IBM and Xerox both use internal finance departments to validate customers' credit worthiness prior to finalizing a product sale. Another example is the banking sector, which uses internal risk departments to verify the credit worthiness of business developed by loan officers or mortgage loan originators. Finally, as a last example, many sales positions, such as that of a real estate agent, are subject to third-party verification by banks and other suppliers, whom are capable of disqualifying sales.

However, salespeople can avoid problems associated with verification processes by qualifying potential customers and ensuring their credit worthiness. Just Energy clearly provides guidelines for prospect qualification in its training material (Just Energy 000481-000501). For example, the training material teaches ICs how to read a prospect's bill to determine whether the prospect's current gas/electric supplier is part of an acceptable class of suppliers (i.e., Columbia Gas, Duke, or Dominion East and American Electric Power) and whether a home is not within a restricted zip code (Just Energy 000484-000485). Therefore, it is clear that Just Energy ICs are given the information they need to elicit prospects who will make it through the two-step verification process and told to communicate clearly, honestly, and diligently in order to avoid lost sales due to problems derived from ambiguity in the verification process.

**Conclusion**

Overall, considering all of the case documents I studied in preparation of this Unsworn Declaration and Report, my education, the extensive experience I have gained throughout my career with sales organizations, and the relevant research I have conducted in the sales profession, it is my opinion that the Just Energy IC role, even in light of the "verification

process," bears all the indicia of a sales position, as would be recognized by sales academics, such as myself. This opinion is confirmed by Just Energy's recruitment and selection practices, its orientation and job shadowing procedures, and its compensation and job activity requirements for the IC position. Although ICs' performance unquestionably depends on a verification step in the sales process, that step, which happens to necessarily exist in many sales roles, is a central and inseparable part of Just Energy's highly effective selling model.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed on this 29th day of May, 2014.

Michael Ahearne, Ph.D

Firmwide:127216458.1 071198.1001

14