Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

DAVINA HURT, ET AL.              )

     Plaintiffs,              )

                    ) CASE NO. 1:12-CV-00758

VS.                              ) Judge James Gwin

                    )

COMMERCE ENERGY, INC.,           )

     Defendants.              )


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF


MICHAEL AHEARNE, PH.D.


JUNE 13, 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF MICHAEL AHEARNE, PH.D., produced as a witness at the instance of PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on FRIDAY, JUNE 13, 2014, from 9:51 a.m. to 12:28 p.m., before Pam Gwin Coder, CSR in and for the State of Texas, recorded by machine shorthand, at the offices of LITTLER MENDELSON, P.C., 1301 McKinney, Suite 1900, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed under penalties of perjury.

Page 2

APPEARANCES

FOR PLAINTIFFS:
MR. JAMES A. DEROCHE
GARSON JOHNSON, LLC
101 West. Prospect Avenue, Suite 1610
Cleveland, Ohio  44115
216.696.9330
jderoche@garson.com

FOR DEFENDANTS:
MS. SHANNON K. PATTON
LITTLER MENDELSON, P.C.
1100 Superior Avenue, 20th Floor
Cleveland, Ohio  44114
216.623.6068
spatton@littler.com

Page 3

EXAMINATION INDEX

WITNESS: MICHAEL AHEARNE, PH.D.

EXAMINATION PAGE

BY MR. DEROCHE                    4

SIGNATURE REQUESTED          132
REPORTER'S CERTIFICATION      133

EXHIBIT INDEX

AHEARNE EXHIBIT NO. 1          19
CV - Michael J. Ahearne
AHEARNE EXHIBIT NO. 2          78
Unsworn Declaration and Expert
Report of Michael Ahearne, Ph.D.
AHEARNE EXHIBIT NO. 3          103
Sales Presentation Script
AHEARNE EXHIBIT NO. 4          106
The Introduction and Obtaining
the Bill
AHEARNE EXHIBIT NO. 5          117
Handwritten notes

Page 4

(All attorneys agreed to waive reading
of the 30(B)(5) information for the
record.)

MICHAEL AHEARNE, PH.D.,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. DEROCHE:

Q   Please state your full name for record, sir.
A   Michael Jude Ahearne.
Q   And, Mr. Ahearne, where do you live?
A   I live here in Houston in Kingwood, Texas.
Q   Okay.  Can you give me your home address?
A   5603 Walnut Point Drive, Kingwood, Texas.
Q   And how long have you lived there?
A   Approximately 11 years.
Q   Okay.  Have you been deposed before?
A   Yes, I have.
Q   How many times?
A   One time.
Q   Okay.  And when was that?
A   It was approximately a year ago.
Q   Okay.
A   Um-hum.
Q   And what case was that in connection with?
A   It was a case concerning Ecolab Corporation.

Page 5

Q   Ecolab Corporation is a business client of
yours as well as someone you're testifying for?
A   Yes.  I've done work with Ecolab Corporation
previously.
Q   Okay.  I'm going to go over just a few ground
rules.
A   Sure.
Q   I'm sure you remember them, but I've got to do
it anyway.
A   Um-hum.
Q   So you have to answer all questions verbally.
Okay?
A   Um-hum.
Q   You just violated that first one.
A   I thought "um-hum" was verbal.
Q   And those --
       (laughter.)
Q   (By Mr. DeRoche) -- don't quite work for the
court reporter.
A   I understand.
Q   We can have -- however, if do you that I'm just
going to ask her to put down yes.  Is that all right?
Just kidding.
       (Laughter.)
Q   (By Mr. DeRoche) You have to let me finish my

2 (Pages 2 - 5)

Page 6

question. And hopefully I won't talk over you when you're giving your answer. Okay?

A Okay.

Q You have to make sure that you understand my question. If there's any ambiguity or you want clarification, let me know up front so I can clarify the question for you. Okay?

A Sure.

Q All right. At the end of this process you're going to get a chance obviously to read this deposition and make corrections, but I'd like you, if you can, during the deposition if you think back to an answer that you want to revisit, change, clarify, or whatever, if you can, let me know that today so we can go back over it today. Okay?

A Certainly.

Q All right. Finally, it's my only chance obviously to talk to you in deposition. So I will ask you to -- it's important that you give truthful, forthright answers. Can you agree to do that?

A I understand, yes.

Q Great. How were you retained in this case?

A I was contacted by Littler and asked to -- given the background, a little bit of the case itself, and asked if I might be interested in providing expert

Page 7

testimony.

Q Okay. You said contacted by Littler. Who was that?

A It was Shannon.

Q And when did Shannon contact you?

A In December of last year.

Q Do you recall the date?

A I don't know the exact date. I'm sorry.

Q Do you keep a calendar?

A I do.

Q And you kept time charges in connection with this case?

A Yes, I did.

Q So that would have the date on it?

A It does, yeah.

Q Okay. How long did that first conversation last?

A Approximately 20 minutes.

Q Do you know how Shannon found you as a potential expert in this case?

MS. PATTON: Objection; foundation, but you can answer.

A I had done some prior work for Littler on the Ecolab case.

Q (By Mr. DeRoche) What attorneys did you work

Page 8

for in that case?

A Shirley Lernér.

Q Any other lawyers you worked with in that case?

A No. She was the lawyer that I dealt with.

Q Okay. And during that first conversation was anybody else on the call besides you and Shannon?

A No, it was just the two of us.

Q And what were you told about the case?

A I was told some basic information about Just Energy. And I was told that the -- that the -- it was a -- the case was a -- that she was interested in me rendering an opinion concerning whether the position was, in fact, a sales position. And she asked if I would be interested in going through some initial information and then letting her know whether this would be a fit for me.

Q A sales position in what respect?

A In that the tasks, the duties, the training, the responsibilities of the IC, in this case, are that of a salesperson.

Q Salesperson in what -- under what standard?

A Under -- under my expert standard of as an academic, as a person of expert in practice, of what constitutes a traditional salesperson.

Q A traditional salesperson? Is that what you

Page 9

said?

A I think there's a -- there's some people might take wider definitions of what sales is. And I'm reflecting on more of a focused definition from an academic perspective of what a role the salesperson is.

Q When you say focused definition, what is that focused deposition?

A If you don't mind, I brought my textbook with me that I write --

Q Okay.

A -- in selling. It happens to be the top selling textbook in the US globally in the area of sales effectiveness and sales force. It's used for students that take an entry level class in sales.

And I really -- I worked hard to make sure I had a very accurate definition of selling in there. And so I refer to that in giving you my definition, to be precise.

Q Is that the definition you used in rendering your opinions in this case?

A Yes. I'll utilize that definition.

Q That's what you did -- you utilized?

A Yes, it is, um-hum.

Q Okay. Go ahead.

MS. PATTON: Of selling?

3 (Pages 6 - 9)

Page 10

A   Of selling, yes, correct. Uh-huh

MS. PATTON: Just to clarify.

A   So the definition is on page 5 under personal selling, definition and philosophy. So I -- just to clarify, personal selling is what I deem this position. It's because it's an interpersonal communication between two people. But the definition is: Personal selling occurs when a company representative interacts directly with the customer or prospective customer to present information about a product or service. It is a process of developing relationships, discovering needs, matching the appropriate products with these needs, and communicating benefits through informing, reminding, or persuading.

Q   Okay. And that's the definition you used in rendering your opinions in this case?

A   Yes, it is.

Q   Okay. What were you told about this case? In other words, what's in dispute?

A   I was told that there were a few things in dispute. One is the fact of whether the role of the individual, the IC, is really a sales role; that is, their responsibility is of a salesperson. And the second in dispute is whether they are really a independent distributor, which I'm not an expert to --

Page 11

I'm not here to provide expertise on. That's not an area of specialty for me.

Q   So you think there's a dispute over whether or not these individuals are salespersons as you defined them in your book?

MS. PATTON: Objection; misstates the testimony.

Q   (By Mr. DeRoche) You can answer.

A   No. I would say that it's a definition of whether a person who is an expert in the area of business and in the United States and in academia would deem this job as a sales position.

Q   Do you know why that would be relevant in this case.

MS. PATTON: Objection; foundation.

Q   (By Mr. DeRoche) You can answer.

A   My understanding is it's relevant in this case because it goes to the classification of exemption of a person from hourly wage classification.

Q   What exemption?

A   I don't know the legal -- I'm not a lawyer so I'm not really an expert on that side of the case.

Q   Do you know whether or not if a person meets your definition of a salesperson as you've laid it out in your book, if that is relevant to the determination

Page 12

of whether or not a person meets an exemption?

MS. PATTON: Objection. He's not testifying as to whether they are exempt.

MR. DEROCHE: You are noted.

Q   (By Mr. DeRoche) You can answer.

A   I would think that it would be very relevant because --

Q   Why do you think that?

A   Because I think that there has to be some expertise out there about what is a standard of a salesperson to be able to establish that. What -- what meets the criteria of a sales job or a salesperson. And my feeling is is that academics and in practice, my job is to really to study the art of selling and the science of selling itself in order to classify what really constitutes selling. That's what I do in my job. That's the focus of my job as a professor.

Q   So you fo- -- you make determinations as to whether or not a person is engaged in quote/unquote selling as you've defined it in your book?

A   I think that that's clearly something that I work on quite a bit. As you'll see in my book and in my work, part of what I do is I identify what are the components or the factors that make a person effective at selling and effective at a selling job. And in

Page 13

order for me to do that, I have to know how to classify a person as to whether they're a salesperson or not.

Q   How often have you been asked to classify persons as to whether or not they're salespeople or not?

A   I do that all --

MS. PATTON: Objection; vague.

Q   (By Mr. DeRoche) You can answer.

A   I do that all the time in my work. So to give you an example of this, when I submit an article for peer review -- and I'm doing that all the time -- there's a question of whether the person in my sample that I'm dealing with might be a salesperson or what would -- they call a frontline service agent and whether the person, for example, is there just servicing versus a person selling. And that kind of thing comes up on a regular basis. And as well as the question of what is a sales job, what pers- -- makes a person effective at selling. So that's constantly something that I deal with.

I'm also the editor of the Journal of Personal Selling and Sales Management, which is the top -- actually I just stepped down from that role a few months ago. But for the last three and a half years I've been the editor of that journal. And so I have to

4 (Pages 10 - 13)

Page 14

determine with a peer review team of hundreds of people what articles define the scope of selling and sales management globally. It's the top journal globally in that area.

Q  Do you know if a person meets the definition of a salesperson as you've outlined it in your book and given it here today, if that person qualifies for an exemption under the Fair Labor Standards Act.

MS. PATTON: Objection. Did not define salesperson in his book. He defined selling.

Q  (By Mr. DeRoche)  You can answer.

A  I don't know whether that's the case. I think that's what's of contention right now is what actually constitutes that. So I don't -- I mean, all I can do is render an expert opinion on whether this position, in my mind, and as an academic expert and a expert in the field, would constitute a selling job.

Q  Do you know how that you -- what you consider in the academic sense as a salesperson or selling, how that matches up with the standards under the Fair Labor Standards Act, whether or not a person is exempt from the wage and hour laws?

MS. PATTON: Objection.

Q  (By Mr. DeRoche)  You can answer.

A  No. I have not studied fair wage labor laws.

Page 15

I'm not an expert in that area. So that would be very difficult for me to address that question.

Q  So the answer was you don't have any idea whether or not the factors that you considered in any way bear on the issue of whether or not a person meets the exemption under the Fair Labor Standards Act?

MS. PATTON: Objection.

Q  (By Mr. DeRoche)  You can answer.

A  From a legalistic standpoint, I'm not sure.

Q  Well, from any standpoint you have no idea.

MS. PATTON: Objection.

A  I think from a professional standpoint, I have an idea.

Q  (By Mr. DeRoche)  Well, you don't have any idea what the standards are under the Fair Labor Standards Act for meeting the exemption of an outside salesperson, correct?

A  I do have some. I mean, I've been given some basic guidelines of that. And --

Q  When --

A  I'm sorry.

Q  Go ahead. You've been given basic guidelines by whom?

A  My -- in the previous case that I dealt with, in the Ecolab case, I was given some -- I was read the

Page 16

definition from a federal perspective.

Q  Read what definition?

A  What the federal perspective is of what a salesperson is.

Q  Did you apply that in this case?

A  I have not looked specifically at that definition, but if I -- I recall that it's very consistent with what I have.

Q  In what respect?

A  In that -- in that the person is selling a product or service and that that individual is converting a sale.

Q  Doing what?

A  Is converting a sale.

Q  Converting a sale?

A  Yeah.

Q  What does converting a sale mean?

A  It means persuading another one to move forward in the process of that transaction of value between two parties.

Q  Is that similar to closing?

A  That's one of the steps of the sales process, yes, closing.

Q  Other than this other case that you have with Littler Mendelson involving Ecolab, have you been

Page 17

retained in any other cases?

A  I have worked in some other cases as not an expert witness, but I advised on. But that was a number of years ago.

Q  What case was that?

A  It was a couple of farmer related cases. Just to be honest with you, I -- it's been so many years now, it's hard for me to remember. It think it was two cases. It's back when I used to consult in the farming industry. So it would be in the late '90, early 2000 time period. One I believe was a case concerning Pfizer Pharmaceutical.

Q  Were they Fair Labor Standards Act cases?

A  No. It was regarding the content of the message that the salesperson was communicating to a customer.

Q  Okay. So you've never testified, other than this Ecolab case, in any other cases involving the Fair Labor Standards Act?

A  I have not, no.

Q  Have you ever read the Fair Labor Standards Act?

A  I haven't read it, no.

Q  Have you ever read the regulations bearing on the issue of the outside sales exemption?

5 (Pages 14 - 17)

Page 18

A   I have not read it, no.

Q   Okay. What was your assignment in this case? What were you asked to do?

A   I was asked to determine under my training and expertise and understanding of what selling is in the profession, whether this job constitutes a sales job.

Q   And what did you do to reach your opinions you've expressed in this case?

A   I -- I went through a considerable amount of material, including all the depositions. They're listed -- first of all, they're listed in my expert report. But in that expert report I went through all the depositions -- or maybe not all, but I'm not sure. But you'll see the depositions I went through -- of a large number of individuals that -- everyone that's involved in the case from an IC perspective as well as some current ICs. I read information in the testimony of Richard Teixeira from -- works in marketing specifically for Just Energy; Dennis Piazza, who's the regional distributor. I went through all the information on the scripts that are provided to these individuals, the marketing materials that are provided. I went through the information on the contractor agreements. I requested and went through detailed information on all the advertisements that are used to

Page 19

recruit individuals, and as well as the commissioned reports of -- I'm trying to remember -- Davina Hurt. I went through her commission report. And I followed the scripts to be able to determine if they followed a standard sales process within the business.

Q   Did you list on -- in your report all the materials that you reviewed in connection with this case?

A   Yes, I have.

Q   Okay. So there's nothing else outside of those that you reviewed in reaching your opinions?

A   No. It's all -- I -- I double-checked it yesterday. It's everything. Um-hum.

Q   Okay. Before we go too much further, I'm going to show you what we marked as Ahearne Exhibit 1, which is a copy of the CV that you attached to your expert report. Do you recognize that, sir?

(Marked Ahearne Exhibit No. 1.)

A   Yes.

Q   (By Mr. DeRoche) It says in the front "short bio."

A   Um-hum.

Q   Why does it say that?

A   Usually what I do when I submit this for -- I do a lot of speaking engagements for major corporations

Page 20

where I come in and speak on the topic of sales or sales force effectiveness and/or when I go to be able to speak at other universities and present my information about my research, they like to request a short bio as part of my CV so that they can read information or background on me. So I provide that as part of my CV.

Q   Do you have a longer CV than this?

A   No. This is a full CV, but I've appended to the front of the CV a short bio.

Q   When was the CV prepared? What's the date?

A   I don't know when it was marked on here, but I believe it was a few weeks ago, a week and a half ago. There's no -- there's no updates.

Q   No updates to this?

A   No, no.

Q   Have you ever spoken at a energy company such as Just Energy?

A   I have not, no.

Q   Do you understand the business of Just Energy?

A   I understand it fairly well. I don't understand it in great detail.

Q   Have you ever consulted with any companies like Just Energy, in other words any of their competitors?

A   I have not, no.

Page 21

Q   Have you ever worked going door to door registering folks who may want to change their energy?

A   I have not been in the energy business, no.

Q   You haven't worked in the energy business at all?

A   I've done a direct selling business where people go door to door to be able to make sales, and I've worked with a number of companies in that space.

Q   What companies in that space have you worked with?

A   Well, first of all I have to be very careful here because I'm under confidentiality agreements with a number of those companies about what I do and what I don't do. But I can say that in broad -- in broad terms companies that sell, for example, books or encyclopedias. I work for companies that sell cosmetics.

Q   Door to door?

A   Some of them door to door, some of them through parties and meetings and events and things of that nature.

Q   Sort of pyramid selling operations.

MS. PATTON: Objection; form.

A   They call it direct selling -- the direct selling industry.

6 (Pages 18 - 21)

Page 22

Q  (By Mr. DeRoche) Other than the books, encyclopedias, and the cosmetics, any others?

A  Insurance sales.

Q  Door to door?

A  Some of it prospecting door to door, yes.

Q  Is there a difference between prospecting and selling?

A  Prospecting is one of the -- one of the stages of a sales process. It's part of selling.

Q  Are there individuals who qualify as lead generators as opposed to salesmen -- salespeople?

A  There are companies that split the task of lead generation and sales.

Q  What does a lead generator do?

A  A lead generator is a salesperson that goes out and -- well, it can be sales and it can be marketing. But a person who identifies potential customers for the firm.

Q  Are lead generators salespeople?

A  In some cases I would consider them to be salespeople. In some cases I would consider them to be marketing.

Q  In what distinction -- what's the distinction?

A  It -- is it okay if I provide you an example? I think that would be the easiest thing for me to do

Page 23

for you.

Q  If you can do it quickly.

A  Okay. Certainly. So a marketing department could be a lead generation department by going through databases and financial records and identifying potential, you know, households, in this case for example, or individuals that would be most ripe for conversion. Okay? That might be a lead generation. And then they would send a salesperson out to a targeted household. That would be a lead generation.

Another lead generation could be a -- an inside salesperson that is a person who works inside the company that calls around to houses and sees if the houses would be interested in speaking to a salesperson to find out more information about a product or service. And once they did, that would be a lead generation. But those are typical lead generation types of situations.

Q  Okay. So lead generators identify potential customers who may at some point be the subject of a contract or a sale?

A  They -- they help to identify and screen people to be -- that are interested, yes.

Q  Okay. What process did you follow in rendering your opinions in this case?  What do you do?

Page 24

A  Oh, okay. So I did outline it in my -- in my report. What I like to do is I like to go through my first -- my first thing that I like to do when I look through to determine this kind of information is first the biggest thing that I look to is what was the process or the information that would be the role of the individual that's out there when they're facing the customer. First, do they face the customer and what's their role. So looking at information, for example, the testimonies of what people did when they interacted with customers. Did they follow what I would deem a typical sales process; that is, they approach the customer and build rapport with the customer; they identify needs of the customer; and then they -- then they give information about -- that helps to satisfy those needs; they negotiate, which is they overcome objections; and then they follow to commitment stage, which is a close stage.

So I went through all the materials in there, and then I went through the training materials which I think is very important for that. I made sure that the firm itself is training on that information and providing a supporting mechanisms for that. I looked to the compensation structure that an individual receives, whether it reflects a typical salesperson's

Page 25

compensation structure. I looked to the tasks and duties that the individual engages in. And -- and also -- and also how they're managed as well.

Q  How much time have you spent in connection with this case?

A  Approximately 70 to 80 hours.

Q  And what's your hourly rate?

A  $650 an hour.

Q  Have you billed for your work?

A  I have not.

Q  Did you do any research in connection with developing your opinions?

A  I did.

Q  How much time was spent on that?

A  I -- I would have to go back to my records to be able to look at that in particular, but I'm guessing from my research it would be somewhere in the order of 10 to 15 hours.

Q  What did you do in connection with research?

A  I -- I went through academic literature to be able to look at articles concerning sales process; compensation; information concerning scripts -- so scripting was a big area that I looked at -- information concerning variable compensation to be able to find out whether everything here was consistent with

7 (Pages 22 - 25)

Page 26

all that work in that area.

Q  Okay. Did you consult with anybody in connection about your work?

A  I did not, no.

Q  After, you said you had a 20 minute conversation with Shannon in December; is that correct?

A  Yeah, that's correct.

Q  When was your next conversation with anybody in connection with this case?

A  Approximately three weeks later I had a follow-up conversation with her.

Q  Did you receive material in the meantime?

A  Yes. I received a CD with -- with information at that time.

Q  Okay.

A  Previously.

Q  And what information was on the CD?

A  The -- some of the depositions of the original parties that were involved. The information -- deposition of a Richard Teixeira, Dennis Piazza, info -- the training information and the training manual as well as script information and then in the verification process.

Q  And then during this three week -- this conversation rather, three weeks after the first

Page 27

conversation, tell me about that. What was said during that conversation?

MS. PATTON: Objection. You can testify to the extent I shared factual information with you.

A  I -- in that conversation we spoke briefly about whether I would be willing to take on the case and I had time to take on the case. Then at that point we talked about my schedule and availability for timing in this time of year for depositions and trial and things of that nature. We talked briefly about my perceptions of -- of the information in the -- in the case. And then she asked me if -- and I said that I would be available to work on it and that I found the -- I found the content interesting when I read through it and that just to reflect back when I had first -- she had first asked me, I said that I wasn't sure whether I would be interested in doing this or not. I said that I may be. And so she provided me the information so that I could go through it all to make sure that I -- that I felt like this was something that I would be interested in work on.

And so afterwards we were checking back to make sure that I was, in fact, interested in going forward and working on this particular case.

Q  Okay. I see.

Page 28

A  And then she asked if there was any additional information that I'd like to request.

Q  Okay. Did you request any additional information?

A  I did, yeah.

Q  What did you request?

A  I requested any additional -- I requested additional information regarding the advertisements that were used to recruit people, and I was given a large amount of information on advertisements. And I asked for any additional information there was on training and scripting with regard to Dennis's area in the Ohio market.

Q  The what? I'm sorry.

A  Piazza's area, yeah. I had read through his testimony in some detail. I wanted -- him and Richard. And I wanted to make sure that I had all their materials that they utilized in their market.

Q  Okay. How do you keep track of your time in connection with this case?

A  I use a spreadsheet.

Q  How do you track your time?

A  Every 15 -- in 15-minute increments.

Q  Do you do narrative descriptions of what you're doing in connection with the case?

Page 29

A  No. I do timestamps. That's it.

Q  Timestamps meaning?

A  When I started and when I ended.

Q  So you have no narrative description of what you were doing during that time?

A  I -- I don't have that, no.

Q  Did you ever shadow a registration agent for Just Energy?

A  I did not.

Q  Did you ever attend an orientation?

A  I did not.

Q  Did you consider the level of supervision of the registration agents in connection with reaching your opinions?

A  Yes, I did.

Q  In what way?

A  In the testimonies they discussed considerably the amount of supervision that was going on. And each in -- the different ICs discussed this.

Q  What was your understanding of the level of supervision provided to the registration agents?

A  Well, first of all I was -- my understanding was that the individuals were given a considerable amount of training from a sales standpoint that is coaching. So when they came in in a early basis, they

8 (Pages 26 - 29)

Page 30

were doing hours at a time of coaching them through the process to be able to help them understand how to sell and to convert the sales.

Q Can you -- I'm going to kind of stick to the question I asked, which was your understanding of the level of supervision provided to the --

A That's -- in my mind coaching is a large part of supervision because it enables a person to send -- in a sales job communicate the message that the firm is interested in communicating to a customer.

Q You're talking about supervision once they start the role of registration agent? So you're speaking about when they're engaging with customers?

A No. I'm talking about when they're actually doing their job as opposed to receiving orientation in advance of doing their job.

Q Oh, okay. When they are doing their job, my understanding also is that they are still going through role plays in that period as well?

A That's my understanding.

Q How often?

A On a periodic bases. Some of the more -- some of the ones that aren't doing quite as well get more role playing and more coaching. Other ones that are doing better and converting more sales are less or are

Page 31

deemed need less backing, get less of it.

Q Where was that fact gleaned?

A It came up mainly in Dennis's deposition, but it also came up in a number of the other depositions of the independent consultants talked about the coaching that they would go through and how they would role play.

Q Who controlled the registration agents work schedules? Them or the company?

MS. PATTON: Objection; foundation. If you know.

Q (By Mr. DeRoche) You can answer.

A I believe they controlled their work schedules.

Q And you base that on what?

A Just the fact that they decided when they were going to come into the office, and they were given guidance, but they decided when they were coming in and when they were going to leave. But they were also given the flexibility of being able to work in certain territories or not or different days or not.

Q So you assume that the registration agents were the ones who determined their work schedules in connection with your rendering of your opinions?

A No. I understand that they were given guidelines on when they are supposed to come in and how

Page 32

often they were to come in. But in my mind that would be irrelevant to whether it's a sales job or not. Many sales -- many sales positions are asked to come in at a certain time of day, asked to stay a certain period when customers come and/or when customers are available, and are monitored to different extents. So I just -- rendering my opinion, that part of it, is somewhat irrelevant.

Q So you say the level of supervision provided is irrelevant to you?

MS. PATTON: Objection.

Q (By Mr. DeRoche) You can answer.

A I believe it's of little relevance to whether it's a sales position or not.

MS. PATTON: The work schedule?

THE WITNESS: Yes. I'm --

MR. DEROCHE: I'm going to ask you not to interfere, Shannon. You want to object, then say the word "object" and they be quiet. If you keep interfering, we're going to call the Court. And you know what happened last time you did that. You want to have that happen again, keep it up?

MS. PATTON: And I don't mean to interfere, but please don't misstate the testimony.

MR. DEROCHE: Well, I would say I'm not

Page 33

misstating. I'm asking questions. I'm not stating testimony. All right? So with all due respect say "object" and then be quiet.

Q (By Mr. DeRoche) Who dictated the days and the times that the registration agents could work?

MS. PATTON: Objection. If you know.

A I -- my understanding is that it was -- they were given recommendations on when they would come in through the team at -- in the Beechwood office about when they came in and the flexibility of when they would work. But I -- I don't know this for a fact.

Q (By Mr. DeRoche) Okay. Did you -- so you didn't assume that one way or the other in rendering your opinions?

A No.

Q Okay. Who dictated where the registration agent's went to knock on doors?

A I mentioned this in my report specifically. I know this was something that came up quite a bit, but they were brought to certain neighborhoods to be able to go out and asked to focus on certain neighborhoods or territories.

Q And you found that to be the consistent -- the most of the testimony and you assumed that in rendering your opinions?

9 (Pages 30 - 33)

Page 34

A  I assumed that there was some -- I assume that that was part of -- I don't know for a fact that that's what everybody did, but I knew that that was one of the practices that was utilized.

Q  Okay. Do you know whether or not it was the standard practice throughout the company?

MS. PATTON: Objection.

A  That, I don't know.

Q  (By Mr. DeRoche) You didn't make an assumption one way or the other on that?

A  No, I did not make an assumption that that was standard practice.

Q  Okay. And in terms of rendering your opinion, I assume that you rendered an opinion with respect to the class as a whole? In other words, all the plaintiffs that are involved in this case; is that correct?

A  Yes. Yes.

Q  So you didn't make a distinction between offices, for instance? No geographic distinction in your report, as I could see?

A  I rendered an opinion based on the information that I was provided and I asked for which is -- which is a sizeable amount of information about their -- about them and their work.

Page 35

Q  What I'm saying is there is no geographic distinctions that you made?

A  No.

Q  And no office distinctions that you made?

A  No.

Q  And you were comfortable doing that in terms of rendering an opinion that applied throughout the company as opposed to any particular geographic location?

A  I -- the -- one of the geographic -- the geographic location and much of the testimony focuses on is the Beechwood office.

Q  That wasn't my question, sir. I'm asking you if you were comfortable rendering an opinion that covered the entire geographic scope of the company at issue in this case.

A  I -- yes, as far as the -- whether they're a sales position or not? Absolutely, yes.

Q  Okay. How many days per week did the registration agents work on average?

MS. PATTON: Objection; foundation. If you know.

Q  (By Mr. DeRoche) You can answer.

A  My guess is it's variable, but I don't know.

Q  Your guess is? So you have no information on

Page 36

that?

A  All -- all I have is the testimony of the individuals. I don't have any records to be able to look at of the days -- of the days they worked.

Q  So you didn't make any -- any -- didn't consider how many days per week on average they worked in rendering your opinions?

A  I did know that -- I did consider it. I know that some of them stated that they worked a number of days per week, six days per week many of them worked or some of them said that they worked every day per week. Some of them said they worked less than that. And that's a -- to me that's very typical of a sales job that some people work more, some people work less. Yes.

Q  So you didn't make an assumption as to an average days per week in rendering your opinions?

A  I didn't make an assumption on that.

Q  What hours do they generally work?

MS. PATTON: Objection; foundation. If you know.

A  I don't -- I don't know the exact times that they worked.

Q  (By Mr. DeRoche) Were the registration agents required to report to the office in the morning?

Page 37

A  There was some testimony saying that they were. But I can't say for a fact that they were. That was what they stated.

Q  So that wasn't something that you considered in connection with rendering your opinions?

A  I did consider whether they were asked to report to the office in the morning. And I think that that's not unusual for a sales position for them to come in and get some information about where they're targeting and coaching and things of that nature.

Q  It reflects a higher level of supervision than is found in the number of --

MS. PATTON: Object.

MR. DEROCHE: If you're going to object, hold on one second. Let me finish my question. You can note an objection. And then we'll have an answer. Let works on that.

MS. PATTON: I apologize. I thought you were finished.

Q  (By Mr. DeRoche) All right.

A  Could you restate, please?

Q  Yes. Reporting to the office in the morning and being told to do so reflects a level of supervision that is applied to the registration agents, correct?

A  The reporting to the -- in the morning and

10 (Pages 34 - 37)

Page 38

being asked to do so is what some of the sales agents said that they were -- was the case that they were asked to do. And what my point is is that that is not unusual that a salesperson is asked to report to an office at a certain time in the morning.

Q  That's not my question. It reflects a level of supervision, correct?

A  Yeah, absolutely.

Q  Okay. Were they prevented from working independently? Registration agents.

MS. PATTON: Objection; foundation.

Q  (By Mr. DeRoche) If you know one way or the other?

A  My understanding is they were not.

Q  They were not prevented from doing so?

A  That's my understanding.

Q  Did you assume that in rendering your opinions?

A  I did not assume -- first of all that would not make a differences to me whether it was a sales position or not. But I did not assume that.

Q  You did not assume that. So you didn't consider it one way or the other?

A  No. That wouldn't reflect -- that wouldn't make a difference in my opinion.

Q  Were registration agents assigned a particular

Page 39

route by the company each day?

MS. PATTON: Objection; foundation. If you know.

A  Some of them stated that they were assigned a route, and -- and that's very typical of a sales position.

Q  (By Mr. DeRoche) So you assumed that they were assigned a route?

A  I -- I assume that there's a possibility that their job was -- I -- see, some of these things that you're bringing up, for example, on the routes and showing up and things, I have yet to see explicit documentation from the company or from the individual showing that -- that this has actually happened. I have to base it on my testimony that they're stating that this is what they did. So I did consider the fact that it -- if -- even if these were the conditions, would it still be a sales position. And I would say, yes, that would still be a sales position. If they were asked to show up in the morning, if they were -- if they were given a specific route, absolutely that would still be a sales position.

Q  Given -- being given a particular route by the company reflects supervision by the company, correct?

A  It -- it's -- given a route by a company is --

Page 40

is good practice by a company. And, yes, it does help on supervision.

Q  It reflects supervision, correct?

A  It does, yeah.

Q  Okay. Did the company control the registration agents' break time?

A  I'm not aware of that.

Q  You don't know one way or the other?

A  I don't know, no.

Q  If they did, you would agree that that reflects supervision, correct?

A  Yeah. That would be part of supervision.

Q  Were the registration agents provided a list by the company of the doors they were to knock on on a particular day?

A  That, I'm not aware of.

Q  If they were given a list of that sort, that would again reflect supervision, correct?

A  It would be supervision, yes.

Q  Were the registration agents told what times they could take breaks and how long those breaks could be?

A  I'm not aware of that.

Q  If they were told that, that would again reflect supervision, correct?

Page 41

A  Yes.

Q  The registration agent is required to purchase and wear Just Energy branded clothing?

A  Yeah. I was told that they were not required to, but they were suggested that -- strongly suggested that that's a good strategy for them.

Q  So do you assume that they were required or not required in rendering your opinion?

A  There was variable information in the testimony about that. So I couldn't assume that that was for sure the case, but I think they -- the majority of them did wear the clothing.

Q  If they were required to purchase the clothing, then you would agree that that reflects a level of supervision, correct?

A  I don't know that that's supervision.

Q  You don't think so?

A  No, not really.

Q  Did the registration agents typically earn pay well above the minimum wage?

MS. PATTON: Objection; foundation.

Q  (By Mr. DeRoche) If you know.

A  I don't have information about what their average pay levels were.

Q  So you have no information as to whether or not

11 (Pages 38 - 41)

Page 42

they on -- typically earned above the minimum wage or not?

A   I don't have the documented number of hours that they've worked.  And I don't have -- so it's hard for me to be -- I can't really determine that.

Q   Well, I'm saying -- I want to make sure I'm clear.  You have no information one way or the other?

A   No, I don't.

Q   And you didn't consider that in rendering your opinions?

A   I did not consider that, no.

Q   Do you know how many worked at least two weeks for the company and earned nothing?

A   I don't know the answer to that.

Q   Do you know how many worked at least two weeks and earned less than $2 per hour?

A   That, I don't know.

Q   Do you know how many earned less than $4 per hour?

A   No, I don't know that.

Q   Same question $5 per hour?  You have no idea?

A   No, I don't.

Q   What was the average monthly earnings of workers -- of the registration agents who worked at least a month?

Page 43

MS. PATTON: Objection; foundation.

Q   (By Mr. DeRoche)  You can answer.  Do you know?

A   I don't.  I don't know the answer to that.

Q   Can you explain your understanding of what the orientation entails that registration agents go through?

A   Yes.  They're given background on the product and services provided by Just Energy.  They are brought through training on the scripting and strategies by which they engage customers.  They are given information about what a -- what their job would entail.  And they're tested on the material to be able to make sure that they're retaining and understanding the material.

Q   Is it a graded test?

A   I believe it's -- it's evaluated by the management, by their managers.

Q   Where did you get that from?

A   From the testimony.

Q   Whose testimony?

A   It was from Dennis Piazza's testimony, if I recall.

Q   How long is the orientation?

A   A couple of days.

Q   Couple.  Two days or three days?

Page 44

A   Two days.

Q   Two days.  How many hours?

MS. PATTON: Objection; foundation.  If you know.

A   That, I don't know the answer to.

Q   (By Mr. DeRoche)  You said there was some sales training.  How long is that sales training?

MS. PATTON: Same objection.

A   It's part of that total training; some of it product, some of it sales.  So I'm not sure what the breakdown is.  I would also just -- just note that for the sales training, the role playing which occurs is also part of the sales training process, which is an ongoing process.  It's peer as well as manager role play.

Q   (By Mr. DeRoche)  And you don't know how often that happens?

A   According to the testimony that I read, it happens quite a bit.  And my evaluation is that that would be higher than -- than many sales jobs.  There's even more role playing at -- which is excellent.  It's part of getting a person conditioned to the sales process.

Q   So you assume that role playing was extensive?

A   Done on a regular basis.

Page 45

Q   For all registration agents?

A   The majority of registration agents, yes.

Q   When you say majority, what do you mean by that?

A   I would say from what I understand some of the registration agents that were more effective or more seasoned would do less role playing, but would help some of the more junior or less effective agents as well.

Q   When you say majority, what do you mean?  Again, what do you mean by that?

A   I would say the -- I would say almost all if not all of them.

Q   Almost all?

A   Um-hum.

Q   So almost all of them would have had to report to an office in the morning in order to do that, right?

A   Yes.

Q   And you say you assume that almost all of them did that?

A   I'm assuming that that was the case, that many of them did that, yeah.

Q   You said many.  You said almost all a minute ago.  Which one is it?

A   I -- I don't know the precise amount.  So I

12 (Pages 42 - 45)

Page 46

would be guessing at that.

Q   I'm not asking for a precise amount. Almost all. And then you said many. So is it almost all or is it many?

MS. PATTON: Objection. I'm not sure -- speculation.

A   I think "many" and "almost all" overlap with one another or "almost all" is a little more specific than "many," but --

Q   So which one do you want to go with?

A   I would say the almost all.

Q   Okay. In your report you referred to negotiation. What do you mean by negotiation?

A   Negotiation is one of the steps of the sales process. It's when a person has objections. So when they come up with reasons why they won't use the product or service and the salesperson attempts to overcome those objections in order to close the sale.

Q   Well, in your report you broke that down to overcoming objections as a separate function or role as opposed to negotiation.

A   It's part of the negotiation process, overcoming objections.

Q   The negotiation entails a back and forth on the terms of a deal, correct?

Page 47

A   Negotiation is broadly classified. And I can tell you that, for example, in my book I have a whole chapter on negotiation, but one of the aspects of negotiation is objection handling.

Q   Do you know if -- what kind of negotiations the registration agents get involved in?

A   I would -- well, it sounded to me and based on the material I read as well as the testimony I saw, it would be things like: I have to wait until my husband gets home, or I have to ask -- get some more information before I do this. And then -- or I'm not clear about -- let me do some more research on your service. And those are objections. And then the individual would try to overcome that objection so that the person would move on and make a commitment.

Q   So you consider that negotiation?

A   That is yes.

Q   Do registration agents have any authority to negotiate the terms of the -- of an agreement with the homeowner?

A   No.

Q   Do registration agents have the right to go and get involved in any back and forth over the terms with any particular customer?

MS. PATTON: Jim, I'm going to object to

Page 48

the use of the term "registration agent" just as -- And I'll leave that as an ongoing objection.

MR. DEROCHE: Fine.

A   No. But I -- I want to clarify the fact that that's not typical in sales jobs that a person has that capability. In fact, I would say that's atypical.

Q   (By Mr. DeRoche) Do the registration agents have any right to vary the terms of a contract with a homeowner?

MS. PATTON: Objection; asked and answered. But go ahead.

Q   (By Mr. DeRoche) You can answer.

A   Not that I'm aware of. And, again, that's not typical.

Q   Do registration agents have any say in whether or not Just Energy accepts any particular proposal from a homeowner?

MS. PATTON: Objection; foundation. If you know.

Q   (By Mr. DeRoche) You can answer.

A   No. They don't have a say, but they do have the ability to verify information prior to submitting to the verification process which would enhance the probability of it all going through.

Q   Proceeding through the verification process

Page 49

does not guarantee that a contract is going to be formed, correct?

A   No. There are other conditions by which -- yeah.

Q   Okay. Does Just Energy have unfettered discretion to accept or reject any proposed contract?

MS. PATTON: Objection; foundation.

Q   (By Mr. DeRoche) You can answer.

A   My understanding is they have a wide ability to reject.

Q   They have unfettered discretion? Are you aware of that? Assume that that's the case.

A   I'm assuming that they have total discretion to accept or reject a customer.

Q   Okay. Do registration agents have any input with any local utility in terms of whether or not the local utility accepts any proposed contract?

A   Not that I'm aware.

Q   And after the registration agents obtain a signed registration and dial the phone for the verification call, do they have any further interaction with the customer at any level?

MS. PATTON: Objection; foundation.

Q   (By Mr. DeRoche) You can answer.

A   Not that I'm aware of.

13 (Pages 46 - 49)

Page 50

Q Okay. Are they allowed to be present during the verification call?

A I do not believe so.

Q In your report you state that the registration agents ensure prospects are fully sold and initiate the verification call which represents the close. What exactly do you mean by that?

A They make sure that the person has confirmed that they want to move forward and be able to use Just Energy and Just Energy services and they verify that the person is qualified for that to the best of their ability. And -- and as I mentioned in my report, this is very typical of sales positions ranging from, you know, very high end positions like Xerox and IBM where a salesperson at Xerox and IBM could sell a very high end piece of equipment to another company and then Xerox and IBM hold the discretion of whether they want to finance that deal or not. They could reject it at any period. Yet those are the --

I mean, this is very typical of sales positions that there is the ability of the firm on the other side to reject a deal that's made by a salesperson; automotive industry, insurance industry, financial services industry. It's -- it's not even a question in my mind that that affects whether the

Page 51

person is a salesperson or not.

Q Do you know if that's a -- the ability of the company to unfettered -- have unfettered discretion to reject any proposed contract, if that's a factor in determining whether or not the outside sales exemption applies? Do you know one way or the other?

A Whether -- whether I would classify it as a sales position, then I -- that -- that -- I don't -- I don't -- I'm trying to understand your question. Could you -- that's --

Q Let's ask it again. Do you know whether or not the company's unfettered discretion to accept or reject any particular contract is a factor in determining whether or not the outside sales exemption applies under the Fair Labor Standards Act?

MS. PATTON: Objection.

Q (By Mr. DeRoche) Do you know one way or the other?

A I believe that's a legalistic issue, and I --

Q So the question is you don't know -- I mean, the answer is you don't know if that's a factor?

A No, I don't.

Q Okay. You say that the verification call represents the close; is that correct?

A No.

Page 52

Q What represents the close -- a close?

A I -- the close is when the salesperson themself finalizes the agreement with the customer before they move forward with the verification call. I consider the verification call the anti -- the -- a point where the company decides whether they want to retain the business or not retain the business. But they're sold --

Q But that is the point when that decision is made, is it?

A Absolutely. The -- the decision is made with the customer to move forward before they -- before they accept that call and they go on that call. And then the following steps afterwards, if anything, they just invalidate a sale. They never engage a sale. So they're not really a part of the sales process.

Q Again, I want to make sure we're clear. If someone goes through the verification call and passes, does that mean there's a contract between the homeowner and Just Energy?

A No. There's additional steps.

Q So the deal isn't consummated at the time their verification call is completed; is that correct?

MS. PATTON: Objection; misstates the testimony.

Page 53

Q (By Mr. DeRoche) Is that correct?

A No. My point that I'm -- my point that I'm making to you is that all of these steps, including the verification step, for example, of whether the finances are in place, the step whether the qualification of transition is in place by the company itself or even the fact that the company just didn't want to do business with that individual. All of those are not part of the selling process whatsoever, it's my opinion.

Q Okay.

A Those steps are all steps that the internal organization is determining whether they want to engage further. But the close happened prior to that period. And the sales process happened prior to that period, is my opinion.

Q Is there a contract between the homeowner and Just Energy when the registered agent leaves the home?

MS. PATTON: Objection; calls for a legal conclusion.

Q (By Mr. DeRoche) You can answer.

A There's not a contract that I'm aware of. I don't know.

Q Okay?

A Actually the answer to that is I'm not sure.

14 (Pages 50 - 53)

Page 54

Q Do you know what a contract is?

MS. PATTON: Objection; calls for a legal conclusion.

Q (By Mr. DeRoche) You can answer.

A I don't know the legal definition in this case of a contract.

Q So you don't know one way or the other if there's a contract when they leave?

A I don't know the legal defin- -- I -- yeah.

Q Were the registration agents permitted to tell customers anything about Just Energy that is not in the sales script?

A They were given very specific guidelines of what they were allowed to say and not allowed to say. And -- and they're able to answer questions. Some of them state that the script is -- the script is supposed to be what we call the guidelines -- the guidelines for the way you're communicating, but the script provides them the ability to communicate information in a way that is consistent with the messaging of the company and doesn't violate any mis- -- or send any missed information to the customer.

Q So I guess I've got to get an answer to my question. So were they permitted to tell customers anything about Just Energy that is not in the sales

Page 55

script?

A My understanding --

Q Yes or no?

A Is -- yes. As far as I know.

Q So you assumed that in connection with rendering your opinion?

MS. PATTON: Objection.

Q (By Mr. DeRoche) You can answer.

A I would say that that didn't really come into my opinion.

Q Okay. Were employees allowed to describe Just Energy services in a manner that was different than what's in the sale script?

MS. PATTON: Objection; foundation.

Q (By Mr. DeRoche) You can answer.

A Again, I believe they were able to use the script as a guideline and be able to state things in a way they wanted to state them as long as it was consistent with the information in the script. That was my -- that was what I assumed.

Q Did the employee -- did the employees have the ability to promise customers that they would qualify for the Just Energy service?

MS. PATTON: Objection to the term "employee." And I'll make that standing throughout.

Page 56

Q (By Mr. DeRoche) You can answer.

A Not that I'm aware of.

Q Do employees have the right to accept customer applications?

A Can you clarify what you mean by that?

Q Did they have a right to form a contract on behalf of Just Energy?

MS. PATTON: Objection; calls for a legal conclusion.

Q (By Mr. DeRoche) You can answer.

A again, I'm not sure. I don't have a definition of what the contract is here.

Q Were registration agents permitted to promise any level of savings to a customer?

A Can you -- can you clarify for me what you mean by savings?

Q Savings off their current utility bills.

A I think that that was one of the areas in which they discussed is -- is the possibility of savings. But they weren't able to guarantee as far as I understand.

Q Okay. Were they able to describe the prospect of savings in any manner inconsistent with the sales script?

A They were to stick to very similar verbiages as

Page 57

in the sales script.

Q If you assume that the registration agents were told what to say, were told where to go, how long to work, and when to take breaks, how to stand when approaching a customer, what amount of eye contact to make, and what to say to the customer, would you agree that that reflects a high level of supervision of their activities?

A No, I would say that -- first of all, I don't agree that all of that is supervision that you just said. Some of that is good coaching, to be able to help a person do a better job of being a salesperson. For example, the posture they use, how to stand, how to communicate. That's consistency of message. All of these are just -- not all of them, but the vast majority of what you talked about there are traditional guidelines in sales to get a person to send a good message and communicate things and maximize the chances that the customer will say yes to them.

For example, I mean let me give you an example of --

Q I just want to go back to my question so we can --

A Well, I just want to finish clarifying what I was saying. That's all. Is that okay?

Page 58

MS. PATTON: Please let him finish it.

MR. DEROCHE: He wasn't answering the question. So --

A  You asked me whether that constitutes supervision. I want to clarify why I'm saying that that doesn't constitute supervision.

Q  (By Mr. DeRoche) It doesn't constitute. That's all I need to know whether or not it does or doesn't. And we can leave it at that.

A  Not all of it constitutes supervision.

Q  All right. That's your opinion, correct?

A  Yes. That's correct. Not all of it constitutes supervision, no.

Q  Does Just Energy hire registration agents for their sales experience?

MS. PATTON: Objection to the term "hiring registration agents." I'll leave that a standing objection throughout, but you can answer.

A  They don't hire purely off of experience, no.

Q  (By Mr. DeRoche) Do they hire at all based on sales experience?

MS. PATTON: Objection; foundation.

A  No. That's not one of their screening criteria is sales experience. I actually addressed this in the report just so that we're clear.

Page 59

Q  (By Mr. DeRoche) And you don't know, just so we're clear, whether or not the registration agents typically earn salaries well above the minimum wage or not, correct?

A  I don't know the exact compensation or average compensation.

Q  Do you know anything about that?

A  I do not.

Q  Okay. So the answer is no, you don't know whether or not they earned well below the minimum wage on average? You do not know that?

A  No. As I said previously, I'm not aware of that.

Q  How many doors does a typical registration agent knock on in any particular hour?

MS. PATTON: Objection; foundation.

Q  (By Mr. DeRoche) You can answer.

A  They give them guidelines on -- on -- at least in some of the testimony were guidelines on the number of doors to knock on and how to be able to dress and things of that nature. I heard some guidelines on the total day of 200 doors to knock on.

Q  Okay.

A  And then I heard others say that it just depends on what neighborhood and the efficiency.

Page 60

Q  Do you believe that the registration agents' work would be difficult to standardize in a particular time frame?

A  Can you clarify what you mean by standardized for me?

Q  Yes. After they've stopped -- after they've reached, for instance, eight hours a day, would there be any reason why another person couldn't pick up where they left off in terms of a particular area and knock on the next set of doors? I mean that's possible to do that, right?

A  I -- just to clarify I guess your question is could multiple people take on the same responsibility?

Q  Right, exactly.

A  Yes, it is possible for multiple people to take on the responsibility.

Q  In other words if you knocked on a certain number of doors in eight hours, it would be just as efficient to have the next person step in where you left off and just continue knocking on the doors in the neighborhood, correct?

MS. PATTON: Objection.

A  I would not say that it would be just as efficient because you gain information from that time period in that particular neighborhood where you're

Page 61

starting to see what objections are and how people are reacting and strategies for approaching the door and standing and posturing yourself that are specific to that group of individuals, socioeconomic class, area, things of that nature, that you can use them to be able to continue.

Another thing, for example, that I would say is that if you're able to then get contextual knowledge of how to engage those customers. So I would say that it would be possible for others to come in and start doing that same job.

Q  Um-hum.

A  But just to clarify what you were saying that they could do it equally as well, I couldn't agree with that statement.

Q  Do you believe that the work that is performed by the registration agents is repetitive and predictable?

A  No. It is not predictable at all, but it is a repetitive task.

Q  Did you ever indicate in your report anywhere that it was repetitive and predictable?

A  I didn't -- again, I don't agree that it's predictable. I agree that there are repetitive elements to the task.

16 (Pages 58 - 61)

Page 62

Q So you didn't say that in your report as far as, you know, that it's predictable?

A As far as I'm aware, I don't remember saying that in my particular report.

Q All right. Do plaintiffs -- do the plaintiffs, the registration agents, prepare their own sales presentations and pitches?

A No. They're given guidelines on how to do that.

Q Do they spend any time outside of working hours developing their own pitches or sales presentations?

A They do on -- they work with -- in role plays and coaching with others to be able to refine how they contact and communicate with customers.

Q But other than the role playing that you mentioned in the morning, other than that, any other outside of normal business hours spent working on sales presentations and pitches that you're aware of?

MS. PATTON: Objection; foundation.

(Speaking simultaneously.)

A I can't say whether -- I've not heard whether they do that or not. I have no knowledge to be able to evaluate that.

THE REPORTER: Can I just remind you guys to speak one at a time? Thank you.

Page 63

MS. PATTON: We're really trying.

Q (By Mr. DeRoche) Have you read any decisions rendered in this case?

A I have not.

Q If someone meets your definition of a salesman or making sales, do you believe -- do you know if they qualified for the outside sales exemption?

MS. PATTON: Objection.

Q (By Mr. DeRoche) You can answer.

A Again, I don't know -- I'm not here to address the legal, as far as that's not an area that I'm a specialist on.

Q Do you know what the purpose of the outside sales exemption is and why it exists?

MS. PATTON: Objection; calls for a legal conclusion.

Q (By Mr. DeRoche) You can answer.

A I don't know, no.

Q Do you know what attributes of particular employees who qualify for the sales exemption justify that exemption from the wage and hour laws?

MS. PATTON: Objection; calls for a legal conclusion. And he's not opining on the applicability of the exemption.

Q (By Mr. DeRoche) You can answer.

Page 64

A I'd like you to clarify the question again because I didn't completely get the whole question.

Q Sure. What about particular individuals, what about their job justifies the exemption from the wage and hour laws?

A That --

MS. PATTON: Same objection.

Q (By Mr. DeRoche) You can answer.

A As I said, I'm not an expert on wage and hour laws.

Q So the answer is you don't know what the attributes are?

A I don't.

Q Do you understand that the jury in this case will be given evidence from both sides concerning what the individuals at issue in this case do, how much money they make, how much they're supervised, and so forth? You're aware of that, right?

A I'm assuming that. I'm not aware of that, no. I'm assuming that.

Q Do you believe that the jury does not have the ability to make conclusions on those fact questions without assistant from you?

MS. PATTON: Objection.

Q (By Mr. DeRoche) You can answer.

Page 65

A I believe that the jury could take my input into consideration in making a decision on this.

Q I'm talking about factual findings. In other words findings with respect to level of supervision. How much training is received. Those are fact questions, right?

MS. PATTON: Objection.

Q (By Mr. DeRoche) You're aware of that, right?

MS. PATTON: Objection.

A You're asking me a question that I'm not an expert on.

Q (By Mr. DeRoche) Okay. I'm just trying to figure out in what way you are to be assisting the jury?

A I -- I -- I will be -- I'm -- I perceive myself to be assisting in the process of understanding what an expert in the field of both academic and in the field of selling would constitute a sales job. And my -- and I believe my testimony would be very helpful in everything here in understanding what would a typical sales job -- what would the classification of a sales job would then a -- would a reasonable person within academia and within practice would state was a sales job. And I just -- I think that I've laid out the information in the report in a way that could assist in

17 (Pages 62 - 65)

Page 66

that -- in that determination.

Q  So you're discussing whether or not particular types of activity would be considered sales as you would understand it in the sales industry and in academia?

A  That's correct.

Q  And you don't know whether or not the standards that you apply in making that determination are the same standards that bear on the issue of whether or not the outside sales exemption applies in this case; is that correct?

A  I think that that's a -- that's a legal question to be determined. And my input could be part of determining that legal question.

Q  Again, do you know if the same standards are applied by the court in making the determination of whether or not an outside sales exemption applies that you apply in rendering your opinions? Do you know one way or the other? Yes or no?

MS. PATTON: Objection; asked and answered.

A  As I -- as I said, I believe you asked me. I believe that my opinion could be used to guide in the determination of whether the tasks and duties as I've laid out analyzed are that of a typical salesperson.

Page 67

Whether those -- whether that maps on exactly to what the laws are saying, that's a determination to be made.

Q  Does it map on it at all? Do you know one way or the other?

MS. PATTON: Objection.

A  As I stated, I'm not an expert. That's not what I'm here to say.

Q  (By Mr. DeRoche) I'm asking do you know one way or the other?

A  No. That's not my expertise.

Q  Have you ever read the regulations under the Fair Labor Standards Act that apply to the outside sales exemption?

MS. PATTON: Objection; asked and answered.

A  We went through that earlier.

Q  (By Mr. DeRoche) I asked you about the statute. I didn't ask you about the regulations.

A  Okay. Fair enough.

Q  It wasn't asked and answered despite counsel's interjection.

MS. PATTON: Objection.

Q  (By Mr. DeRoche) So I'm asking: Have you ever read the regulations?

A  No, I have not.

Page 68

Q  Have you ever read any decisions of the US Supreme Court that sets forth the standards to be used by a factfinder in determining the question of whether or not the outside sales exemption applies?

A  I've read some information on this in -- with regard to the pharmaceutical industry, and the Supreme Court decision on this. But, again, this is not an area that I'm an expert on.

Q  What decision have you read?

A  I don't remember the exact details of the decision, but when the case came out about whether pharmaceutical sales representatives met the standard for exemption in their positions, I read all the news media's about that. And I read some of the information in the cases about that. But that's the extent to which I'm familiar with that information.

Q  So you don't know what else, what specific elements, have been laid out by the Supreme Court in determining whether or not the sales exemption applies?

A  I'm not -- I know a little bit of information. I'm not an expert on that area.

Q  Do you know anything -- do you know anything about the standards?

A  No.

Q  Okay. Are you aware that the federal judge in

Page 69

this case already made rulings that instruct the parties on what standards they're supposed to use in deciding the question of whether or not the outside sales exemption applies? Are you aware of that?

MS. PATTON: Objection.

A  I was -- no.

Q  (By Mr. DeRoche) Okay. So I take it from that answer that you don't know what -- what particular factors were considered by the Judge in rendering a determination on the exemption itself?

A  I -- I don't know the details of how the Judge went through the process.

Q  You don't know anything about it, do you?

A  No.

Q  Okay.

MS. PATTON: Objection.

Q  (By Mr. DeRoche) Now, as I understand it, you've been engaged in one other litigation matter in your life, correct, in terms of being an expert?

A  For -- on providing expert testimony, yes.

Q  Okay. Do you know what the limits are on what an expert can do and can't do in terms of testifying in court?

A  I don't have all the details on that, no.

Q  Do you have any details on that?

18 (Pages 66 - 69)

Page 70

A   No.

Q   Is it the -- is your purpose as an expert to help the jury understand and reach conclusions on the question of whether or not the individuals in this case are highly supervised?

MS. PATTON: I'm sorry, Jim. Could you repeat that? I didn't get it.

A   I --

Q   (By Mr. DeRoche)  Well, you're not answering the questions. So I'm not going to worry about you.

MS. PATTON: Could you read it back for me please, just so I understand.

Q   (By Mr. DeRoche)  I can ask it again so you don't have to read it back.

Is your purpose as an expert to help the jury understand and reach conclusions on the question of whether or not individuals in this case are highly supervised?

A   No. As I stated in the beginning my purpose is to guide in the determination of whether the job that the individual's engaged in is, in fact, a sales position.

Q   As recognized in academia?

A   As I -- as I would say a normal standard of what that definition would be in practice and in

Page 71

academia.

Q   So the answer to my question is, no, you're not?

A   That you framed it, you asked me what my mission was. That's my mission.

Q   Is it your intention as an expert in this case to help the jury determine whether or not an individual in this case received a certain level of wages or compensation?

A   No. I'm not -- I'm not an expert in that, no.

Q   Is it your intent as an expert in this case to help the jury understand whether the individuals in this case received a certain amount of training?

A   Yes, I did provide in my report details about the type of training and the extent of training that they received regarding the sales position. So, yes, that is part of what my role was.

Q   Well, I understand you're opining as to in your opinion what that means in terms of the training they received. You're assuming a certain level of training.

A   I was given documentation about the materials that they were asked to read --

Q   I understand.

A   -- scripts they were given. So those aren't assumptions; those are facts.

Page 72

Q   I understand.

A   Yeah. So that was going through that material.

Q   But in terms of those facts, you're not helping the jury reach a conclusion as to whether or not those facts are true or not?

A   I'm helping them to reach a conclusion as to whether those documents are consistent with a typical salesperson would have for them in their training materials for them to be able to be effective with their job.

Q   So the fact of how much or the amount of training received is not something that you were assisting the jury in determining?

MS. PATTON: Objection.

Q   (By Mr. DeRoche)  Simply making -- rendering opinions as to what that amount of training means?

MS. PATTON: Objection; asked and answered.

Q   (By Mr. DeRoche)  You can answer.

A   I'm rendering an opinion as to whether the content of the training and the amount of training is consistent with that of a sales position, and that's what I'm rendering an opinion on.

Q   Is it your intent as an expert in this case to help the jury understand whether individuals in this

Page 73

case had certain sales background or experience in the sales field before working for Just Energy?

A   It is my intention to be able to clarify that matter of whether having experience prior to or not is -- is typical in a sales -- in an entry level sales position.

Q   I understand your opinion is it doesn't matter in terms of whether or not in your view someone is a salesperson. But you're not helping them understand the fact of how much sales experience was required. You're assuming --

MS. PATTON: Objection.

Q   (By Mr. DeRoche)  -- that fact in your opinion, correct?

MS. PATTON: Objection; asked and answered.

Q   (By Mr. DeRoche)  You can answer?

A   Since I -- since I was not given the summary information about everyone's amount of sales experience, I -- I did provide -- did get, however, the depositions of the -- of the parties in the matter that many of them had had prior sales experience or had sold previously in -- in their prior -- in prior positions. And some of them, in fact, had sold specifically in similar types of positions.

19 (Pages 70 - 73)

Page 74

Q   Does the lack of hiring individuals based on prior sales experience suggest that an individual is or is not subject to the outside sales exemption?

MS. PATTON: Objection; calls for a legal conclusion.

Q   (By Mr. DeRoche) You can answer.

A   As -- just to answer your question, as I -- as I stated in my opinion a person not having sales -- there's a number of reasons why in a sales job that a person would not have prior sales experience.  And companies look for people without prior sales experience.  One of which is the fact that they want to train the individual on good selling skills and capabilities for their company and not take on bad examples or unethical examples from other companies.

Q   All right.

A   Another one would be that the individual could become more effective in selling their particular products because they get training specifically on how to sell those products.

Q   Let's go back to the question I asked.  Does the lack of hiring for prior sales experience suggest that an individual is or is not subject to the outside sales exemption?  Do you know one way or the other?

MS. PATTON: Objection.  Calls for a

Page 75

legal conclusion.  He's not -- that's outside the scope of his --

MR. DEROCHE:  Your objection is noted, counsel.  You can be quiet now.

A   The answer to that question is, is if the determination that's being made, if they meet the exemption, if my information that I'm providing of whether that's typical of a sales job helps in the guidance of the determination of that -- of that, then I believe that my opinion on that would be relevant.

Q   Do you know one way or the other if hiring for prior sales experience bears on the issue of whether or not the exemption applies?

MS. PATTON: Objection; asked and answered.

Q   (By Mr. DeRoche) You can answer.

A   As I said that I -- I do not know the extent to which that would impact it, but I would hope that in understanding --

Q   That's all I'm asking you, sir.  You can give a yes or no answer on that.  Do you know one way or the other?

A   I prefer to clarify my answer.

Q   Well, again, I'm asking the questions and with all due respect, you have to answer the questions that

Page 76

I ask, not give speeches.

A   I --

Q   So what I'm asking you is do you know, yes or no, if the hiring for prior sales experience bears on the issue of whether or not the exemption applies.  Do you know the answer to that question, sir?

MS. PATTON:  Same objections.

Q   (By Mr. DeRoche) Yes or no?

A   I answered that previously.  And the answer to that is it's not a clear yes or no, but it -- answer on that question.

Q   Okay.

MS. PATTON:  Are we coming up -- I'm sorry, Jim.  Are we coming up on an opportunity for a break in a minute or are you --

MR. DEROCHE:  I'm plowing through here.

MS. PATTON:  Anybody need a break?  Do you need a break?

THE WITNESS:  In a few minutes would be great if I could get a drink and stuff and hang out for a minute, yeah.

Q   (By Mr. DeRoche) Is it your opinion that a uniformity of conduct in requirements by Just Energy as it pertains to these workers, suggests that the workers should uniformly be characterized as salespeople?

Page 77

A   Could you clarify that question for me, please.

Q   What don't you understand?

A   The -- I think the terminology that the uniformity --

Q   Okay.

A   I want to understand exactly what you're getting at.

Q   I'm not trying to get at -- I'm just asking questions.  You don't need to figure out what I'm getting at.

A   No.  I mean, I'm trying to ask -- I'm trying to identify exactly what you're asking me to answer.

Q   Yeah.  Is it your opinion that the uniformity of conduct and requirements by Just Energy as it pertains to these workers suggests that the workers should uniformly be characterized as salespersons?  Yes or no?

A   My opinion is is that given the roles and responsibilities and duties as I viewed them of these salespeople and the consistency of those roles, responsibilities, and duties, that they would be classified as a salesperson in my mind.

Q   So they -- that determination could be made by you with respect to all the members of the class; is that correct?

20 (Pages 74 - 77)

Page 78

A  Based on the information that I've read, yes.

Q  Okay. And that applies uniformly to all offices of Just Energy, correct?

A  Based on the information that I've gone through, yes, I'm willing to state that.

Q  Okay. Anywhere in your report -- I can give you a copy just so we have it on the record. I'm going to hand you your report.

A  Sure.

Q  I've marked that as Exhibit 2.

(Marked Ahearne Exhibit No. 2.)

A  Sure.

MS. PATTON: I think it's marked B, Jim, just to be clear.

MR. DEROCHE: What's that?

MS. PATTON: I think you're using letters. Are you using numbers or --

MR. DEROCHE: No, I'm using numbers. It's 2.

MS. PATTON: Oh, I'm seeing it was Exhibit A.

MR. DEROCHE: Yeah. It's not Exhibit A. It's Exhibit 2. That's -- that's the A that he put on it when he attached it to his report.

MS. PATTON: Got it. I apologize.

Page 79

MR. DEROCHE: No, no problem.

MS. PATTON: Now we're on 2.

Q  (By Mr. DeRoche) All right. So is there anyplace in your report where you took into account the amount of compensation made by these individuals in reaching your conclusions?

A  I did. I -- I did -- let me get to the -- the section. Hold on a second.

Q  Point to that.

A  There's a section that I have in here called Compensation. It's on page 8.

Q  Okay.

A  So --

Q  I know the method of compensation. I'm talking about the amount.

A  Well, I -- I discuss specifically the idea of variable compensation and compensation based on -- based on sales itself and that is commission based compensation.

Q  Okay. So let's go back to my question then.

A  Um-hum.

Q  Anyplace in the report where you take into account the amount of compensation made by these individuals when reaching your conclusions?

A  Yes. As I said in this section of the report,

Page 80

I specifically talk about variable compensation. When people are paid on variable pay, if they don't sell anything, they don't get paid. So, yes, I do take into consideration that factor. So if a person sells nothing. They don't get paid.

Q  Again, that's not my question, sir.

A  Um-hum.

Q  The amount of compensation made by these individuals, not the method of compensation, the amount.

A  So in the last two lines -- the last two lines, okay, I -- I say Richard Teixeira's testimony, for instance, acknowledges that it is conceivable for a Just Energy IC to work long hours or days a week and earn nothing if they failed to attain contracts. So that's the amount of compensation. This possibility --

Q  Nothing?

A  That's saying nothing. That's saying nothing. Their compensation would be nothing in that case. Okay?

Q  Okay. Did you take that into account in reaching your opinions?

A  Yes, I did. And so this possibility of earning zero dollars is consistent with and plausible in light of highly leveraged, variable pay plans and due to the

Page 81

cyclical nature of sales and ineffectiveness of a given salesperson, for example, it's possible that somebody earns zero. And, in fact, that's very normal in many sales positions for that to be the case.

Q  Sir, I want to make sure we understand each other because I'm asking you the questions.

A  And I was answering your questions.

Q  Let's talk about the amount of compensation made by the members of the class, other than those that you've recognized that made zero. Did you take that into account at any point in your report?

A  I did. I also took into consideration that individuals that were, for example, Chad Chappie that was deposed in the case talked about how much compensation he made. So he was actually -- his pay as he would state in here was well in excess of what somebody in a minimum wage standard would make. I mean, he was making a tremendous amount of money in the situation.

Q  Do you know what the typical wage was for individuals in his position?

A  I don't. That's why I said it's a variable pay situation and insensitive situation.

Q  So you have no idea --

MS. PATTON: Objection.

21 (Pages 78 - 81)

Page 82

Q (By Mr. DeRoche) -- whether or not -- what the typical worker would --

A As I stated the typical worker -- and that is, the -- all of these workers are paid on a variable pay system. So I'm very aware of how they're compensated.

Q Well, I understand you're aware of the system of compensation. That's not my question. I'm talking about the typical amount of compensation.

A I know that --

MS. PATTON: Objection; foundation. If you know.

Q (By Mr. DeRoche) Do you know one way or the other?

A The -- I don't know the exact amount that an average individual is paid.

Q What's the approximate amount?

MS. PATTON: Objection; foundation. If you know.

Q (By Mr. DeRoche) Do you know the approximate amount?

A Well, for example, in the testimony of -- of the individuals that they talked about, that ranged considerably depending on the individuals. Some would say that for periods of time they were paid nothing, and some would say for periods of time they were paid

Page 83

tens of thousands of dollars. So.

Q Do you know typical how much is paid?

A I don't know.

Q Do you know how many, for instance, made zero?

A I don't have that information, no.

Q Okay. In your report you state that a few of the workers, I believe, earned nothing in particular weeks; is that correct?

A I state that there -- that, yes, there are individuals that earned nothing.

Q You said there were a few?

A Um-hum.

Q Since you include that in your report --

A I said it's conceivable that they worked long hours and earned nothing or failed to --

Q You said there are a few -- a few made nothing; is that correct? Am I wrong in that?

A I'm trying to see where you're pulling that from. Can you point to me where you're saying that.

Q The first sentence at the top of page 9: A few of the plaintiffs -- right?

A That's -- that's -- the reason I say a few is because I only saw the people that were deposed. I don't know about everybody else. I'm going off of the individuals who were deposed.

Page 84

Q Okay. Do you know how many of the class members earned zero?

A That, I don't. I was going off the individuals deposed.

Q When you consider it, hundreds of individuals wouldn't be a few, right?

MS. PATTON: Objection.

A As I say, I don't know the information on that.

Q (By Mr. DeRoche) Did you ever make an effort to find out?

A That was -- it wouldn't have been impacting my decision as I state below.

Q So the answer to my question is no?

A No. No, I didn't make an effort.

Q Okay. What was the average educational grade level of the persons in the class? Do you know?

A I don't have an average, no.

Q What was the average length of time that the persons in the class worked for the company?

MS. PATTON: Objection; foundation. If you know.

Q (By Mr. DeRoche) You can answer.

A I don't have any information.

Q And what percentage of the cases do the class members receive a payment for a completed application?

Page 85

MS. PATTON: Objection; foundation. If you know.

A I don't have that information.

Q (By Mr. DeRoche) What information do the workers have before they set out on a particular date to do canvassing that allow them to determine which neighborhoods they can properly solicit?

A They're given guidance -- well, my understanding is they're given guidance by the drivers and the individuals in the office about where they should focus.

Q Do they have access to information on which neighborhoods the companies has obtained a solicitation permit? Do you know?

A That, I'm not aware of.

Q Do you know if they have information on which neighborhoods contain individuals who have a energy supplier from one of the companies for which Just Energy is eligible to switch?

A I'm not aware if they have that information.

Q Do they have information on which neighborhoods were recently solicited by other Just Energy teams?

A I don't know.

Q Do you know if all that information is within the exclusive control of Just Energy.

22 (Pages 82 - 85)

Page 86

MS. PATTON: Objection; foundation.

A   That, I'm not aware of.

Q   (By Mr. DeRoche) You don't know one way or the other?

A   I'm not certain. I can tell you that Just Energy could make efforts in certain areas like that to provide that information.

Q   Do you know if they do?

A   I don't know the answer to that.

Q   Okay.

THE WITNESS: Could I use the restroom a second? Would that be okay?

MR. DEROCHE: Oh, yeah. Let's take a break.

THE WITNESS: Thank you.

(Break.)

Q   (By Mr. DeRoche) Have you ever reviewed the customer application that is -- you know, that is signed by the customer?

A   I -- I believe I had one of those, if I remember.

Q   It's not listed in your report.

MS. PATTON: Can I interrupt, Jim?

MR. DEROCHE: Yeah.

MS. PATTON: I believe it's an exhibit to

Page 87

some of the deposition transcripts.

THE WITNESS: Yeah.

Q   (By Mr. DeRoche) Are those --

A   I believe it's on -- it's part of what's her name's as well, Donna Hart -- Donna Hurts or Davina Hurt.

Q   Did you review that in connection with your report?

A   Yes, I did.

Q   Okay. Did you review section 3?

A   I -- you have to refer me to it. It's -- I don't remember exactly what section.

MS. PATTON: And I'm going to object, Jim. We produced a number of customer agreements. So you'd have to be specific.

Q   (By Mr. DeRoche) Based on your review of the customer agreements that you had --

A   Um-hum.

Q   -- is it your understanding that Just Energy has unfettered control over whether or not an application is ultimately accepted?

MS. PATTON: Objection to form.

Q   (By Mr. DeRoche) You can answer. Go ahead.

A   My understanding is they -- they reserve the right to be able to reject applications, yes.

Page 88

Q   Okay. Do you know what tests of creditworthiness are exercised or used rather by Just Energy in determining whether or not to accept an application?

MS. PATTON: Objection.

A   No, I don't have that information.

Q   (By Mr. DeRoche) Do you know if the registration agents are given that information?

A   No.

Q   Have you ever given or attempted to give an opinion in a court proceeding related to the application of the outside sales exemption under the Fair Labor Standards Act?

A   As I stated I was part of a case for Ecolab Corporation in that regard.

Q   And what was your opinion in that case?

A   My opinion in that case, or my expert opinion, was that job constituted a sales position.

Q   Similar to this case?

A   It was a -- it was a little bit of a different -- a very different sales position in this case in some ways.

Q   What were they doing?

A   In addition to selling, they were actually doing a service component job as well. So they were

Page 89

servicing dish machines and things of that nature.

Q   They were selling --

A   They were selling the materials used in the dish machines as well as supporting products and things of that nature.

Q   And you've submitted a report in that case. Have you given a deposition?

A   Yes, I have.

Q   Have you testified in court?

A   No, I haven't.

Q   Do you know if your opinion has been challenged in that case?

A   No, I don't. Actually my -- my -- there was a -- they challenged -- there was a ruling on the -- they challenged my -- me as an expert.

Q   Okay.

A   And my rate. And the Judge upheld my position as an expert and the rate in the matter in federal court. And -- and demanded that they pay on that.

Q   I'm sorry. What was the first part of that, their challenge?

A   Their challenge was what -- whether I was -- whether I constituted an expert. And then whether my rate -- my rate was a valid rate. And on both of those situations, he said that -- the Judge said yes and yes

23 (Pages 86 - 89)

Page 90

and required them to pay me.

Q   So your report has not been subject to a challenge in terms of admissibility?

MS. PATTON: Objection; legal conclusion. But if you know.

Q   (By Mr. DeRoche) Do you know one way or the other?

A   Not that I'm aware, no.

Q   Okay. Do you have any specialized background or training in the subject of wage and hour laws?

A   No, I don't, as I've mentioned before.

Q   Have you ever worked for the Department of Labor?

A   No.

Q   Ever worked for any state or local agency that is tasked with enforcing wage and hour laws?

A   I have not.

Q   Did you review any treatises, texts, or other authoritative publications dealing with the outside sales exemption before you rendered your opinions?

A   No.

Q   What is the difference between the question of whether a person is making a sale as compared to the question of whether or not they are subject to the outside sales exemption under the Fair Labor Standards

Page 91

Act?

MS. PATTON: Objection.

Q   (By Mr. DeRoche) Do you know if there's a distinction between those two questions?

A   I know that one is used as input into the other.

Q   You don't know how, though?

A   No. I'm aware that there are opinion cases that are out there that -- that juries and judges are using input from experts in determining whether -- whether the -- whether the law should be applied.

Q   You're aware of them using experts in that?

A   The opinions of experts as input.

Q   Okay. Where would that -- where did that occur?

A   In the -- I was -- I saw a case for Terminix. I saw a case for the -- the Pfizer Pharmaceutical case, the -- and a couple of other cases around that area.

Q   And the opinions in those cases were what again?

A   I don't know the exact details. I wasn't -- I'm not an expert on the opinions. But I do know that the -- the courts used the experts' testimony in making decisions.

Q   In what respect?

Page 92

A   I don't know. I just know that they were part of the decision.

Q   Who were the experts in that case? Are you familiar with them?

A   I don't know all the experts.

Q   Are you -- you -- I see you have a list -- a lot -- a long list of publications in which you have coauthors; is that correct?

A   Yes. That's correct.

Q   Do you know of any of the coauthors for -- on any of those publications or for that matter any of your other colleagues who have rendered opinions similar to the ones you're rendering in this case?

A   Ex-- acted as an expert?

Q   Yeah.

A   Yes. I'm aware of one.

Q   Who?

A   Andy Zoltners.

Q   What's -- how do you spell that name?

A   Z-O-L-T-N-E-R-S.

Q   Z-O-L-T?

A   N-E-R-S.

Q   N-E-R-S. How do you know that Mr. Zoltners acted as an expert in a wage and hour case?

A   I just heard from him that he had acted as an

Page 93

expert.

Q   In what context?

A   We didn't discuss it in detail.

Q   I'm saying what context did you hear from him that he did that?

A   He had just mentioned that he had worked -- he has worked a wage and hour case previously.

Q   What was the wage and hour case?

A   I don't know the cases that he has. He just mentioned that was something he had done previously.

Q   And where does he live?

A   He's in Chicago.

Q   What is his position? Do you know?

A   He's a professor at Northwestern University.

Q   And what kind of cases has he worked on?

A   I don't have no idea.

Q   And in what context again did you have this discussion with Mr. Zoltners?

A   I just heard from -- I actually just heard that he had worked on a case previously in this area and --

Q   Heard from whom?

A   From somebody else that is a professor up at Northwestern University.

Q   And how did that come up where you would have that kind of conversation?

24 (Pages 90 - 93)

Page 94

A   We had just been talking about the question of whether people are salespeople or not and things of that nature.

Q   In relation to this case?

A   No.

Q   I'm sorry. I'm --

A   This was actually very -- some time ago this conversation happened. And I'm just bringing that up. That's all.

Q   And who was the other professor?

A   There was a group of professors that were around at the time we were talking about the job. It was during the discussion of pharmaceuticals is when this case was at it's height, the idea of whether pharmaceutical reps are, in fact, salespeople because that was sort of a popular discussion point in academia.

Q   Do you know if the individuals at issue in this case bear any resemblance to the pharmaceutical reps?

        MS. PATTON: Objection; foundation. If you know.

Q   (By Mr. DeRoche) You can answer.

A   If you're asking me to say that they're -- that the way they sell and approach customers bears resemblance? Is that the question.

Page 95

Q   Bears resemblance in any respect relevant to the issue of whether or not they're -- the outside sales exemption applies.

        MS. PATTON: Objection. Answer to -- same objection, a legal conclusion.

Q   (By Mr. DeRoche) You can answer.

A   I don't know whether legally it bears reference to that and whether --

Q   So you don't know whether they bear any resemblance with respect to the factors that are important under the Fair Labor Standards Act?

        MS. PATTON: Objection; misstates the testimony.

Q   (By Mr. DeRoche) You can answer.

A   As I stated, the fair -- I'm not an expert in the Fair Labor Standards Act. I'm at expert in what a sales job constitutes. And I would say that a pharmaceutical salesperson's job follows the similar steps of the sales process like I laid out in this position as well.

Q   Do you know if they bear any resemblance, the individual at issue in this case, to the individuals who were at issue in that -- in the pharmaceutical cases --

        MS. PATTON: Objection; asked and --

Page 96

Q   (By Mr. DeRoche) -- in terms of factors that are important in determining whether or not the outside sales exemption applies?

        MS. PATTON: Asked and answered.

A   I am not an expert, again, on Fair Labor Standards, no.

Q   (By Mr. DeRoche) So the answer is no?

A   Yeah, yeah.

Q   Do you know what the purpose of the outside sales exemption is, why it exists?

        MS. PATTON: Objection.

A   No, I don't have no info.

Q   (By Mr. DeRoche) Okay. Does the lack of hiring for prior sales experience suggest that a worker is or is not intended to be covered by the outside sales exemption? Do you know one way or the other?

        MS. PATTON: Objection; and I'm going to continue to object to questions about the exemption.

A   Could you just restate it for me, please.

Q   (By Mr. DeRoche) Does the lack of hiring for prior sales experience suggest that a worker is or is not intended to be covered by the outside sales exemption? Yes or no?

        MS. PATTON: This is outside the scope of his expertise.

Page 97

A   We talked about that previously, and I addressed the lack of experience in my report as to whether a person in my mind was viewed as a salesperson.

Q   (By Mr. DeRoche) Again, sir, that's not my question. Does the lack of hiring for prior sales experience suggest that a worker is or is not covered by the outside sales exemption? Do you know one way or the other?

A   That's outside my expertise.

Q   So the answer is no; you have no idea?

A   Right.

Q   Okay. Does the fact that a worker is away from the office with minimum supervision suggest that they are or are not covered by the outside sales exemption? Do you know one way or the other?

        MS. PATTON: Same objection.

A   Again, I'm not an expert on this.

Q   (By Mr. DeRoche) So the answer is no?

A   No.

Q   Does the fact that a worker earns substantially less than minimum wage suggest that they're intended or not intended to be covered by the outside sales exemption? Do you know one way or the other?

        MS. PATTON: Continuing objections.

Page 98

These call for legal conclusions and are outside his area of expertise.

MR. DEROCHE: Noted your objection.

Q (By Mr. DeRoche) Do you know one way or the other?

A No. Again, that's not my area of expertise.

Q Does the fact that a worker performed the type of work that is easy to standardize into scheduled work periods for each workday indicate that a worker is or is not intended to be covered by the outside sales exemption? Do you know one way or the other?

A Again, same answer. Outside my --

Q No?

A No, I don't.

Q Does the fact that the worker -- the work is easily spread to other workers after 40 hours a week for a particular type of work, suggest that a worker is or is not intended to be covered by the outside sales exemption? Do you know one way or the other?

A As we discussed before, I don't agree that it's easily spread in this case. So that part I want to clarify that -- that -- and I don't believe that's a fact.

Q Well, that's your -- that's your assumption of a fact. And I'll accept that. But I'm asking you does

Page 99

the fact that work is easily spread to other workers --

A The part I disagree with is the word "fact." I don't know how to establish that that's a fact.

Q Sir, I'm just asking you -- again, listen to the question, please, and don't cut me off. Does the fact that a -- that work is easily spread, if that fact is found -- I know you don't have to agree that it's true -- is that a factor in determining whether or not a particular worker is covered or is not covered by the outside sales exemption? Do you know one way or the other?

A No. That's not -- again, that's not an area of expertise for me.

Q In your review of the sales scripts, would you agree that they are detailed?

MS. PATTON: Objection; vague.

Q (By Mr. DeRoche) You can answer.

A There's a lot of information in them, yes.

Q Okay. And they give explicit instructions for instance in how to stand when approaching the door, correct?

A My understanding is they're -- they do give details, but they're to act as a guide for the individual.

Q Do you know if the registration agents are

Page 100

required to leave brochures with all customers?

A I -- I don't know the answer to that.

Q You don't know one way or the other?

A I don't know whether they're required to.

Q So you didn't glean that from the materials you reviewed?

A They are asked to do that, yes. I don't know about the word required is the part that I'm not -- I mean legally required, I don't know the answer to that question.

Q Well, I'm not saying legally because you're not a lawyer.

A Yeah.

Q I'm asking you does Just Energy require brochures to be left with all customers?

A Yes, they ask --

MS. PATTON: Objection; asked and answered.

A They ask that they're left.

Q (By Mr. DeRoche) Are they required?

A I don't know about -- like I said, I don't know how they would enforce the requirement.

Q Well, I'm not asking about enforcement. Do they express a requirement to their --

A As I mentioned --

Page 101

Q Again, let me finish the question, sir, before you start answering.

A Um-hum.

Q Okay. Are they required to provide brochures with all customers? Yes or no?

MS. PATTON: Objection; asked and answered.

Q (By Mr. DeRoche) You can answer the question. If you know one way or the other.

A They're requested to.

Q And that's what you gleaned from the materials you reviewed in this case?

A That's correct.

MS. PATTON: Jim, if there are any materials you'd like to question the witness on or like him to testify to, I'd ask that you show him a copy.

Q (By Mr. DeRoche) Are the registration agents required to show their badge to customers when speaking to the customers?

A I know they're asked to wear a badge or to carry a badge.

Q Okay. Do you know if the registration agents must hold the customer contract in such a fashion that it's visible to the customer at all times?

A May I ask that you point me to the document

26 (Pages 98 - 101)

Page 102

where you're obtaining this information.

Q Again, I'm asking you if you know one way or on the other in this case?

A Can I just ask that you refer to the document that --

Q You can answer the question I asked.

MS. PATTON: You can answer the question if you know, but for the record, the witness would like something to refresh his recollection.

Q (By Mr. DeRoche) Do you know one way or the other as you sit here?

A I don't remember specifically on that point.

Q How precise are the instructions in your experience that are given to the registration agents in the sales script?

A They're -- in my opinion they are consistent with the type of information that's given to a person that's in a training mechanism or in a mode to be able to sell from a person to person type of a sale. It's normal to have that level of detail.

Q So let's go back to the question I asked. How precise are the instructions that are given in the sales presentation script that are provided to the registration agents?

MS. PATTON: Objection; precise is vague.

Page 103

Q (By Mr. DeRoche) You can respond.

A Precise meaning how detailed.

Q Yeah.

A They're fairly detailed.

Q Very detailed?

A I said fairly detailed.

Q Fairly detailed?

A Yes.

Q I thought you said very detailed.

A I would not put them as extremely detailed, no.

Q Do they tell -- well, here, let's look at them.

(Marked Ahearne Exhibit No. 3.)

Q (By Mr. DeRoche) I'm showing you what we marked as Ahearne Exhibit 3. Do you recognize that document, sir?

MS. PATTON: May I have a copy, Jim?

MR. DEROCHE: Yes.

Q (By Mr. DeRoche) Is that one of the documents you were provided by counsel for the defense?

A I believe it is, yes.

Q You reviewed it in forming your opinions in this case?

A Yes.

Q And it's one of the sales presentation scripts that we were just discussing?

Page 104

A I -- I assume that's the one you were referring to since you handed it to me, yes.

Q Well, was it the one you were referring to in your mind when you answered the question?

MS. PATTON: Objection. The witness reviewed a lot of sales scripts.

A There were multiple sales scripts. So I apologize. I'm not sure which one I was referring to.

Q (By Mr. DeRoche) Okay.

A Um-hum.

Q So this is one of the ones you reviewed, though? You don't think this is very detailed and precise or do you think it is?

A I think this is typical of a company trying to bring a person through a sales process and train them on the way in which they engage a customer. This is -- I would not say very detailed. This is, yes, a good high level of detail, but not very detailed.

Q You don't think it's very detailed? For instance, it says: Knock on the door, and step back from the door; is that correct?

A Again, this is -- this is standard training material. I mean the question of whether it's very detailed or not is relative to other situations.

Q Okay. Sir?

Page 105

A I -- I'm trying to answer your question.

Q I don't think you are. You're giving a speech. It's -- you know, and I understand that. But I already asked the question. The document says: Knock on the door and step back from the door, correct?

A Yes, it does.

Q And it says: Keep your eyes down so you're not putting pressure on the potential customer. So it instructs the registration agent where to put their eyes, correct?

A Yes.

Q Okay. Agreement held out in plain view. So it tells them how to hold the agreement, correct?

A Yes.

Q Acknowledge the customer with a friendly wave and do not make eye contact. Again, telling them where to put their eyes, correct?

A Yes.

Q Continue to look at the agreement, walk forward slowly to the customer. Again, telling them where to put their eyes, correct?

MS. PATTON: Objection to "telling" but --

Q (By Mr. DeRoche) You can answer.

A My understanding and this is based on the --

27 (Pages 102 - 105)

Page 106

based on the testimony of Richard Teixeira in marketing -- is these were used as guides to help a person train and understand how to accomplish the task. And that's very typical in a sales situation to have that.

(Marked Ahearne Exhibit No. 4.)

Q (By Mr. DeRoche) Is there any indication on the document which parts are guides and which parts are instructions?

A Let me give you an example of -- let me explain to you what I mean by guide. In sales positions when you're training a person on messaging or sending information or walking through sales process, you want to give them as explicit instructions as possible of what is best practice. So what this is laying out is in their experience what a best practice engagement would look like. And that helps the person to do a better job of closing the deal and getting more agreements. So this is very consistent with what other people use.

Q It's called a script, correct?

A It's scripting. In fact, I -- I cited several examples of articles in the -- in the academic literature that talk about the value of these scriptings in sales training.

Q And in terms of the -- you say it's a guide.

Page 107

Is there any indication on here at all that it's simply a guide as opposed to instructions on what they need to do?

A I'm just going off the testimony of the marketing expert.

Q So there's no indication on the document?

A It does not say the word "guide" anywhere on the document.

Q Okay. I'll show you what we marked as Exhibit 4.

Have you seen that document before, sir?

A Yes, I believe I have.

Q Okay. The document was provided to you by defense counsel?

A Yes.

Q In the second paragraph, last sentence: The following is a summary of what you observed in the video that you need to do to proceed with the sales presentation.

Do you interpret need to do as an instruction that this is what the registration agents should be doing?

A It's -- it's guidance on how they should be acting, yes.

Q It says they need to do it. Does that indicate

Page 108

that it's mandatory?

A I think that's an interpretation of the wording. I guess it could be interpreted as mandatory, but I'm not -- that, I'm not certain of.

Q Are there any -- is there any indication on this document that any of the instructions are not requirements of the job?

A Well, the reason I say that is if you look at the verbiage that's used, like use a friendly knock on the door, what is -- what constitutes a friendly knock on the door? That's -- that's why I say that these are guidance. I mean these are types of things that a person would do that guides them.

Q It says "step away from the door" after that, correct?

A That -- that's -- that's giving them specific ideas on how to make a friendly approach for a person, yes.

Q It indicates all --

A That's why I'm saying. Many of the words on here are reflective of not explicit but guide, and then other words with giving them examples or instructions on how to execute on this.

Q Number 2, as you introduce yourself state that you are, et cetera.

Page 109

So it's giving a specific statement that the registrant is required to make; is that correct?

A Yeah, absolutely that's correct.

Q Next numbered paragraph, paragraph 3, you must clearly and precisely state the reason, et cetera.

The use of the word must in that sentence indicates that it's a mandatory requirement of the job, correct?

A The --

MS. PATTON: Objection.

A As I mentioned before, I don't think -- I don't know that it's a requirement of the job. I know that this is a -- this is very consistent with making sure a person follows normal guidelines for being able to execute. And I'm not -- I'm not clear on how many of these things are actually required by law. So, for example, number 2 you mentioned before, as you introduce yourself, state you're with Just Energy and you can't state that you're with the utility. So that may be a legal requirement.

Q But you don't know one way or the other?

A I don't know for certain.

Q Did you interpret the word must in paragraph 3 as a mandatory requirement given that the word "must" is used? You know what that word means, right?

28 (Pages 106 - 109)

Page 110

A    Must means that --

Q    Must means must, right?

A    Yeah.

Q    Required?

A    Yeah. I understand.

Q    Paragraph 5, all -- all customers must receive marketing brochure with your name and ID number, including -- included, rather, whether they sign up or not.

Do you see that, sir?

A    Yes. This is -- this is common practice in selling.

Q    Is it clear to you that there's a requirement that all brochures -- all customers receive a marketing brochure?

A    Yes. It -- this one is very clear.

Q    Number 6, the customer must be able to see if during -- see the contract during the presentation.

Do you see that?

A    The customer must be able to see it during the presentation, yes.

Q    Okay. Do you interpret must as a mandatory requirement of the job?

A    I interpret it as a -- I -- you're asking me to give -- based on the information I'm looking at here,

Page 111

it's -- it is asking them to do that. And I am not clear whether that's enforced, not enforced, those things.

Q    No. Do you know what the term -- the word "must" means?

MS. PATTON: I'm going to object, Jim, that mandatory requirements is a -- you know, of the job --

Q    (By Mr. DeRoche) Do you know what the --

MS. PATTON: -- is outside his expertise.

Q    (By Mr. DeRoche) You know what the word "must" means, right?

A    Of course.

Q    If you say "must" to someone, it indicates that they must do it, shall do it, right?

A    Yeah. It's a -- I believe it's a statement that this is a -- this is what they're asking you to do.

Q    They're not asking you. They're telling you you must do it; isn't that correct, sir?

MS. PATTON: Objection.

A    It depends. It's a very contextual question. And it -- it appears that they're asking him to do this. And I just don't know whether it's enforced. That was the question that I was stating to you. I

Page 112

don't know the enforcement on it.

Q    (By Mr. DeRoche) Did you ever try to ask anybody what kind of enforcement is done?

A    I just -- I just read the testimony. I didn't ask -- I wasn't able to go and ask specific people on that.

Q    The answer is no, you didn't make any effort to determine if it's enforced?

A    I didn't have a need to.

Q    Okay. The answer is no then. You didn't?

A    No, I didn't.

Q    Okay. Other than Mr. Zoltner's experience that you heard about secondhand, do you know of any other colleagues of yours who have purported to provide opinions of the type you're giving in this case?

A    I have another colleague that does work in the area, as well.

Q    Who is that?

A    Her name is Ann Coughlin.

Q    And how do you spell that last name?

A    C-O-U-G-H-L-I-N.

Q    Ann, you said?

A    Ann, yes. A-N-N.

Q    And where is she located?

A    She's a professor at Northwestern University.

Page 113

Q    And how do you know she provides expert testimony in this area?

A    I don't know the exact nature of all of her expert testimony, but I do know that she provides a lot of testimony on sales and the job of sales in the direct selling industry.

Q    In the context of wage and hour cases?

A    I don't know. That, I don't know.

Q    How did you find out that she was engaged in providing expert testimony on sales?

A    I've heard it from a number of different people, including her. And I've -- and I've read statements on the Web about things that she's done in the area. For example, in cases regarding company's like Avon and different direct selling companies.

Q    I'm sorry. What have you read on the Web?

A    Just about some details about her opinions on those cases.

Q    And what resource on the Web?

A    Like news stories or media coverage on things.

Q    How many times -- are you aware how many times she's testified?

A    I don't. She doesn't speak about any of it. So even -- we've never talked about it, and I've not really seen anything on it.

29 (Pages 110 - 113)

Page 114

Q Any I think you said you have no idea if any of those cases involve, for instance, exemptions from the wage and hour laws?

A This isn't an area of discussion that I have with any of these people. So I've never asked them that question. And I don't know. I just know that they provide expert testimony in the area of sales. That's all I'm aware of. I'm aware of other people that I work with that provide expert testimony in sales, too, but not -- not regarding this stuff at all.

Q Not regarding wage and hour cases?

A Not that I'm aware of.

Q Okay. And what other -- what other persons are you saying provide expert testimony on the area of sales?

A If I remember properly there's another fellow -- his name is Das Narayandas at Harvard business school -- that's done some work in that area.

Q What's -- how do you spell that last name?

A I would be butchering his name by spelling it, but it's N-A-R-A-N-D-A-S [sic], I think.

Q And what kind of cases has he testified in?

A That, I'm unaware of. I just know that he provides expert testimony occasionally.

Q But you have no idea what kind of cases?

Page 115

A No.

Q Okay. Anybody else?

A Off the top of my head, those are the people that I've mentioned to you that I'm aware of that do this stuff.

Q Do you know of any -- any other individuals who have provided -- ever attempted to provide testimony on the applicability of a outsides sales exemption to a particular class of individuals?

MS. PATTON: Objection; asked and answered.

A No. I'm sorry. I don't. No, I don't.

Q (By Mr. DeRoche) Did you submit your expert report to any type of peer review?

A No, I didn't.

Q Does your report contain all the opinions that you intend to give in this case?

A Yes.

Q Do you -- are you intending to do any further work in this case as we sit here?

A Further work?

Q Yes.

A If I'm asked to go to trial or anything.

Q I'm talking about any further opinions or any other work in that regard.

Page 116

MS. PATTON: Objection.

Q (By Mr. DeRoche) You can answer.

A Not that I'm aware of.

Q And you have not formed any further or additional opinions about this case that aren't expressed in your report; is that correct?

A That's correct.

Q We talked about two conversations that you had with defense counsel in this case. I believe one was in December, and then I believe there was another one, a second one, in January; is that correct?

A That's the approximate time, yes. That's correct.

Q And then other than those two conversations, have you had any other conversations with defense counsel?

A Yes, I have.

Q Okay. Tell me about each those instances.

MS. PATTON: And objection to the extent I've -- counsel shared -- you can testify to the extent we shared factual information with you, but that's all.

THE WITNESS: Okay.

Q (By Mr. DeRoche) Okay. When was the next time after January?

A I don't have my exact records with me today,

Page 117

but -- of the dates --

Q Uh-huh. That's okay.

A -- that I provided, but approximately three or four weeks later --

Q Okay.

A -- we had another conversation.

Q What was that conversation about?

A Just asked me how I'm doing, and if I need any additional information.

Q So you had been retained already at that point?

A Yes.

Q Okay. Did you ask for additional information?

A I believe I asked if there was some additional information regarding adds for the job postings.

Q Okay. Anything else besides that discussed or requested?

MS. PATTON: Same objection and instruction.

Q (By Mr. DeRoche) Go ahead.

A I'm just reflecting to see if there were any other times when I requested additional information.

Q I see you're referring to notes as we sit here today; is that correct?

A You -- yes. This is just some of my notes.

Q Okay. And you're helping -- using those to

30 (Pages 114 - 117)

Page 118

refresh your recollection?

A   On a few things, yes.

Q   Okay.  And you used that a number of times today during the deposition to refresh your recollection on certain matters; is that correct?

A   A few times, yes.

Q   I'm going to ask that I get a copy of those.

MS. PATTON:  Certainly.

Q   (By Mr. DeRoche)  If you look on page 6 of your report.

A   Yes.

Q   Top of that page.  It says:  The job postings that Just Energy uses to advertise IC positions often signal job candidates that Just Energy is a sales organization in search of applicants to fill sales positions.  What do you mean by often signal?

A   Because it -- it gives them the idea that in the advertisement that the pay is variable and that there is high potential for what they can earn, for example, in some of the ads.  And some of the ads infer flexibility in the position itself.  And then others explicitly talk about sales, the word "sales" in the ad.

Q   How many use registration agent as a description of the position?

Page 119

A   I don't know the count on that.  There is a tremendous number of ads in the file.  So I'd have to do a count and refer to those.

Q   I don't know if I asked this yet.  I apologize if I did, but are you aware whether or not the registration agents are present in the home during the verification call?

MS. PATTON:  Objection; asked and answered.

Q   (By Mr. DeRoche)  You can answer.

MS. PATTON:  You can answer it?

A   Again, you asked that previously.  And I said I -- I don't think that they are usually present.

Q   (By Mr. DeRoche)  Are they ever present?

A   That, I'm not aware of if they're ever present.

Q   Do you know one way or the other?

A   No.

Q   On page 13 of your report, final paragraph before the conclusion section.

A   Um-hum.

Q   First sentence:  However, comma, salespeople can avoid problems associated with the verification processes by qualifying potential customers and ensuring their creditworthiness.

Do you see that, sir?

Page 120

A   Yes.

Q   And what can these registration agents due to ensure creditworthiness?

A   I think that they can ask questions concerning -- if I remember right, there's some information that they ask to be able to qualify the person.  I don't have it exactly in front of me, but --

Q   Where is it reflected?

A   I believe it's in part of the scripting, if I remember right.

Q   Well, you have a -- is it indicated anywhere in the script that you have in front of you?

A   I think it's based on some of the customer billing information, to be able to make sure that the individual is, in fact, qualified for the program.

Q   Does it have anything to do with creditworthiness?

A   And the on-time portion of things as well.

Q   On-time portion of what?

A   So in the training material it teaches the consultant how to read the prospects bill to determine whether the prospect's current gas and electric supplier is part of the acceptable class of suppliers.  So that's one of the things --

Q   Again, I'm asking about the creditworthiness

Page 121

issue, sir.  So let's focus on that.  So when you say in here that they can ensure their creditworthiness, I'm asking you where do you get that idea?

A   I was particularly speaking to the fact of whether they qualified through the classification and through the -- whether they were the proper ZIP code for utilization and whether the bill was on time in their current bill that they were looking at.  But that's all the information that I -- that they can glean from that to be able to get that information.

Q   Well, sir, creditworthiness doesn't have anything to do with any of that stuff.  So --

A   Obviously if they're not on time on their bills, that is going to make them less creditworthy, correct?

Q   It may or may not, depending on the standards used for creditworthiness.

A   What I'm saying is that it's in the control of the agent to be able to do a better job of screening an individual prior to putting them into the process.

Q   But, again, sir, you're saying ensuring their creditworthiness.  What exactly are you saying that these ICs can do to ensure creditworthiness?

MS. PATTON:  Objection; asked and answered.

31 (Pages 118 - 121)

Page 122

A   As I stated the things that they can do that they're -- that are in their control are listed below in the training materials about looking to determine whether the person is part of an acceptable class, whether they are in the ZIP code or range needed and whether their current bill is on time and paid.

Q   (By Mr. DeRoche) All right. So are they instructed that if someone has a bill, for instance, that reflects a late payment that they're not to sign them up?

MS. PATTON: Objection. If you know.

A   I -- I'm not aware. That's not a criteria that I'm aware of.

Q   (By Mr. DeRoche) Are they instructed to politely get up and leave when they see a late payment on their utility bill?

A   I think the point that I'm making here is that there are a number of efforts that they can make to be able to try to help that when they go through the next steps of the process, that things will go through much more smoothly and the probability of things being accepted are better at the end point.

Q   Well, I understand obviously they have to meet a certain criterion that is very specific in terms of whether or not they qualify to even be a potential

Page 123

customer. Those are the things you're referring to.

A   Yeah.

Q   Do they -- right. I understand that. What I'm saying is what does that have to do with creditworthiness? That has nothing to do with creditworthiness, correct?

MS. PATTON: Objection; asked and answered.

A   And as I pointed to before is whether the credit -- the decision of the company to decide whether creditworthy or not creditworthy would not be in my determination or classification of whether a person has a sales job or not.

Q   (By Mr. DeRoche) Again, that's not my question, sir. In your report you said? These salespeople can avoid problems associated with verification processes by, among other things, ensuring creditworthiness. So I'm asking you what exactly can they do in that regard --

MS. PATTON: Objection.

Q   (By Mr. DeRoche) -- that led you to put that in your report that you're giving in this case?

MS. PATTON: Asked and answered.

A   I laid out the examples I provided below. To answer your question, whether it -- to make sure that

Page 124

their credit reports are valid and things like this and are at a high enough level, that's the company to determine this.

Q   (By Mr. DeRoche) Sir, I'm asking -- you used the word "creditworthiness" not me. It's your report, and you wrote it. And you said they had some kind of ability to ensure the customers' creditworthiness and that therefore they can control what happens on this verification call.

MS. PATTON: Objection; misstates the --

Q   (By Mr. DeRoche) So what exactly are you referring to?

A   I think you're overemphasizing the strength of this assertion on that regarding the context.

Q   It's your assertion, sir. And I'm asking you what you based it on.

A   And I'm telling you that you're overemphasizing the importance of that particular terminology at the end of that sentence.

Q   Well, again, weight or not weight. You said it in your report. So I'm asking what did you base that on when you put it in your report?

A   And as I answered the question, I was referring to, in this situation, whether the individual is deemed part of the acceptable class, whether the individual is

Page 125

in a proper ZIP code, and -- and whether the individual was given the information necessary to be able to go through the process.

Q   Do the registration agents have the right to select which doors they knock on or do they have to knock on all the doors that they're given and directed to knock on?

A   I'm not aware of whether they're allowed to have variance in that. That's something I -- I'm not -- I don't know.

Q   You indicate on page 4 of your report that the registration agents have -- or the verification process is within the control of the verification agents.

A   Can you refer to me where --

Q   In the middle of the page next to the word further on page 4.

A   So where it says the verification process performed after the point of sale is a good business practice?

Q   Right below that you see the word further in its own paragraph?

A   Oh, further.

Q   It looks like it was dropped in apparently somewhere, but in any event, regardless, you're saying the IC's control -- have control over the verification

32 (Pages 122 - 125)

Page 126

process. What factual basis do you have for that?

A   As I was stating before, there are certain classifications when they're verified that would exempt them. So, for example, they can make sure that their name and information on the application is all spelled correctly and all the details on the application are all correct. They can make sure that they're in a classification of a ZIP code that's correct in the working and they're moving over from the right energy company. All these kind of things are within the control of the -- of the independent consultant when they show up to the door to be able to make the sale if they go through it and it's passed over. So as they're --

Q   Well, there's all administerial things about filling out forms and --

A   But those are things that can invalidate from what I understand.

Q   Yeah. But I'm saying you're saying they have control over the process based on who they select and the engage potential customers in a thoughtful and diligent manner?

A   Yes.

Q   What exactly does that have to do with the verification process? I mean, I'm just -- I'm trying

Page 127

to understand that sentence.

A   I just stated to you exactly what it has to do with. If they do their job properly of making sure that those people fit the class, they're qualified for the program, all the information is detailed properly on their forms, that it should make that process much smoother. That's exactly what I'm referring to here.

Q   Okay. That's fine. Page 9 very top of the page I see that you used the word "contract" twice in that sentence. Do you know what that word means in the way that you used it?

A   Let me look at the context by which I'm using it here.

Q   Um-hum.

A   So something in this entails that a few of the plaintiffs earn nothing in particular weeks either because they failed to attain signed contracts or because the contracts that they did attain were otherwise canceled.

So, yes, I understand that -- that they failed to get anybody to agree either to move forward in the registration process or those people that they agreed to move forward in the registration process, failed to meet the criteria that the company deemed acceptable.

Page 128

Q   So but you use the word contracts in that --

A   I'm clarifying for you exactly what I meant by that. That's what I just --

Q   You don't actually -- you don't know what the word "contract" means, I take it?

A   I told you exactly what I meant by that statement.

Q   Okay, sir. I'm asking -- you used the word "contracts." Why did you use the word "contracts"?

A   Because what I meant by the word "contract" was an agreement between that customer and the salesperson to be able to move forward in the agreement.

Q   So not a contract between Just Energy and the customer?

MS. PATTON: Objection.

A   I'm not here -- I'm not a legal expert to determine what a legally binding contract in this situation is.

Q   (By Mr. DeRoche) Well, you used the word contracts in your --

A   I think it's --

Q   Did you mean application?

A   It's a standard terminology within sales when you have a person sign an agreement between you and the other party or move forward in a process, agree to move

Page 129

forward in a process in the party, you either have a verbal contract or a written contract. And we talked about that in sales. Not from a legalistic standpoint of whether that's a contract or not.

Q   Okay. So you don't know if a contract is actually formed at any point while the registration agents are involved?

MS. PATTON: Objection; calls for a legal conclusion. Misstates the testimony.

Q   (By Mr. DeRoche) You can answer?

A   As I stated that's -- I'm not making a legal assertion on that, no.

Q   What about a factual question?

A   I -- I -- they do have an agreement to move forward between them and that -- and that independent consultant as you call it, registration agent. And that I see and that customer has agreed to move forward to the next step and proceed and utilize Just Energy. And then the next steps of the process are to set up the -- set it up. And if they disqualify at some point that's because of the company's determined they're disqualified or the utilities determine they're disqualified.

Q   Well, they're not canceling a contract. The contract has performed, right?

33 (Pages 126 - 129)

Page 130

A Again, this is not my area of expertise.

Q Okay.

MR. DEROCHE: I have nothing further.

MS. PATTON: Are we done?

MR. DEROCHE: Yep.

MS. PATTON: I don't believe I have anything either.

(Discussion off the record.)

(Marked Ahearne Exhibit No. 5.)

Q (By Mr. DeRoche) Let's go back on the record for a moment. Can you identify what we've marked as Exhibit 5, sir?

A Yes.

Q Okay. What is it?

A They're just some of my notes.

Q Notes you referred to from time to time during the deposition today?

A Yes.

Q Okay. That's all I have.

MS. PATTON: And the witness does not waive reading. We will read.

(The deposition concluded at 12:28 p.m.)

Page 132

MR. JAMES A. DEROCHE - 02:27

MS. SHANNON K. PATTON - NONE

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this the 15th day of June, 2014.

_____

PAM GWIN CODER
TEXAS CSR NO. 5216
Expiration Date: 12/31/14

Page 131

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DAVINA HURT, ET AL.       )
        Plaintiffs,       )
                          ) CASE NO. 1:12-CV-00758
VS.                       ) Judge James Gwin
                          )
COMMERCE ENERGY, INC.,    )
        Defendants.       )

•••••••••••••••••••••••••••••••••••••••••••••••••••••

REPORTER'S CERTIFICATION

THE STATE OF TEXAS:
COUNTY OF HARRIS:

I, PAM GWIN CODER, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MICHAEL AHEARNE, PH.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the amount of time used by each party at the deposition is as follows:

Page 133

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT NO: 1880609
CASE NAME: Hurt, Davina, Et Al. v. Commerce Energy
DATE OF DEPOSITION: 6/13/2014
WITNESS' NAME: Michael Ahearne, Ph.D.

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_____   _____
Date             Michael Ahearne, Ph.D.

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;

They signed the foregoing Sworn Statement; and

Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

34 (Pages 130 - 133)

Page 134

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT NO: 1880609
CASE NAME: Hurt, Davina, Et Al. v. Commerce Energy
DATE OF DEPOSITION: 6/13/2014
WITNESS' NAME: Michael Ahearne, Ph.D.
    In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
    I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
    I request that these changes be entered
as part of the record of my testimony.

    I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.
_____   _____
    Date         Michael Ahearne, Ph.D.

    Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
    They have read the transcript;
    They have listed all of their corrections
    in the appended Errata Sheet;
    They signed the foregoing Sworn
    Statement; and
    Their execution of this Statement is of
    their free act and deed.
    I have affixed my name and official seal
this _____ day of_____, 20____.
    _____
    Notary Public

    _____
    Commission Expiration Date

Page 135

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
    ASSIGNMENT NO: 1880609
PAGE/LINE(S) /   CHANGE   /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____   _____
    Date         Michael Ahearne, Ph.D.
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .
    _____
    Notary Public

    _____
    Commission Expiration Date

35 (Pages 134 - 135)

[00758 - ago]                                                    Page 1

| **0** | **4** | 112:5 120:6,14 | additional 28:1,3,7 |
|---|---|---|---|
| **00758** 1:4 131:4 | **4** 3:4,12 42:18 106:5 | 121:10,19 122:19 | 28:8,11 52:21 116:5 |
| **1** | 107:10 125:11,16 | 125:2 126:12 | 117:9,12,13,21 |
| | **40** 98:16 | 128:12 | **address** 4:12 15:2 |
| **1** 3:8 19:15,18 | **44114** 2:8 | **absolutely** 35:18 | 63:10 |
| **10** 25:18 | **44115** 2:4 | 38:8 39:21 52:11 | **addressed** 58:24 |
| **101** 2:4 | **5** | 109:3 | 97:2 |
| **103** 3:11 | | **academia** 11:11 | **adds** 117:14 |
| **106** 3:12 | **5** 3:13 4:2 10:3 | 65:23 66:5 70:23 | **administerial** |
| **11** 4:15 | 42:21 110:6 130:9 | 71:1 94:17 | 126:15 |
| **1100** 2:8 | 130:12 | **academic** 8:23 9:5 | **admissibility** 90:3 |
| **117** 3:13 | **5216** 132:14 | 14:16,19 25:20 | **ads** 118:20,20 119:2 |
| **12/31/14** 132:14 | **5603** 4:13 | 65:17 106:22 | **advance** 30:16 |
| **12:28** 1:16 130:22 | **6** | **academics** 12:13 | **advertise** 118:13 |
| **13** 1:10,15 119:18 | | **accept** 49:6,14 51:12 | **advertisement** |
| **1301** 1:18 | **6** 110:17 118:9 | 52:13 56:3 88:3 | 118:18 |
| **132** 3:5 | **6/13/2014** 133:3 | 98:25 | **advertisements** |
| **133** 3:6 | 134:3 | **acceptable** 120:23 | 18:25 28:8,10 |
| **15** 25:18 28:23,23 | **650** 25:8 | 122:4 124:25 | **advised** 17:3 |
| **15th** 132:9 | **7** | 127:25 | **affixed** 133:15 |
| **1610** 2:4 | | **accepted** 87:21 | 134:21 |
| **1880609** 133:2 | **70** 25:6 | 122:22 | **agency** 90:15 |
| 134:2 135:2 | **78** 3:9 | **accepts** 48:16 49:17 | **agent** 13:14 29:7 |
| **19** 3:8 | **8** | **access** 85:12 | 30:12 41:2 48:1 |
| **1900** 1:19 | | **accomplish** 106:3 | 53:18 59:15 105:9 |
| **1:12** 1:4 131:4 | **8** 79:11 | **account** 79:4,23 | 118:24 121:19 |
| **2** | **80** 25:6 | 80:21 81:11 | 129:16 |
| | **9** | **accurate** 9:16 | **agent's** 33:17 |
| **2** 3:9 42:16 78:10,11 | | **acknowledge** | **agents** 29:13,21 31:8 |
| 78:19,23 79:2 | **9** 83:20 127:8 | 105:15 133:11 | 31:21 33:5 35:20 |
| 108:24 109:17 | **90** 17:10 | 134:16 | 36:24 37:24 38:1,10 |
| **20** 7:18 26:5 133:16 | **9:51** 1:15 | **acknowledges** 80:13 | 38:25 40:6,13,20 |
| 134:22 135:22 | **a** | **act** 14:8,21 15:6,16 | 41:19 42:24 43:5 |
| **200** 59:22 | | 17:13,19,22 51:15 | 45:1,2,6,8 47:6,18 |
| **2000** 17:10 | **a.m.** 1:15 | 67:12 88:13 91:1 | 47:22 48:7,15 49:15 |
| **2014** 1:10,15 132:9 | **ability** 48:22 49:9 | 95:11,16 99:23 | 49:19 50:5 54:10 |
| **20th** 2:8 | 50:12,21 51:2 54:19 | 133:14 134:20 | 56:13 57:2 58:14,17 |
| **216.623.6068** 2:9 | 55:22 64:22 124:7 | **acted** 92:14,24,25 | 59:2 60:1 61:17 |
| **216.696.9330** 2:5 | **able** 12:11 19:4 20:2 | **acting** 107:24 | 62:6 88:8 99:25 |
| **3** | 21:7 25:16,21,24 | **action** 132:5,7 | 101:17,22 102:14 |
| | 30:2 31:19 33:20 | **activities** 57:8 | 102:24 107:21 |
| **3** 3:11 87:10 103:12 | 36:3 43:12 50:9 | **activity** 66:3 | 119:6 120:2 125:4 |
| 103:14 109:4,23 | 54:15 55:16,17 | **ad** 118:23 | 125:12,13 129:7 |
| **30** 4:2 | 56:20,22 57:11 | **addition** 88:24 | **ago** 4:21 13:24 17:4 |
| | 59:20 61:5,8 62:13 | | 20:13,13 45:24 94:7 |
| | 62:22 72:9 73:3 | | |
| | 87:25 102:18 | | |
| | 109:14 110:17,20 | | |

**agree** 6:20 40:10 41:14 57:6,10 61:14 61:23,24 98:20 99:7 99:15 127:21 128:25

**agreed** 4:1 127:23 129:17

**agreement** 47:19 52:3 105:12,13,19 128:11,12,24 129:14

**agreements** 18:24 21:12 87:14,17 106:18

**ahead** 9:24 15:22 48:11 87:23 117:19

**ahearne** 1:9,12 3:2,8 3:9,9,10,11,12,13 4:4,9,10 19:15,18 78:11 103:12,14 106:5 130:9 131:15 133:4,9 134:4,13 135:20

**al** 1:3 131:3 133:3 134:3

**allow** 85:6

**allowed** 50:1 54:14 54:14 55:11 125:8

**ambiguity** 6:5

**amount** 18:9 28:10 29:18,24 34:24 45:25 46:2 57:5 71:13 72:11,16,21 73:19 79:5,15,23 80:8,10,16 81:8,18 82:8,14,16,20 131:24

**analyzed** 66:25

**andy** 92:18

**ann** 112:19,22,23

**answer** 5:11 6:2,12 7:22 11:8,16 12:5 13:8 14:11,24 15:3 15:8 31:12 32:12 35:23 37:16 42:14

43:2,3 44:5 48:12 48:20 49:8,24 51:21 53:21,25 54:4,15,23 55:8,15 56:1,10 58:18 59:9,17 63:9 63:17,25 64:8,11,25 69:8 71:2 72:19 73:17 74:6,7 75:5 75:16,21,23,25 76:6 76:9,10 77:12 84:13 84:22 86:9 87:23 94:22 95:4,6,14 96:7 97:11,19 98:12 99:17 100:2,9 101:8 102:6,7 105:1,24 112:7,10 116:2 119:10,11 123:25 129:10

**answered** 48:11 66:21 67:15,20 72:18 73:16 75:15 76:9 96:4 100:18 101:7 104:4 115:11 119:9 121:25 123:8 123:23 124:23

**answering** 58:2 70:9 81:7 101:2

**answers** 6:20

**anti** 52:5

**anybody** 8:6 26:2,8 76:17 112:3 115:2 127:21

**anyplace** 79:4,22

**anyway** 5:9

**apologize** 37:18 78:25 104:8 119:4

**apparently** 125:23

**appear** 133:11 134:15

**appears** 111:23

**appended** 20:9 134:11,18

**applicability** 63:23 115:8

**applicants** 118:15

**application** 84:25 86:18 87:21 88:4,12 126:5,6 128:22

**applications** 56:4 87:25

**applied** 35:7 37:24 66:16 91:11

**applies** 51:6,14 66:10,17 68:4,19 69:4 75:13 76:5 78:2 95:3 96:3

**apply** 16:5 66:8,18 67:12

**approach** 24:12 94:24 108:17

**approaching** 57:5 61:2 99:20

**appropriate** 10:12

**approximate** 82:16 82:19 116:12

**approximately** 4:15 4:21 7:18 25:6 26:10 117:3

**area** 9:12 11:2,10 14:4 15:1 25:23 26:1 28:12,15 60:9 61:4 63:11 68:8,21 91:18 93:20 98:2,6 99:12 112:17 113:2 113:14 114:4,7,14 114:18 130:1

**areas** 56:18 86:6

**art** 12:14

**article** 13:10

**articles** 14:2 25:21 106:22

**asked** 6:23,25 8:13 13:3 18:3,4 27:12 27:16 28:1,11 30:5 32:3,4 33:21 34:23 37:6 38:1,3,4 39:20 48:10 58:4 66:20,22 67:14,17,20 71:4,22 72:17 73:15 74:21

75:14 95:25 96:4 100:7,17 101:6,20 102:6,21 105:4 114:5 115:10,23 117:8,13 119:4,8,12 121:24 123:7,23

**asking** 33:1 35:13 46:2 65:10 67:8,23 75:20,24 76:3 77:8 77:12 81:6 94:23 98:25 99:4 100:14 100:23 102:2 110:24 111:1,17,19 111:23 120:25 121:3 123:18 124:4 124:15,21 128:8

**aspects** 47:3

**assertion** 124:14,15 129:12

**assigned** 38:25 39:4 39:8

**assignment** 18:2 133:2 134:2 135:2

**assist** 65:25

**assistant** 64:23

**assisting** 65:13,16 72:13

**associated** 119:22 123:16

**assume** 31:21 33:13 34:1,14 38:17,18,20 38:21 39:9 41:7,10 44:24 45:19 49:12 57:2 104:1

**assumed** 33:24 34:1 39:7 55:5,20

**assuming** 45:21 49:13 64:19,20 71:20 73:11

**assumption** 34:9,11 36:16,18 98:24

**assumptions** 71:25

**attached** 1:21 19:16 78:24 134:7

[attain - certain]                                                    Page 3

attain  80:15 127:17
  127:18
attempted  88:10
  115:7
attempts  46:17
attend  29:10
attorneys  4:1 7:25
  132:5
attributes  63:19
  64:12
atypical  48:6
authoritative  90:19
authority  47:18
authorize  134:11
automotive  50:23
availability  27:8
available  27:13 32:6
avenue  2:4,8
average  35:20 36:6
  36:17 41:24 42:23
  59:5,11 82:15 84:15
  84:17,18
avoid  119:22 123:16
avon  113:15
aware  40:7,16,23
  48:13 49:11,18,25
  53:22 56:2 59:12
  62:3,18 64:18,19
  65:8 68:25 69:4
  82:5,6 85:15,20
  86:2 90:8 91:8,12
  92:16 113:21 114:8
  114:8,12 115:4
  116:3 119:5,15
  122:12,13 125:8

**b**

b  3:7 4:2 78:13
back  6:12,14 17:9
  25:15 27:15,22
  46:24 47:23 57:22
  70:11,14 74:21
  79:20 102:21
  104:20 105:5
  130:10

background  6:24
  20:6 43:7 73:1 90:9
backing  31:1
bad  74:14
badge  101:18,20,21
base  31:14 39:15
  124:21
based  34:22 47:7
  58:20 74:1 78:1,4
  79:17,18,18 87:16
  105:25 106:1
  110:25 120:13
  124:16 126:20
bases  30:22
basic  8:9 15:19,22
basis  13:17 29:25
  44:25 126:1
bear  15:5 66:9 94:19
  95:9,21
bearing  17:24
bears  75:12 76:4
  94:24 95:1,7
beechwood  33:9
  35:12
beginning  70:19
behalf  56:7
believe  17:11 20:13
  31:13 32:13 43:16
  50:3 51:19 55:16
  60:1 61:16 63:6
  64:21 65:1,19 66:22
  66:23 75:10 83:7
  86:20,25 87:4 98:22
  103:20 107:12
  111:16 116:9,10
  117:13 120:9 130:6
benefits  10:13
best  50:11 106:14,15
better  30:25 57:12
  106:17 121:19
  122:22
big  25:23
biggest  24:5
bill  3:13 120:21
  121:7,8 122:6,8,16

billed  25:9
billing  120:14
bills  56:17 121:14
binding  128:17
bio  19:21 20:5,10
bit  6:24 12:22 33:19
  44:19 68:20 88:20
book  11:5,25 12:20
  12:22 14:6,10 47:2
books  21:15 22:1
branded  41:3
break  40:6 76:15,17
  76:18 86:14,16
breakdown  44:11
breaks  40:21,21
  57:4
briefly  27:5,10
bring  104:15
bringing  39:11 94:8
broad  21:14,14
broadly  47:1
brochure  110:7,15
brochures  100:1,15
  101:4 110:14
broke  46:19
brought  9:8 33:20
  43:8
build  24:13
business  5:1 11:11
  19:5 20:20 21:3,4,6
  52:7,7 53:8 62:17
  114:17 125:18
butchering  114:20

**c**

c  2:1 112:21
calendar  7:9
call  8:6 13:14 21:24
  32:20 49:21 50:2,6
  51:23 52:4,5,13,13
  52:18,23 54:17 98:1
  119:7 124:9 129:16
called  79:10 106:20
calls  23:13 53:19
  54:2 56:8 63:15,22

74:4,25 129:8
canceled  127:19
canceling  129:24
candidates  118:14
canvassing  85:6
capabilities  74:14
capability  48:6
careful  21:11
carry  101:21
case  1:4 4:24,25
  6:22,24 7:12,20,24
  8:1,3,8,11,19 9:20
  10:16,18 11:14,17
  11:22 14:12 15:24
  15:25 16:5,24 17:5
  17:11,18 18:2,8,16
  19:8 23:6,25 25:5
  26:9 27:6,7,12,24
  28:20,25 34:16
  35:16 38:2 41:11
  45:21 49:12 54:5
  63:3 64:14,16 66:10
  68:11 69:1 70:4,17
  71:6,8,11,13 72:24
  73:1 80:19 81:4,14
  88:14,16,17,19,21
  89:6,12 91:16,17,17
  92:3,13,24 93:7,8
  93:20 94:4,14,19
  95:22 98:21 101:12
  102:3 103:22
  112:15 115:17,20
  116:5,9 123:22
  131:4 133:3 134:3
cases  17:1,2,6,9,13
  17:18 22:20,21
  68:15 84:24 91:8,18
  91:19 93:9,15 95:24
  113:7,14,18 114:2
  114:11,22,25
cause  1:15
cd  26:13,17
certain  31:19 32:4,4
  33:20,21 38:5 60:17
  71:8,13,20 73:1

86:5,6 108:4 109:22 118:5 122:24 126:2
certainly 6:16 23:3 118:8
certificate 134:11
certification 3:6 131:8 133:1 134:1
certified 131:12
certify 131:13 132:3
cetera 108:25 109:5
chad 81:13
challenge 89:21,22 90:3
challenged 89:11,14 89:15
chance 6:10,17
chances 57:18
change 6:13 21:2 134:8 135:3
changes 133:7 134:7 134:9
chappie 81:13
chapter 47:3
characterized 76:25 77:16
charges 7:11
checked 19:12
checking 27:22
chicago 93:12
cited 106:21
civil 1:20 133:5 134:5
clarification 6:6
clarify 6:6,13 10:2,5 48:4 56:5,15 58:5 60:4,12 61:13 64:1 73:3 75:23 77:1 98:22
clarifying 57:24 128:2
class 9:14 34:15 61:4 77:24 81:9 84:1,16,19,24 115:9 120:23 122:4 124:25 127:4

classification 11:18 11:19 65:21 121:5 123:12 126:8
classifications 126:3
classified 47:1 77:22
classify 12:15 13:1,3 51:7
clear 42:7 47:12 52:17 58:25 59:2 76:10 78:14 109:15 110:13,16 111:2
clearly 12:21 109:5
cleveland 2:4,8
client 5:1
close 24:18 46:18 50:6 51:24 52:1,1,2 53:14
closing 16:21,23 106:17
clothing 41:3,12,13
coaching 29:25 30:1 30:7,24 31:5 37:10 57:11 62:13
coauthors 92:8,10
code 121:6 122:5 125:1 126:8
coder 1:16 131:12 132:13
colleague 112:16
colleagues 92:12 112:14
come 20:1 31:16,25 32:1,3,5 33:8 37:9 46:16 55:9 61:10 93:24
comes 13:17
comfortable 35:6,14
coming 31:17 76:13 76:14
comma 119:21
commerce 1:5 131:5 133:3 134:3
commission 19:3 79:18 133:19 134:25 135:25

commissioned 19:1
commitment 24:17 47:15
common 110:11
communicate 30:9 54:19 57:14,18 62:14
communicating 10:13 17:15 30:10 54:18
communication 10:6
companies 20:23 21:8,9,13,15,16 22:12 74:11,15 85:13,18 113:15
company 10:8 20:17 23:13 31:9 34:6 35:8,15 39:1,13,24 39:24,25 40:1,5,14 42:13 50:16 51:3 52:6 53:6,7 54:20 74:14 84:19 104:14 123:10 124:2 126:10 127:24
company's 51:12 113:14 129:21
compared 90:23
compensated 82:5
compensation 24:24 25:1,22,24 59:5,6 71:9 79:5,11,14,17 79:17,19,23 80:1,8 80:9,16,19 81:8,15 82:7,8
competitors 20:24
completed 52:23 84:25
completely 64:2
component 88:25
components 12:24
conceivable 80:13 83:14
concerning 4:25 8:12 17:11 25:21,22

25:24 64:15 120:4
concluded 130:22
conclusion 53:20 54:3 56:9 63:16,23 72:4,6 74:5 75:1 90:4 95:5 119:19 129:9
conclusions 64:22 70:3,16 79:6,24 98:1
conditioned 44:22
conditions 39:17 49:3
conduct 76:23 77:14
confidentiality 21:12
confirmed 50:8
connection 4:24 7:11 19:7 25:4,11 25:19 26:3,9 28:20 28:25 29:13 31:23 37:5 55:5 87:7
consider 14:18 22:20,21 29:12 36:6 36:8 37:6 38:22 39:16 42:9,11 47:16 52:4 84:5
considerable 18:9 29:23
considerably 29:17 82:23
consideration 65:2 80:4 81:12
considered 15:4 37:4 66:3 69:9
consistency 57:14 77:20
consistent 16:8 25:25 33:23 54:20 55:19 72:7,22 80:24 102:16 106:18 109:13
constantly 13:19
constitute 14:17 58:6,7 65:18

[constituted - decisions]                                    Page 5

constituted  88:18
  89:23
constitutes  8:24
  12:16 14:14 18:6
  58:4,10,13 95:17
  108:10
consult  17:9 26:2
consultant  120:21
  126:11 129:16
consultants  31:5
consulted  20:23
consummated  52:22
contact  7:5 57:5
  62:14 105:16
contacted  6:23 7:2
contain  85:17
  115:16
content  17:14 27:14
  72:21
contention  14:13
context  93:2,4,17
  113:7 124:14
  127:12
contextual  61:8
  111:22
continue  60:20 61:6
  96:18 105:19
continuing  97:25
contract  23:21 48:8
  49:1,6,17 51:4,13
  52:19 53:17,22 54:1
  54:6,8 56:6,12
  101:23 110:18
  127:9 128:5,10,13
  128:17 129:2,2,4,5
  129:24,25
contractor  18:23
contracts  80:15
  127:17,18 128:1,9,9
  128:20
control  40:5 85:25
  87:20 121:18 122:2
  124:8 125:13,25,25
  126:11,20

controlled  31:8,13
conversation  7:16
  8:5 26:6,8,11,25
  27:1,2,5 93:25 94:8
  117:6,7
conversations  116:8
  116:14,15
conversion  23:8
convert  30:3
converting  16:12,14
  16:15,17 30:25
copy  19:16 78:7
  101:16 103:16
  118:7
corporation  4:25
  5:1,3 88:15
corporations  19:25
correct  10:1 15:17
  26:6,7 34:17 37:24
  38:7 39:24 40:3,11
  40:18,25 41:15
  46:25 49:2 51:24
  52:23 53:1 58:11,12
  59:4 60:21 66:6,11
  69:19 73:14 77:25
  78:3 83:8,17 92:8,9
  99:21 101:13
  104:21 105:5,10,13
  105:17,21 106:20
  108:15 109:2,3,8
  111:20 116:6,7,11
  116:13 117:23
  118:5 121:15 123:6
  126:7,8
corrections  6:11
  134:17
correctly  126:6
cosmetics  21:17
  22:2
coughlin  112:19
counsel  75:4 103:19
  107:14 116:9,16,20
  132:3
counsel's  67:20

count  119:1,3
county  131:10
  133:10 134:15
couple  17:6 43:24
  43:25 91:18
course  111:13
court  1:1 5:19 32:20
  66:16 68:2,7,18
  69:23 88:11 89:9,19
  131:1 133:7
courts  91:23
coverage  113:20
covered  35:15 96:15
  96:22 97:7,15,23
  98:10,18 99:9,9
credit  123:10 124:1
creditworthiness
  88:2 119:24 120:3
  120:17,25 121:2,11
  121:17,22,23 123:5
  123:6,18 124:5,7
creditworthy
  121:14 123:11,11
criteria  12:12 58:23
  122:12 127:24
criterion  122:24
csr  1:16 132:14
current  18:17 56:17
  120:22 121:8 122:6
customer  10:9,9
  17:16 24:8,8,13,13
  24:14 30:10 47:24
  49:14,22 52:3,12
  54:22 56:3,14 57:5
  57:6,19 86:18,19
  87:14,17 101:23,24
  104:16 105:8,15,20
  110:17,20 120:13
  123:1 128:11,14
  129:17
customers  22:17
  23:20 24:11 30:13
  32:5,5 43:10 54:11
  54:24 55:22 61:9
  62:14 94:24 100:1

100:15 101:5,18,19
  110:6,14 119:23
  124:7 126:21
cut  99:5
cv  1:4 3:9 19:16
  20:5,7,8,9,10,11
  131:4
cyclical  81:1

**d**

d  3:1,7 114:21
das  114:17
databases  23:5
date  7:7,8,14 20:11
  85:5 132:14 133:3,9
  133:19 134:3,13,25
  135:20,25
dates  117:1
davina  1:3 19:2 87:5
  131:3 133:3 134:3
day  32:4 36:11 39:1
  40:15 59:22 60:7
  132:9 133:16
  134:22 135:22
days  31:20 33:4
  35:19 36:4,4,6,10
  36:10,17 43:24,25
  43:25 44:1,2 80:14
deal  13:20 46:25
  50:18,22 52:22
  106:17
dealing  13:13 90:19
dealt  8:4 15:24
december  7:6 26:6
  116:10
decide  123:10
decided  31:15,17
decides  52:6
deciding  69:3
decision  52:9,11
  65:2 68:7,9,11
  84:12 92:2 123:10
decisions  63:2 68:1
  91:24

[declaration - doors]

declaration  3:10
deed  133:14 134:20
deem  10:5 11:12
 24:11
deemed  31:1 124:24
 127:24
defendants  1:6 2:6
 131:6
defense  103:19
 107:14 116:9,15
defin  54:9
define  14:2,9
defined  11:4 12:20
 14:10
definition  9:4,6,16
 9:18,19,21 10:3,4,7
 10:15 11:9,24 14:5
 16:1,2,7 54:5 56:11
 63:5 70:25
definitions  9:3
demanded  89:19
dennis  18:19 26:20
 43:21
dennis's  28:12 31:3
department  23:3,4
 90:12
depending  82:23
 121:16
depends  59:25
 111:22
deposed  4:16 81:14
 83:23,25 84:4
deposition  1:8,12,21
 6:10,12,18 9:7
 26:20 31:3 87:1
 89:7 118:4 130:17
 130:22 131:17,25
 133:1,3 134:1,3
depositions  18:10
 18:13,14 26:18 27:9
 31:4 73:21
deroche  2:3 3:4 4:7
 5:18,25 7:25 11:8
 11:16 12:4,5 13:8
 14:11,24 15:8,14
19:20 22:1 31:12
32:12,17,25 33:4,12
34:9 35:23 36:24
37:14,20 38:12 39:7
41:22 43:2 44:6,16
48:3,7,12,20 49:8
49:24 51:17 53:1,21
54:4 55:8,15 56:1
56:10 58:2,7,20
59:1,17 63:2,9,17
63:25 64:8,25 65:8
65:12 67:8,17,23
69:7,17 70:9,13
72:15,19 73:13,17
74:6 75:3,16 76:8
76:16,22 78:15,18
78:22 79:1,3 82:1
82:12,19 84:9,22
85:4 86:3,13,17,24
87:3,16,23 88:7
90:6 91:3 94:22
95:6,14 96:1,7,13
96:20 97:5,19 98:3
98:4 99:17 100:20
101:8,17 102:10
103:1,13,17,18
104:9 105:24 106:6
111:9,11 112:2
115:13 116:2,23
117:19 118:9
119:10,14 122:7,14
123:14,21 124:4,11
128:19 129:10
130:3,5,10 132:1
describe  55:11
 56:22
description  29:4
 118:25
descriptions  28:24
despite  67:20
detail  20:22 28:16
 93:3 102:20 104:18
detailed  18:24 99:15
 103:2,4,5,6,7,9,10
 104:12,17,18,19,24
127:5
details  68:10 69:11
 69:24,25 71:14
 91:21 99:23 113:17
 126:6
determination
 11:25 66:1,8,16,24
 67:2 69:10 70:20
 75:6,9 77:23 123:12
determinations
 12:18
determine  14:1 18:4
 19:4 24:4 42:5 71:7
 85:6 112:8 120:21
 122:3 124:3 128:17
 129:22
determined  31:22
 66:13 129:21
determining  51:5,13
 53:13 66:14 68:3,19
 72:13 88:3 91:10
 96:2 99:8
developing  10:11
 25:12 62:11
dial  49:20
dictated  33:4,16
difference  22:6
 38:24 90:22
differences  38:19
different  29:19
 31:20 32:6 55:12
 88:20,21 113:11,15
difficult  15:2 60:2
diligent  126:22
direct  21:6,24,24
 113:6,15
directed  125:6
directly  10:9
disagree  99:2
discovering  10:11
discretion  49:6,11
 49:13 50:17 51:3,12
discuss  79:16 93:3
discussed  29:17,19
 56:19 98:20 117:15
discussing  66:2
 103:25
discussion  93:18
 94:13,16 114:4
 130:8
dish  89:1,4
dispute  10:19,21,24
 11:3
disqualified  129:22
 129:23
disqualify  129:20
distinction  22:23,23
 34:19,20 91:4
distinctions  35:2,4
distributor  10:25
 18:20
district  1:1,1 131:1
 131:1
division  1:2 131:2
document  101:25
 102:4 103:15 105:4
 106:7 107:6,8,11,13
 108:6
documentation
 39:13 71:21
documented  42:3
documents  72:7
 103:18
doing  13:11 16:13
 27:17 28:25 29:5
 30:1,15,16,17,23,25
 35:6 38:15 61:11
 88:23,25 107:22
 117:8
dollars  80:24 83:1
donna  87:5,5
door  21:1,1,7,7,18
 21:18,19,19 22:4,4
 22:5,5 61:2 99:20
 104:20,21 105:5,5
 108:10,11,14
 126:12
doors  33:17 40:14
 59:14,20,22 60:10
 60:18,20 125:5,6

double  19:12
dress  59:20
drink  76:20
drive  4:13
drivers  85:9
dropped  125:23
due  33:2 75:25
  80:25 120:2
duly  1:14 4:5 131:15
duties  8:18 25:2
  66:24 77:19,21

**e**

e  2:1,1 3:1,1,7,7 4:6
  92:20,22,23
earlier  67:16
early  17:10 29:25
earn  41:19 59:3
  80:15 118:19
  127:16
earned  42:1,13,16
  42:18 59:10 83:7,10
  83:15 84:2
earning  80:23
earnings  42:23
earns  81:3 97:21
easiest  22:25
easily  98:16,21 99:1
  99:6
eastern  1:2 131:2
easy  98:8
ecolab  4:25 5:1,3
  7:24 15:25 16:25
  17:18 88:14
editor  13:21,25
educational  84:15
effective  12:24,25
  13:19 45:6,8 72:9
  74:18
effectiveness  9:13
  20:2
efficiency  59:25
efficient  60:19,24
effort  84:9,14 112:7

efforts  86:6 122:18
eight  60:7,18
either  127:16,21
  129:1 130:7
electric  120:22
elements  61:25
  68:18
eligible  85:19
employed  132:4
employee  55:21,25
employees  55:11,21
  56:3 63:20
enables  30:8
encyclopedias  21:16
  22:2
ended  29:3
energy  1:5 8:10
  18:19 20:17,18,20
  20:24 21:2,3,4 29:8
  41:3 43:8 48:16
  49:5 50:10,10 52:20
  53:18 54:11,25
  55:12,23 56:7 58:14
  73:2 76:23 77:14
  78:3 80:14 85:17,19
  85:22,25 86:6 87:19
  88:3 100:14 109:18
  118:13,14 126:9
  128:13 129:18
  131:5 133:3 134:3
enforce  100:22
enforced  111:2,2,24
  112:8
enforcement  100:23
  112:1,3
enforcing  90:16
engage  43:10 52:15
  53:13 61:9 104:16
  126:21
engaged  12:19
  69:18 70:21 113:9
engagement  106:15
engagements  19:25
engages  25:2

engaging  30:13
enhance  48:23
ensure  50:5 120:3
  121:2,23 124:7
ensuring  119:24
  121:21 123:17
entail  43:12
entails  43:5 46:24
  127:15
entered  134:9
entire  35:15 133:5
  134:5
entry  9:14 73:5
equally  61:14
equipment  50:16
errata  134:7,10,18
  135:1
establish  12:11 99:3
et  1:3 108:25 109:5
  131:3 133:3 134:3
evaluate  62:23
evaluated  43:16
evaluation  44:19
event  125:24
events  21:20
everybody  34:3
  83:24
everyone's  73:19
evidence  64:15
ex  92:14
exact  7:8 36:22 59:5
  68:10 82:14 91:21
  113:3 116:25
exactly  50:7 60:14
  67:1 77:6,12 87:12
  120:7 121:22
  123:18 124:11
  126:24 127:2,7
  128:2,6
examination  3:3
example  13:10,15
  21:15 22:24 23:7
  24:9 39:11 47:2
  53:4 57:13,20,21
  61:7 81:2,13 82:21

106:9 109:17
  113:14 118:20
  126:4
examples  74:15,15
  106:22 108:22
  123:24
excellent  44:21
excess  81:16
exclusive  85:25
execute  108:23
  109:15
executed  134:10
execution  133:14
  134:19
exempt  12:3 14:21
  126:3
exemption  11:18,20
  12:1 14:8 15:6,16
  17:25 51:5,14 63:7
  63:14,20,21,24 64:4
  66:10,17 67:13 68:4
  68:13,19 69:4,10
  74:3,24 75:7,13
  76:5 88:12 90:20,25
  95:3 96:3,10,16,18
  96:23 97:8,15,24
  98:11,19 99:10
  115:8
exemptions  114:2
exercised  88:2
exhibit  3:8,9,11,12
  3:13 19:15,18 78:10
  78:11,21,22,23
  86:25 103:12,14
  106:5 107:9 130:9
  130:12
exists  63:14 96:10
experience  58:15,19
  58:21,24 73:1,4,10
  73:20,22 74:2,10,12
  74:22 75:12 76:4
  96:14,21 97:2,7
  102:14 106:15
  112:12

[expert - gas]

| | | | |
|---|---|---|---|
| expert 3:10 6:25 7:20 8:22,23 10:25 11:10,22 14:15,16 14:16 15:1 17:3 18:11,12 19:16 64:9 65:11,17 67:6 68:8 68:21 69:19,20,22 70:2,15 71:6,10,11 72:24 88:17 89:15 89:18,23 91:22 92:14,24 93:1 95:15 95:16 96:5 97:18 107:5 113:1,4,10 114:7,9,14,24 115:13 128:16 | 34:2 37:2 39:16 48:4,6 53:7 64:22 65:5 70:21 72:11 73:10,13,24 74:12 81:3 94:15 97:13,21 98:7,15,23,25 99:1 99:2,3,6,6 106:21 120:15 121:4 | finalizes 52:3 finally 6:17 finance 50:18 finances 53:4 financial 23:5 50:24 financially 132:6 find 23:15 25:25 84:10 113:9 findings 65:3,4 fine 48:3 127:8 finish 5:25 37:15 57:24 58:1 101:1 finished 37:19 | forming 103:21 forms 126:16 127:6 forth 46:24 47:23 64:18 68:2 forthright 6:20 forward 16:18 27:24 50:9 52:4,12 105:19 127:21,23 128:12,25 129:1,15 129:17 found 7:19 27:13,14 33:23 37:12 99:7 |
| expertise 11:1 12:10 18:5 67:10 96:25 97:10 98:2,6 99:13 111:10 130:1 | factfinder 68:3 factor 51:4,13,21 80:4 99:8 factors 12:24 15:4 69:9 95:10 96:1 facts 71:25 72:3,5 factual 27:4 65:3 116:21 126:1 129:13 | firm 22:18 24:22 30:9 50:21 first 4:5 5:14 7:16 8:5 18:11 21:11 24:3,3,4,8 26:25 27:15,16 29:22 38:18 57:9 83:20 89:20 119:21 | foundation 7:21 11:15 31:10 35:21 36:20 38:11 39:2 41:21 43:1 44:3 48:18 49:7,23 55:14 58:22 59:16 62:19 82:10,17 84:20 85:1 86:1 94:20 |
| experts 91:10,12,13 91:23 92:3,5 | failed 80:15 83:15 127:17,21,24 | fit 8:16 127:4 flexibility 31:19 33:10 118:21 | four 117:4 frame 60:3 framed 71:4 |
| expiration 132:14 133:19 134:25 135:25 | fair 14:8,20,25 15:6 15:15 17:13,18,21 51:15 67:12,19 88:13 90:25 95:11 95:15,16 96:5 | floor 2:8 fo 12:18 focus 12:17 33:21 85:11 121:1 | free 133:14 134:20 friday 1:15 friendly 105:15 108:9,10,17 |
| explain 43:4 106:9 explicit 39:12 99:19 106:13 108:21 | fairly 20:21 103:4,6 103:7 | focused 9:4,6,7 focuses 35:11 folks 21:2 | front 6:6 19:20 20:10 120:7,12 frontline 13:14 |
| explicitly 118:22 express 100:24 expressed 18:8 116:6 | familiar 68:16 92:4 far 35:17 55:4 56:20 62:1,3 63:11 farmer 17:6 farming 17:9 | follow 23:24 24:11 24:17 26:11 followed 19:3,4 | full 4:8 20:9 fully 50:5 function 46:20 |
| extensive 44:24 extent 27:4 68:15 71:15 75:17 116:19 116:20 | fashion 101:23 federal 1:19 16:1,3 68:25 89:18 | following 52:14 107:17 131:14 follows 4:5 95:18 109:14 131:25 | further 19:14 49:21 53:14 115:19,21,24 116:4 125:16,20,22 130:3 132:3,6 |
| extents 32:6 extremely 103:10 eye 57:5 105:16 eyes 105:7,10,17,21 | feeling 12:13 fellow 114:16 felt 27:20 field 14:17 65:17,17 73:2 | force 9:13 20:2 foregoing 133:13 134:18 | **g** |
| **f** | figure 65:13 77:9 file 119:2 | form 21:23 56:6 87:22 | g 112:21 gain 60:24 garson 2:3 |
| face 24:8 facing 24:7 fact 8:13 10:21 27:23 31:2,15 33:11 | fill 118:15 filling 126:16 final 119:18 | formed 49:2 116:4 129:6 | garson.com 2:5 gas 120:22 |

[generally - idea]                                                          Page 9

| | | h | |
|---|---|---|---|
| generally 36:19 | 126:13 130:10 | | hold 37:15 50:17 |
| generation 22:13 | goes 11:18 22:15 | h 3:7 112:21 | 79:8 101:23 105:13 |
| 23:4,8,10,11,17,17 | 52:18 | half 13:24 20:13 | home 4:12 47:10 |
| generator 22:14,15 | going 5:5,22 6:10 | hand 78:8 132:8 | 53:18 119:6 |
| generators 22:11,19 | 8:14 19:14 21:1 | handed 104:2 | homeowner 47:20 |
| 23:19 | 23:4 27:23 29:18 | handling 47:4 | 48:9,17 52:19 53:17 |
| geographic 34:20 | 30:4,18 31:16,18 | handwritten 3:14 | honest 17:7 |
| 35:1,8,10,11,15 | 32:17,20 37:14 | hang 76:20 | hope 75:18 |
| getting 44:22 77:7 | 47:25 48:24 49:1 | happen 32:22 | hopefully 6:1 |
| 77:10 106:17 | 70:10 72:2 78:7 | happened 32:21 | hour 14:22 25:8 |
| give 4:12 6:19 13:9 | 83:24 84:3 87:13 | 39:14 53:14,15 94:8 | 42:16,19,21 59:15 |
| 24:15 57:20 59:18 | 96:17 107:4 111:6 | happens 9:11 44:17 | 63:21 64:5,9 90:10 |
| 75:20 76:1 78:6 | 118:7 121:14 | 44:19 124:8 | 90:16 92:24 93:7,8 |
| 88:10 99:19,22 | good 40:1 41:6 | hard 9:15 17:8 42:4 | 113:7 114:3,11 |
| 106:9,13 110:25 | 57:11,17 74:13 | harris 131:10 | hourly 11:19 25:7 |
| 115:17 | 104:17 125:18 | hart 87:5 | hours 25:6,18 30:1 |
| given 6:24 14:7 | grade 84:15 | harvard 114:17 | 36:19 42:3 44:2 |
| 15:18,22,25 28:9 | graded 43:15 | head 115:3 | 60:7,18 62:10,17 |
| 29:23 31:16,19,24 | great 6:22 20:22 | hear 93:4 | 80:14 83:15 98:16 |
| 33:8 39:21,23,23,25 | 76:20 | heard 59:21,24 | household 23:10 |
| 40:17 43:7,10 54:13 | ground 5:5 | 62:21 92:25 93:19 | households 23:6 |
| 62:8 64:15 71:21,24 | group 61:4 94:11 | 93:19,21 112:13 | houses 23:13,14 |
| 73:18 77:18 81:1 | guarantee 49:1 | 113:11 | houston 1:19 4:11 |
| 85:8,9 88:8,10 89:7 | 56:20 | height 94:14 | huh 10:1 117:2 |
| 102:14,17,22 | guess 35:24,25 | held 105:12 | hum 4:23 5:10,13,15 |
| 109:24 125:2,6 | 54:23 60:12 108:3 | help 23:22 30:2 40:1 | 9:23 19:13,22 45:15 |
| 131:17 132:8 | guessing 25:16 46:1 | 45:7 57:12 70:3,15 | 61:12 79:21 80:7 |
| gives 118:17 | guidance 31:17 75:9 | 71:7,12 72:25 106:2 | 83:12 87:18 101:3 |
| giving 6:2 9:17 | 85:8,9 107:23 | 122:19 | 104:10 119:20 |
| 105:2 108:16,22 | 108:12 | helpful 65:19 | 127:14 |
| 109:1 112:15 | guide 66:23 70:20 | helping 72:3,6 73:9 | hundreds 14:1 84:5 |
| 123:22 | 99:23 106:10,25 | 117:25 | hurt 1:3 19:2 87:6 |
| glean 100:5 121:10 | 107:2,7 108:21 | helps 24:15 75:8 | 131:3 133:3 134:3 |
| gleaned 31:2 101:11 | guideline 55:17 | 106:16 | hurts 87:5 |
| globally 9:12 14:3,3 | guidelines 15:19,22 | hereto 1:21 | husband 47:9 |
| go 5:5 6:14 9:24 | 31:25 54:13,17,17 | high 50:14,15 57:7 | |
| 15:22 19:14 20:2 | 57:17 59:18,19,21 | 104:18 118:19 | i |
| 21:7 24:2 25:15 | 62:8 109:14 | 124:2 | ibm 50:14,15,17 |
| 27:19 31:6 33:21 | guides 106:2,7 | higher 37:11 44:20 | ic 8:19 10:22 18:16 |
| 43:5 46:10 47:22 | 108:13 | highly 70:5,17 80:25 | 80:14 118:13 |
| 48:11 52:13 57:3,22 | guys 62:24 | hire 58:14,19,20 | ic's 125:25 |
| 74:21 79:20 87:23 | gwin 1:4,16 131:4 | hiring 58:17 74:1,22 | ics 18:17 29:19 |
| 102:21 112:5 | 131:12 132:13 | 75:11 76:4 96:14,20 | 121:23 |
| 115:23 117:19 | | 97:6 | idea 15:3,10,13,14 |
| 122:19,20 125:2 | | | 42:21 79:16 81:24 |

93:16 94:14 97:11 114:1,25 118:17 121:3
ideas  108:17
identifies  22:17
identify  12:23 23:19 23:22 24:14 77:12 130:11
identifying  23:5
impact  75:18
impacting  84:11
importance  124:18
important  6:19 24:21 95:11 96:2
include  83:13
included  110:8
including  18:10 53:3 110:8 113:12
inconsistent  56:23
incorporated 134:12
increments  28:23
independent  10:25 31:5 126:11 129:15
independently 38:10
indicate  61:21 98:9 107:25 125:11
indicated  120:11
indicates  108:19 109:7 111:14
indication  106:6 107:1,6 108:5
individual  10:22 16:11 24:7,24 25:2 39:13 47:14 53:8 71:7 74:2,13,17,23 82:15 95:22 99:24 120:15 121:20 124:24,25 125:1
individual's  70:21
individuals  11:4 18:15,22 19:1 22:10 23:7 29:23 36:3 61:4 64:3,16 70:4

70:17 71:12 72:25 74:1 79:5,24 80:9 81:13,21 82:22,23 83:10,25 84:3,5 85:10,17 94:18 95:22 115:6,9
industry  17:10 21:25 50:23,23,24 66:4 68:6 113:6
ineffectiveness  81:1
infer  118:20
info  26:20 96:12
information  4:2 8:9 8:15 10:10 18:17,21 18:23,25 20:4,6 23:15 24:4,6,9,15 24:22 25:22,24 26:13,17,19,21,22 27:4,11,19 28:2,4,8 28:10,11 34:22,24 35:25 37:9 41:9,23 41:25 42:7 43:11 47:11 48:22 54:19 54:22 55:19 60:24 65:25 68:5,14,16,20 73:19 75:7 78:1,4 83:5 84:8,23 85:3,4 85:12,16,20,21,24 86:7 88:6,8 99:18 102:1,17 106:12 110:25 116:21 117:9,12,14,21 120:5,14 121:9,10 125:2 126:5 127:5
informing  10:13
initial  8:14
initiate  50:5
input  49:15 65:1 66:13 91:5,10,13
insensitive  81:23
inside  23:12,12
instance  1:13 34:20 60:7 80:13 83:4 99:20 104:20 114:2 122:8

instances  116:18
instruct  69:1
instructed  122:8,14
instruction  107:21 117:18
instructions  99:19 102:13,22 106:8,13 107:2 108:6,22
instructs  105:9
insurance  22:3 50:23
intend  115:17
intended  96:15,22 97:22,23 98:10,18
intending  115:19
intent  71:11 72:24
intention  71:6 73:3
interacted  24:10
interaction  49:21
interacts  10:8
interested  6:25 8:11 8:14 23:14,23 27:17 27:21,23 30:10 132:7
interesting  27:14
interfere  32:18,24
interfering  32:20
interjection  67:21
internal  53:12
interpersonal  10:6
interpret  107:20 109:23 110:22,24
interpretation  108:2
interpreted  108:3
interrupt  86:23
introduce  108:24 109:18
introduction  3:12
invalidate  52:15 126:17
involve  114:2
involved  18:16 26:19 34:16 47:6,23 129:7

involving  16:25 17:18
irrelevant  32:2,8,10
issue  15:5 17:25 35:16 51:19 64:16 66:9 75:12 76:5 94:18 95:2,22,23 121:1

### j

j  3:9
james  1:4 2:3 131:4 132:1
january  116:11,24
jderoche  2:5
jim  47:25 70:6 76:14 78:13 86:23 87:14 101:14 103:16 111:6
job  11:12 12:12,14 12:17,17,25 13:18 14:17 18:6,6 30:9 30:15,16,17 32:2 36:13 39:10 43:11 57:12 61:11 64:4 65:18,21,22,24 70:20 72:10 74:9 75:8 88:18,25 94:12 95:17,18 106:17 108:7 109:7,12 110:23 111:8 113:5 117:14 118:12,14 121:19 123:13 127:3
jobs  44:20 48:5
johnson  2:3
journal  13:21,25 14:3
jude  4:9
judge  1:4 68:25 69:9 69:11 89:17,25 131:4
judges  91:9
june  1:10,15 132:9

[junior - major]                                                      Page 11

**junior** 45:8
**juries** 91:9
**jury** 64:14,21 65:1
  65:14 70:3,16 71:7
  71:12 72:4,13,25
**justifies** 64:4
**justify** 63:20

**k**

**k** 2:7 132:2
**keep** 7:9 28:19
  32:19,22 105:7
**kept** 7:11
**kidding** 5:23
**kind** 13:16 24:4
  30:4 47:5 93:15,25
  112:3 114:22,25
  124:6 126:10
**kingwood** 4:11,13
**knew** 34:3
**knock** 33:17 40:14
  59:15,20,22 60:9
  104:20 105:4 108:9
  108:10 125:5,6,7
**knocked** 60:17
**knocking** 60:20
**know** 6:6,14 7:8,19
  8:15 11:13,21,23
  13:1 14:5,12,18
  20:12 23:6 31:11
  32:21 33:6,11,19
  34:2,5,8 35:22,24
  36:8,8,21,22 38:12
  39:3 40:8,9 41:16
  41:22 42:12,14,15
  42:17,18,20 43:2,3
  44:4,5,16 45:25
  47:5 48:19 50:14
  51:2,6,11,17,20,21
  53:23 54:1,5,7,9
  55:4 58:8 59:1,5,7,9
  59:11 62:2 63:6,10
  63:13,18,19 64:11
  66:7,15,18 67:3,8
  68:17,20,22,22 69:8

69:11,13,21 74:24
75:11,17,21 76:3,6
79:14 81:20 82:9,11
82:12,14,18,19 83:2
83:3,4,24 84:1,8,16
84:21 85:2,14,16,23
85:24 86:3,8,9,18
88:1,7 89:11 90:5,6
91:3,5,7,21,22 92:1
92:1,5,10,23 93:9
93:13 94:18,21 95:7
95:9,21 96:9,16
97:8,16,24 98:4,11
98:19 99:3,7,10,25
100:2,3,4,7,9,21,21
101:9,20,22 102:2,8
102:10 105:3
109:12,12,21,22,25
111:4,7,9,11,24
112:1,13 113:1,3,4
113:8,8 114:6,6,23
115:6 119:1,4,16
122:11 125:10
127:10 128:4 129:5
**knowledge** 61:9
  62:22

**l**

**l** 92:20,21 112:21
**labor** 14:8,20,25
  15:6,15 17:13,19,21
  51:15 67:12 88:13
  90:13,25 95:11,16
  96:5
**lack** 74:1,22 96:13
  96:20 97:2,6
**laid** 11:24 65:24
  66:25 68:18 95:19
  123:24
**large** 18:15 28:10
  30:7
**late** 17:10 122:9,15
**laughter** 5:17,24
**law** 91:11 109:16

**laws** 14:22,25 63:21
  64:5,10 67:2 90:10
  90:16 114:3
**lawyer** 8:4 11:21
  100:12
**lawyers** 8:3
**laying** 106:14
**lead** 22:10,12,14,15
  22:19 23:4,8,10,11
  23:16,17,19
**leave** 31:18 48:2
  54:8 58:9,17 100:1
  122:15
**leaves** 53:18
**led** 123:21
**left** 60:9,20 100:15
  100:19
**legal** 11:21 53:19
  54:2,5,9 56:8 63:11
  63:15,22 66:12,14
  74:4 75:1 90:4 95:5
  98:1 109:20 128:16
  129:8,11 135:1
**legalistic** 15:9 51:19
  129:3
**legally** 95:7 100:9
  100:11 128:17
**length** 84:18
**lerner** 8:2
**letters** 78:17
**letting** 8:15
**level** 9:14 29:12,20
  30:6 32:9 37:11,23
  38:6 41:14 49:22
  56:14 57:7 65:4
  71:8,20 73:5 84:16
  102:20 104:18
  124:2
**levels** 41:24
**leveraged** 80:25
**life** 69:19
**light** 80:24
**limits** 69:21
**line** 134:7 135:3

**lines** 80:11,11
**list** 19:6 40:13,17
  92:6,7
**listed** 18:11,11
  86:22 122:2 134:7
  134:17
**listen** 99:4
**listing** 134:7
**literature** 25:20
  106:23
**litigation** 69:18
**little** 6:24 32:13 46:8
  68:20 88:20
**littler** 1:18 2:7 6:23
  7:2,23 16:25
**littler.com** 2:9
**live** 4:10,11 93:11
**lived** 4:14
**llc** 2:3
**local** 49:16,17 90:15
**located** 112:24
**location** 35:9,11
**long** 4:14 7:16 40:21
  43:23 44:7 55:18
  57:3 80:14 83:14
  92:7
**longer** 20:8
**look** 24:3,5 25:16,21
  36:4 74:11 103:11
  105:19 106:16
  108:8 118:9 127:12
**looked** 16:6 24:24
  25:1,23
**looking** 24:9 110:25
  121:8 122:3
**looks** 125:23
**lot** 19:25 92:7 99:18
  104:6 113:4

**m**

**m** 3:1 4:6
**machine** 1:17
**machines** 89:1,4
**major** 19:25

[majority - number]                                                    Page 12

majority 41:11 45:2
  45:3,10 57:16
making 53:3 63:6
  65:2 66:8,16 72:15
  81:18 90:23 91:23
  109:13 122:17
  127:3 129:11
managed 25:3
management 13:22
  14:3 43:17
manager 44:14
managers 43:17
mandatory 108:1,3
  109:7,24 110:22
  111:7
manner 55:12 56:23
  126:22
manual 26:21
map 67:3
maps 67:1
marked 19:15,18
  20:12 78:10,11,13
  103:12,14 106:5
  107:9 130:9,11
market 28:13,18
marketing 18:18,22
  22:16,22 23:3 106:1
  107:5 110:7,14
matches 14:20
matching 10:12
material 18:10
  26:12 43:12,14 47:8
  72:2 104:23 120:20
materials 18:22
  19:7 24:19,20 28:18
  71:21 72:9 89:3
  100:5 101:11,15
  122:3
matter 69:18 73:4,7
  73:21 89:18 92:11
matters 118:5
maximize 57:18
mckinney 1:18
mean 14:14 15:18
  16:17 32:23 45:3,10

45:11 46:13 50:7,20
  51:20 52:19 56:5,15
  57:20 60:4,10 77:11
  81:18 100:9 104:23
  106:10 108:12
  118:16 126:25
  128:22
meaning 29:2 103:2
means 16:18 71:19
  72:16 109:25 110:1
  110:2 111:5,12
  127:10 128:5
meant 128:2,6,10
mechanism 102:18
mechanisms 24:23
media 113:20
media's 68:14
meet 75:6 122:23
  127:24
meeting 15:16
meetings 21:20
meets 11:23 12:1,12
  14:5 15:5 63:5
members 77:24 81:9
  84:2,25
mendelson 1:18 2:7
  16:25
mentioned 33:18
  50:12 62:16 90:11
  93:6,10 100:25
  109:11,17 115:4
message 17:15 30:9
  57:14,18
messaging 54:20
  106:11
met 68:12
method 79:14 80:9
michael 1:9,12 3:2,9
  3:10 4:4,9 131:15
  133:4,9 134:4,13
  135:20
middle 125:15
midwest 135:1
mind 9:8 14:16 30:7
  32:1 50:25 77:22

97:3 104:4
minimum 41:20
  42:1 59:3,10 81:17
  97:14,22
minute 26:5 28:23
  45:23 76:15,21
minutes 7:18 76:19
mis 54:21
missed 54:21
mission 71:5,5
misstate 32:24
misstates 11:6 52:24
  95:12 124:10 129:9
misstating 33:1
mode 102:18
moment 130:11
money 64:17 81:18
monitored 32:6
month 42:25
monthly 42:23
months 13:24
morning 36:25 37:7
  37:22,25 38:5 39:20
  45:17 62:16
move 16:18 47:15
  50:9 52:4,12 127:21
  127:23 128:12,25
  128:25 129:14,17
moving 126:9
multiple 60:13,15
  104:7

|   n   |
|---|

n 2:1 3:1,1,1,7 4:6,6
  92:20,22,23 112:21
  112:23,23 114:21
  114:21
name 4:8 92:19
  110:7 112:19,20
  114:17,19,20 126:5
  133:3,4,15 134:3,4
  134:21
name's 87:5
narayandas 114:17

narrative 28:24
  29:4
nature 21:21 27:10
  37:10 59:21 61:5
  81:1 89:1,5 94:3
  113:3
necessary 125:2
need 31:1 58:8
  76:17,18 77:9 107:2
  107:18,20,25 112:9
  117:8
needed 122:5
needs 10:12,13
  24:14,16
negotiate 24:16
  47:19
negotiation 46:13
  46:13,14,21,22,24
  47:1,3,4,16
negotiations 47:5
neighborhood 59:25
  60:21,25
neighborhoods
  33:20,21 85:7,13,17
  85:21
neither 132:3
never 17:17 52:15
  113:24 114:5
news 68:13 113:20
normal 62:17 70:24
  81:3 102:20 109:14
northern 1:1 131:1
northwestern 93:14
  93:23 112:25
notary 133:10,18
  134:15,23 135:23
note 37:16 44:11
noted 12:4 75:3 98:3
notes 3:14 117:22,24
  130:15,16
number 17:4 18:15
  21:8,13 31:4 36:9
  37:12 42:3 59:19
  60:18 74:9 87:14
  108:24 109:17

110:7,17 113:11
118:3 119:2 122:18
**numbered** 1:15
109:4
**numbers** 78:17,18
134:7

**o**

**o** 3:1 4:6 92:20,21
112:21
**object** 32:18,19 33:3
37:13,14 47:25
87:13 96:18 111:6
**objection** 7:21 11:6
11:15 12:2 13:7
14:9,23 15:7,11
21:23 27:3 31:10
32:11 33:6 34:7
35:21 36:20 37:16
38:11 39:2 41:21
43:1 44:3,8 46:5
47:4,14 48:2,10,18
49:7,23 51:16 52:24
53:19 54:2 55:7,14
55:24 56:8 58:16,18
58:22 59:16 60:22
62:19 63:8,15,22
64:7,24 65:7,9
66:20 67:5,14,22
69:5,16 72:14,17
73:12,15 74:4,25
75:3,14 81:25 82:10
82:17 84:7,20 85:1
86:1 87:22 88:5
90:4 91:2 94:20
95:4,5,12,25 96:11
96:17 97:17 98:3
99:16 100:17 101:6
102:25 104:5
105:22 109:10
111:21 115:10
116:1,19 117:17
119:8 121:24
122:11 123:7,20
124:10 128:15

129:8
**objections** 24:17
46:15,18,20,23
47:13 61:1 76:7
97:25
**observed** 107:17
**obtain** 49:19
**obtained** 85:13
**obtaining** 3:12
102:1
**obviously** 6:10,18
121:13 122:23
**occasionally** 114:24
**occur** 91:15
**occurs** 10:8 44:12
**office** 31:16 33:9
35:4,12 36:25 37:7
37:22 38:5 45:17
85:10 97:14 132:8
**officer** 131:16
**offices** 1:18 34:20
78:3
**official** 133:15
134:21
**oh** 24:1 30:17 78:20
86:13 125:22
**ohio** 1:1 2:4,8 28:13
131:1
**okay** 4:12,16,20,22
5:5,12 6:2,3,7,15
7:2,16 8:5 9:10,24
10:15,18 17:17 18:2
19:10,14 22:24 23:3
23:8,19,24 24:1
26:2,15 27:25 28:3
28:19 30:17 33:12
33:16 34:5,13 35:19
38:9 40:5 46:12
49:5,15 50:1 51:23
53:11,24 55:11
56:22 57:25 59:9,23
65:12 67:19 68:25
69:7,15,21 76:12
77:5 78:2,6 79:12
79:20 80:12,20,21

83:6 84:1,15 86:10
86:12 87:10 88:1
89:16 90:9 91:14
96:13 97:13 99:19
101:4,22 104:9,25
105:12 107:9,13
110:22 112:10,12
114:13 115:2
116:18,22,23 117:2
117:5,12,15,25
118:3 127:8 128:8
129:5 130:2,14,19
**once** 23:16 30:11
**ones** 30:23,24 31:22
92:13 104:11
**ongoing** 44:14 48:2
**operations** 21:22
**opining** 63:23 71:18
**opinion** 8:12 14:15
32:7 34:13,14,22
35:7,14 38:24 41:8
53:10,16 55:6,10
58:11 66:23 71:19
72:20,23 73:7,13
74:8 75:10 76:22
77:13,18 88:11,16
88:17,17 89:11 91:8
102:16
**opinions** 9:20 10:16
18:7 19:11 23:25
25:12 29:14 31:23
33:14,25 36:7,17
37:5 38:17 42:10
66:18 72:16 80:22
90:20 91:13,19,22
92:12 103:21
112:15 113:17
115:16,24 116:5
**opportunity** 76:14
**opposed** 22:11
30:15 35:8 46:21
107:2
**oral** 1:8,12 131:17
**order** 12:15 13:1
25:17 45:17 46:18

**organization** 53:13
118:15
**orientation** 29:10
30:15 43:5,23
**original** 26:18
**outcome** 132:7
**outline** 24:1
**outlined** 14:6
**outside** 15:16 17:25
19:10 51:5,14 62:10
62:17 63:7,13 66:10
66:17 67:12 68:4
69:3 74:3,23 75:1
88:12 90:19,25 95:2
96:2,9,15,22,24
97:8,10,15,23 98:1
98:10,12,18 99:10
111:10
**outsides** 115:8
**overcome** 24:16
46:18 47:14
**overcoming** 46:20
46:23
**overemphasizing**
124:13,17
**overlap** 46:7

**p**

**p** 2:1,1
**p.c.** 1:18 2:7
**p.m.** 1:16 130:22
**page** 3:3 10:3 79:11
83:20 118:9,12
119:18 125:11,15
125:16 127:8,9
134:7 135:3
**paid** 80:2,3,5 82:4
82:15,24,25 83:2
122:6
**pam** 1:16 131:12
132:13
**paragraph** 107:16
109:4,4,23 110:6
119:18 125:21

part 12:23 20:5,7
22:9 30:7 32:7 34:2
40:12 44:9,13,22
46:22 52:16 53:9
66:13 71:17 87:4
88:14 89:20 92:1
98:21 99:2 100:8
120:9,23 122:4
124:25 134:9
particular 25:16
27:24 35:8 38:25
39:23 40:15 47:24
48:16 51:13 59:15
60:2,9,25 62:4
63:19 64:3 66:2
69:8 74:18 83:7
85:5 98:17 99:9
115:9 124:18
127:16
particularly 121:4
parties 16:20 21:20
26:19 69:2 73:21
132:4
parts 106:7,7
party 128:25 129:1
131:24
passed 126:13
passes 52:18
patton 2:7 7:21 9:25
10:2 11:6,15 12:2
13:7 14:9,23 15:7
15:11 21:23 27:3
31:10 32:11,15,23
33:6 34:7 35:21
36:20 37:13,18
38:11 39:2 41:21
43:1 44:3,8 46:5
47:25 48:10,18 49:7
49:23 51:16 52:24
53:19 54:2 55:7,14
55:24 56:8 58:1,16
58:22 59:16 60:22
62:19 63:1,8,15,22
64:7,24 65:7,9
66:20 67:5,14,22

69:5,16 70:6,11
72:14,17 73:12,15
74:4,25 75:14 76:7
76:13,17 78:13,16
78:20,25 79:2 81:25
82:10,17 84:7,20
85:1 86:1,23,25
87:13,22 88:5 90:4
91:2 94:20 95:4,12
95:25 96:4,11,17,24
97:17,25 99:16
100:17 101:6,14
102:7,25 103:16
104:5 105:22
109:10 111:6,10,21
115:10 116:1,19
117:17 118:8 119:8
119:11 121:24
122:11 123:7,20,23
124:10 128:15
129:8 130:4,6,20
132:2
pay 41:19,24 80:2
80:25 81:15,22 82:4
89:19 90:1 118:18
payment 84:25
122:9,15
peer 13:11 14:1
44:14 115:14
penalties 1:22
people 9:2 10:7 14:1
21:7 23:22 24:10
28:9 36:14,14 60:13
60:15 61:1 74:11
80:2 83:23 94:2
106:19 112:5
113:12 114:5,8
115:3 127:4,22
perceive 65:15
percentage 84:24
perceptions 27:11
performed 61:16
98:7 125:18 129:25
period 17:11 30:19
32:4 50:19 53:14,15

60:25
periodic 30:22
periods 82:24,25
98:9
perjury 1:22
permit 85:14
permitted 54:10,24
56:13
pers 13:18
person 8:23 11:10
11:19,23 12:1,19,24
13:2,12,15,16,19
14:5,7,21 15:5
16:10 22:17 23:12
30:8 44:22 46:15
47:15 48:5 50:8,11
51:1 57:12,17 60:8
60:19 65:22 74:8,10
80:4 90:23 97:3
102:17,19,19
104:15 106:2,11,16
108:13,17 109:14
120:6 122:4 123:12
128:24
personal 10:3,5,7
13:22
personally 133:11
134:15
persons 13:4 84:16
84:19 114:13
perspective 9:5 16:1
16:3 18:16
persuading 10:14
16:18
pertains 76:24
77:15
pfizer 17:12 91:17
ph.d. 1:9,12 3:2,10
4:4 131:15 133:4,9
134:4,13 135:20
pharmaceutical
17:12 68:6,12 91:17
94:15,19 95:18,23
pharmaceuticals
94:13

philosophy 10:4
phone 49:20
piazza 18:19 26:20
piazza's 28:15 43:21
pick 60:8
piece 50:16
pitches 62:7,11,18
place 53:5,6
plain 105:12
plaintiffs 1:3,13 2:2
34:16 62:5,5 83:21
127:16 131:3
plans 80:25
plausible 80:24
play 31:7 44:15
playing 30:24 44:12
44:21,24 45:7 62:15
plays 30:19 62:12
please 4:8 32:24
37:21 58:1 70:12
77:1 96:19 99:5
plowing 76:16
point 4:13 23:20
27:7 38:3 52:5,9
53:2,2 79:9 81:11
83:19 94:16 101:25
102:12 117:10
122:17,22 125:18
129:6,20
pointed 123:9
politely 122:15
popular 94:16
portion 120:18,19
position 8:12,13,17
10:5 11:12 14:15
32:14 35:18 37:8
38:20 39:6,18,19,22
51:8 70:22 71:16
72:22 73:6 81:21
88:18,21 89:17
93:13 95:20 118:21
118:25
positions 32:3 50:13
50:14,21 68:13
73:23,25 81:4

[positions - rapport]                                                                Page 15

| | | | q |
|---|---|---|---|
| 106:10 118:13,16 | 97:6 121:20 | properly 85:7 | qualification 53:5 |
| possibility 39:9 | probability 48:24 | 114:16 127:3,5 | qualified 50:11 63:7 |
| 56:19 80:16,23 | 122:21 | proposal 48:16 | 120:15 121:5 127:4 |
| possible 60:10,15 | problem 79:1 | proposed 49:6,17 | qualifies 14:7 |
| 61:10 81:2 106:13 | problems 119:22 | 51:4 | qualify 22:10 55:22 |
| postings 117:14 | 123:16 | prospect 2:4 56:22 | 63:20 120:6 122:25 |
| 118:12 | procedure 1:20 | prospect's 120:22 | qualifying 119:23 |
| posture 57:13 | 133:5 134:5 | prospecting 22:5,6,8 | question 6:1,5,7 |
| posturing 61:3 | proceed 107:18 | prospective 10:9 | 13:12,18 15:2 30:5 |
| potential 7:20 22:17 | 129:18 | prospects 50:5 | 35:13 37:15 38:6 |
| 23:6,19 105:8 | proceeding 48:25 | 120:21 | 42:21 50:25 51:9,20 |
| 118:19 119:23 | 88:11 132:5 | provide 11:1 20:6 | 54:24 57:22 58:3 |
| 122:25 126:21 | process 6:9 10:11 | 22:24 71:14 73:20 | 60:12 64:1,2 65:10 |
| practice 8:23 12:13 | 16:19,22 19:5 22:9 | 86:7 101:4 112:14 | 66:13,14 68:3 69:3 |
| 34:6,12 40:1 65:23 | 23:24 24:6,12 25:21 | 114:7,9,14 115:7 | 70:4,16 71:2 74:7 |
| 70:25 106:14,15 | 26:23 30:2 44:13,14 | provided 18:21,22 | 74:21 75:5 76:6,11 |
| 110:11 125:19 | 44:23 46:15,22 | 27:18 29:21 30:6 | 77:1 79:20 80:6 |
| practices 34:4 | 48:23,25 52:16 53:9 | 32:9 34:23 40:13 | 82:7 84:13 90:22,24 |
| precise 9:18 45:25 | 53:15 65:16 69:12 | 43:8 102:23 103:19 | 94:1,25 97:6 99:5 |
| 46:2 102:13,22,25 | 95:19 104:15 | 107:13 115:7 117:3 | 100:10 101:1,8,15 |
| 103:2 104:13 | 106:12 121:20 | 123:24 | 102:6,7,21 104:4,23 |
| precisely 109:5 | 122:20 125:3,12,17 | provides 54:18 | 105:1,4 111:22,25 |
| predictable 61:18 | 126:1,20,25 127:6 | 113:1,4 114:24 | 114:6 123:15,25 |
| 61:19,22,24 62:2 | 127:22,23 128:25 | providing 6:25 | 124:23 129:13 |
| prefer 75:23 | 129:1,19 | 24:23 69:20 75:7 | questions 5:11 33:1 |
| prepare 62:6 | processes 119:23 | 113:10 | 54:15 64:22 65:6 |
| prepared 20:11 | 123:17 | provisions 1:20 | 70:10 75:24,25 77:9 |
| present 10:10 20:3 | produced 1:13 | public 133:10,18 | 81:6,7 91:4 96:18 |
| 50:1 119:6,13,14,15 | 87:14 | 134:15,23 135:23 | 120:4 |
| presentation 3:11 | product 10:10 16:11 | publications 90:19 | quickly 23:2 |
| 102:23 103:24 | 23:15 43:7 44:10 | 92:7,11 | quiet 32:19 33:3 |
| 107:19 110:18,21 | 46:17 | pulling 83:18 | 75:4 |
| presentations 62:7 | products 10:12 | purchase 41:2,13 | quite 5:18 12:22 |
| 62:11,18 | 74:19,20 89:4 | purely 58:19 | 30:23 33:19 44:19 |
| pressure 105:8 | profession 18:6 | purported 112:14 | quote 12:19 |
| prevented 38:9,15 | professional 15:12 | purpose 63:13 70:2 | |
| previous 15:24 | professor 12:17 | 70:15,19 96:9 | r |
| previously 5:4 26:16 | 93:14,22 94:10 | pursuant 1:19 | r 2:1 92:20,22,23 |
| 59:12 73:23 76:9 | 112:25 | put 5:22 78:23 | 114:21 |
| 93:7,10,20 97:1 | professors 94:11 | 103:10 105:9,17,21 | range 122:5 |
| 119:12 | program 120:15 | 123:21 124:22 | ranged 82:22 |
| prior 7:23 48:22 | 127:5 | putting 105:8 | ranging 50:13 |
| 53:14,15 73:4,22,23 | promise 55:22 56:13 | 121:20 | rapport 24:13 |
| 73:23 74:2,10,11,22 | proper 121:6 125:1 | pyramid 21:22 | |
| 75:12 76:4 96:14,21 | | | |

**rate** 25:7 89:17,18 89:24,24,24
**reach** 18:7 70:3,16 72:4,6
**reached** 60:7
**reaching** 19:11 29:13 79:6,24 80:22
**reacting** 61:2
**read** 1:22 6:10 15:25 16:2 17:21,23,24 18:1,17 20:5 27:14 28:15 44:18 47:8 63:2 67:11,24 68:1 68:5,9,13,14 70:11 70:14 71:22 78:1 112:4 113:12,16 120:21 130:21 133:5,6,12 134:5,6 134:17
**reading** 4:1 130:21
**really** 9:15 10:22,24 11:22 12:14,16 41:18 42:5 52:16 55:9 63:1 113:25
**reason** 60:8 83:22 108:8 109:5 134:8 135:3
**reasonable** 65:22
**reasons** 46:16 74:9
**recall** 7:7 16:7 43:22
**receive** 26:12 84:25 110:6,14
**received** 26:13 65:5 71:8,13,16,20 72:12
**receives** 24:25
**receiving** 30:15
**recognize** 19:17 103:14
**recognized** 70:23 81:10
**recollection** 102:9 118:1,5
**recommendations** 33:8

**record** 1:21 4:3,8 78:7 102:8 130:8,10 131:17 134:9
**recorded** 1:17
**records** 23:5 25:15 36:3 116:25
**recruit** 19:1 28:9
**refer** 9:17 87:11 102:4 119:3 125:14
**reference** 95:7
**referenced** 133:11 134:15
**referred** 46:12 130:16
**referring** 104:1,3,8 117:22 123:1 124:12,23 127:7
**refine** 62:13
**reflect** 27:15 38:23 40:18,25
**reflected** 120:8
**reflecting** 9:4 117:20
**reflective** 108:21
**reflects** 24:25 37:11 37:23 38:6 39:24 40:3,10 41:14 57:7 122:9
**refresh** 102:9 118:1 118:4
**regard** 28:12 68:6 88:15 115:25 123:19
**regarding** 17:14 28:8 71:16 113:14 114:10,11 117:14 124:14
**regardless** 125:24
**regional** 18:20
**registered** 53:18
**registering** 21:2
**registrant** 109:2
**registration** 29:7,13 29:21 30:12 31:8,21 33:5,16 35:20 36:24

37:24 38:10,25 40:5 40:13,20 41:2,19 42:24 43:5 45:1,2,6 47:6,18,22 48:1,7 48:15 49:15,19,20 50:4 54:10 56:13 57:2 58:14,17 59:2 59:14 60:1 61:17 62:6 88:8 99:25 101:17,22 102:14 102:24 105:9 107:21 118:24 119:6 120:2 125:4 125:12 127:22,23 129:6,16
**regular** 13:17 44:25
**regulations** 17:24 67:11,18,24
**reject** 49:6,10,14 50:18,22 51:4,12 87:25
**related** 17:6 88:11 132:4
**relation** 94:4
**relationships** 10:11
**relative** 104:24
**relevance** 32:13
**relevant** 11:13,17,25 12:6 75:10 95:1
**remember** 5:8 17:8 19:2 62:3 68:10 86:21 87:12 102:12 114:16 120:5,10
**remind** 62:24
**reminding** 10:14
**render** 14:15
**rendered** 34:14,22 63:3 90:20 92:12
**rendering** 8:12 9:19 10:16 23:24 31:23 32:7 33:13,24 34:13 35:7,14 36:7,17 37:5 38:17 41:8 42:9 55:6 66:18 69:9 72:15,20,23

92:13
**repeat** 70:7
**repetitive** 61:17,20 61:22,24
**report** 3:10 18:12,12 19:3,6,17 24:2 33:18 34:21 36:25 37:7 38:4 45:16 46:12,19 50:4,12 58:25 61:21 62:1,4 65:25 71:14 78:6,8 78:24 79:4,22,25 81:11 83:6,13 86:22 87:8 89:6 90:2 97:2 115:14,16 116:6 118:10 119:18 123:15,22 124:5,21 124:22 125:11
**reporter** 5:19 62:24 131:12 133:7
**reporter's** 3:6 131:8
**reporting** 37:22,25
**reports** 19:2 124:1
**representative** 10:8
**representatives** 68:12
**represents** 50:6 51:24 52:1
**reps** 94:15,19
**request** 20:4 28:2,3 28:6 134:9,11
**requested** 3:5 18:24 28:7,7 101:10 117:16,21
**require** 100:14
**required** 36:25 41:2 41:4,7,8,13 73:10 90:1 100:1,4,8,9,20 101:4,18 109:2,16 110:4
**requirement** 100:22 100:24 109:7,12,20 109:24 110:13,23
**requirements** 76:23 77:14 108:7 111:7

research  20:4 25:11 25:17,19 47:12
resemblance  94:19 94:25 95:1,10,21
reserve  87:24
resource  113:19
respect  8:17 16:9 33:2 34:14 65:4 75:25 77:24 91:25 95:1,10
respond  103:1
responsibilities  8:19 77:19,21
responsibility  10:23 60:13,16
restate  37:21 96:19
restroom  86:11
retain  52:6,7
retained  6:22 17:1 117:10
retaining  43:13
review  13:11 14:1 87:7,10,16 90:18 99:14 115:14 133:1 134:1
reviewed  19:7,11 86:17 100:6 101:12 103:21 104:6,11
revisit  6:13
richard  18:18 26:20 28:16 80:12 106:1
right  5:22 6:9,17 14:13 33:2 37:20 45:17 47:22 48:8 56:3,6 58:11 60:11 60:14 62:5 64:18 65:6,8 74:16 79:3 83:21 84:6 87:25 97:12 109:25 110:2 111:12,15 120:5,10 122:7 123:3 125:4 125:20 126:9 129:25
ripe  23:7

role  9:5 10:21,22 13:23 24:6,9 30:12 30:19,24 31:6 44:12 44:14,21,24 45:7 46:20 62:12,15 71:17
roles  77:18,20
route  39:1,5,8,21,23 39:25
routes  39:11
rules  1:20 5:6 133:5 134:5
ruling  89:14
rulings  69:1

### s

s  2:1 92:20,22,23 114:21 134:8,8 135:3
salaries  59:3
sale  16:12,14,15,17 23:21 46:18 52:15 52:15 55:13 90:23 102:19 125:18 126:12
sales  3:11 8:13,17 9:3,13,13,14 10:22 11:12 12:12 13:18 13:22 14:2 16:22 17:25 18:6 19:5 20:1,2 21:7 22:3,9 22:13,16 24:12 25:21 29:24 30:3,9 30:25 32:2,3,3,14 35:18 36:13 37:8 38:1,19 39:5,18,19 39:22 44:6,7,10,12 44:13,20,22 46:14 48:5 50:13,20 51:5 51:8,14 52:16 53:15 54:12,25 56:23 57:1 57:17 58:15,21,24 62:6,11,17 63:6,7 63:14,20 65:18,21 65:21,23 66:3,4,10

66:17 67:13 68:4,12 68:19 69:4 70:21 71:16 72:22 73:1,2 73:5,5,10,19,22 74:2,3,8,9,10,11,22 74:24 75:8,12 76:4 79:18 81:1,4 88:12 88:18,21 90:20,25 95:3,17,19 96:3,10 96:14,16,21,22 97:6 97:8,15,23 98:10,18 99:10,14 102:15,23 103:24 104:6,7,15 106:4,10,12,24 107:18 113:5,5,10 114:7,10,15 115:8 118:14,15,22,22 123:13 128:23 129:3
salesman  63:5
salesmen  22:11
salespeople  13:4 22:11,19,21 76:25 77:20 94:2,15 119:21 123:16
salesperson  8:20,21 8:24,25 9:5 10:23 11:24 12:11,12 13:2 13:13 14:6,10,19 15:17 16:4 17:15 22:15 23:9,12,14 38:4 46:17 50:15,23 51:1 52:2 57:12 66:25 72:8 73:9 77:22 81:2 97:4 128:11
salesperson's  24:25 95:18
salespersons  11:4 77:16
sample  13:12
satisfy  24:15
savings  56:14,16,17 56:19,23

saw  47:8 83:23 91:16,17
saying  35:1 37:1 42:6 57:25 58:5 61:13 62:3 67:2 80:18,18 83:19 93:4 100:11 108:20 114:14 121:18,21 121:22 123:4 125:24 126:19,19
says  19:20 104:20 105:4,7 107:25 108:14 118:12 125:17
schedule  27:8 32:15
scheduled  98:8
schedules  31:9,13 31:22
school  114:18
science  12:15
scope  14:2 35:15 75:1 96:24
screen  23:22
screening  58:23 121:19
script  3:11 26:22 54:12,16,16,18 55:1 55:13,17,19 56:24 57:1 102:15,23 106:20 120:12
scripting  25:23 28:12 43:9 106:21 120:9
scriptings  106:24
scripts  18:21 19:4 25:22 71:24 99:14 103:24 104:6,7
seal  132:8 133:15 134:21
search  118:15
seasoned  45:7
second  10:24 37:15 79:8 86:12 107:16 116:11

secondhand  112:13
section  79:8,10,25
  87:10,12 119:19
see  12:22 18:14
  27:25 34:21 39:10
  39:12 61:1 83:18
  92:6 110:10,17,18
  110:19,20 117:20
  117:22 119:25
  122:15 125:20
  127:9 129:17
seeing  78:20
seen  107:11 113:25
sees  23:13
select  125:5 126:20
sell  21:15,16 30:2
  50:15 74:20 80:2
  94:24 102:19
selling  9:11,12,16,25
  10:1,4,5,8 12:14,15
  12:16,20,25,25
  13:16,19,22 14:2,10
  14:17,19 16:10 18:5
  21:6,22,24,25 22:7
  22:9 53:9 65:18
  74:13,18 88:24 89:2
  89:3 110:12 113:6
  113:15
sells  80:4
send  23:9 30:8
  54:21 57:17
sending  106:11
sense  14:19
sentence  83:20
  107:16 109:6
  119:21 124:19
  127:1,10
separate  46:20
service  10:10 13:14
  16:11 23:16 46:17
  47:13 55:23 88:25
services  43:8 50:10
  50:24 55:12
servicing  13:16 89:1

set  60:10 85:5
  129:19,20
sets  68:2
shadow  29:7
shannon  2:7 7:4,5
  7:19 8:6 26:6 32:18
  132:2
shared  27:4 116:20
  116:21
sheet  134:7,10,18
  135:1
shirley  8:2
short  19:20 20:5,10
shorthand  1:17
  131:12
show  19:15 39:20
  101:16,18 107:9
  126:12
showing  39:12,14
  103:13
sic  114:21
side  11:22 50:22
sides  64:15
sign  110:8 122:9
  128:24
signal  118:14,16
signature  3:5
signed  1:22 49:20
  86:19 127:17
  133:13 134:18
similar  16:21 56:25
  73:25 88:19 92:13
  95:18
simply  72:15 107:1
simultaneously
  62:20
sir  4:8 19:17 35:13
  75:20 76:6 80:6
  81:5 97:5 99:4
  101:1 103:15
  104:25 107:11
  110:10 111:20
  119:25 121:1,11,21
  123:15 124:4,15
  128:8 130:12

sit  102:11 115:20
  117:22
situation  81:19,23
  81:23 106:4 124:24
  128:18
situations  23:18
  89:25 104:24
six  36:10
sizeable  34:24
skills  74:13
slowly  105:20
smoother  127:7
smoothly  122:21
socioeconomic  61:4
sold  50:5 52:8 73:22
  73:24
solicit  85:7
solicitation  85:13
solicited  85:22
solutions  135:1
somebody  81:2,17
  93:22
somewhat  32:8
sorry  7:8 15:21
  28:14 70:6 76:14
  89:20 94:6 113:16
  115:12
sort  21:22 40:17
  94:16
sounded  47:7
space  21:8,9
spatton  2:9
speak  20:1,3 62:25
  113:23
speaking  19:25
  23:14 30:13 62:20
  101:18 121:4
specialist  63:12
specialized  90:9
specialty  11:2
specific  39:21 46:8
  54:13 61:3 68:17
  87:15 108:16 109:1
  112:5 122:24

specifically  16:6
  18:19 33:18 73:24
  74:19 79:16 80:1
  102:12
speculation  46:6
speech  105:2
speeches  76:1
spell  92:19 112:20
  114:19
spelled  126:5
spelling  114:20
spend  62:10
spent  25:4,14 62:17
split  22:12
spoke  27:5
spoken  20:17
spread  98:16,21
  99:1,6
spreadsheet  28:21
stage  24:17,18
stages  22:8
stand  57:4,13 99:20
standard  8:21,22
  12:10 19:5 34:6,12
  68:12 70:24 81:17
  104:22 128:23
standardize  60:2
  98:8
standardized  60:4
standards  14:8,20
  14:21 15:6,15,15
  17:13,19,21 51:15
  66:7,9,15 67:12
  68:2,23 69:2 88:13
  90:25 95:11,16 96:6
  121:16
standing  55:25
  58:18 61:3
standpoint  15:9,10
  15:12 29:24 129:3
start  30:12 61:11
  101:2
started  29:3
starting  61:1

state   1:17 4:8 50:4
  54:16 55:17,18
  65:23 78:5 81:16
  83:6,9 84:12 90:15
  108:24 109:5,18,19
  131:9,13 133:10
  134:15
stated   1:20 36:9
  37:3 39:4 67:6
  70:19 74:8 82:3
  88:14 95:15 122:1
  127:2 129:11
statement   61:15
  109:1 111:16 128:7
  133:13,14 134:19
  134:19
statements   113:13
states   1:1 11:11
  131:1
stating   33:1 39:15
  111:25 126:2
statute   67:18
stay   32:4
step   53:4,5 60:19
  104:20 105:5
  108:14 129:18
stepped   13:23
steps   16:22 46:14
  52:14,21 53:3,12,12
  95:19 122:20
  129:19
stick   30:4 56:25
stopped   60:6
stories   113:20
strategies   43:9 61:2
strategy   41:6
strength   124:13
strongly   41:5
structure   24:24 25:1
students   9:14
studied   14:25
study   12:14
stuff   76:20 114:10
  115:5 121:12

styled   1:14
subject   23:20 74:3
  74:23 90:2,10,24
submit   13:10 19:24
  115:13
submitted   89:6
submitting   48:22
subscribed   133:10
  134:14 135:21
substantially   97:21
suggest   74:2,22
  96:14,21 97:7,14,22
  98:17
suggested   41:5,5
suggests   76:24
  77:15
suite   1:19 2:4
summary   73:18
  107:17
superior   2:8
supervised   64:17
  70:5,18
supervision   29:12
  29:18,21 30:6,8,11
  32:9 37:11,23 38:7
  39:24 40:2,3,11,12
  40:18,19,25 41:15
  41:16 57:7,10 58:5
  58:6,10,13 65:4
  97:14
supplier   85:18
  120:23
suppliers   120:23
supporting   24:23
  89:4
supposed   31:25
  54:16 69:2
supreme   68:2,6,18
sure   5:7,8 6:4,8 9:16
  15:9 18:13 24:21
  27:16,20,23 28:17
  41:11 42:6 43:13
  44:10 46:5 50:8
  52:17 53:25 56:11
  64:3 78:9,12 81:5

104:8 109:13
  120:14 123:25
  126:4,7 127:3
switch   85:19
sworn   1:14 4:5
  131:16 133:10,13
  134:14,18 135:21
system   82:5,6

**t**

t   3:1,7 4:6 92:20,21
take   9:3,14 27:6,7
  40:21 57:4 60:13,15
  65:1 69:7 74:14
  79:22 80:3,21 81:10
  86:13 128:5
taken   1:14 132:6
talk   6:1,18 80:1 81:8
  106:23 118:22
talked   27:8,10 31:5
  57:16 81:14 82:22
  97:1 113:24 116:8
  129:2
talking   30:11,14
  65:3 79:14 82:7
  94:1,12 115:24
targeted   23:10
targeting   37:10
task   22:12 61:20,25
  106:3
tasked   90:16
tasks   8:18 25:1
  66:24
teaches   120:20
team   14:1 33:9
teams   85:22
teixeira   18:18 26:20
  106:1
teixeira's   80:12
tell   27:1 47:2 54:10
  54:24 86:5 103:11
  116:18
telling   105:16,20,22
  111:19 124:17

tells   105:13
tens   83:1
term   48:1 55:24
  58:16 111:4
terminix   91:16
terminology   77:3
  124:18 128:23
terms   21:15 34:13
  35:6 46:25 47:19,23
  48:8 49:16 60:9
  69:19,22 71:19 72:3
  73:8 90:3 96:1
  106:25 122:24
territories   31:20
  33:22
test   43:15
tested   43:12
testified   4:5 17:17
  89:9 113:22 114:22
testify   27:3 101:16
  116:20
testifying   5:2 12:3
  69:22
testimonies   24:10
  29:17
testimony   7:1 11:7
  18:17 28:16 32:24
  33:2,24 35:11 36:2
  37:1 39:15 41:9
  43:19,20,21 44:18
  47:8 52:25 59:19
  65:19 69:20 80:12
  82:21 91:23 95:13
  106:1 107:4 112:4
  113:2,4,5,10 114:7
  114:9,14,24 115:7
  129:9 131:17 133:6
  133:7 134:6,9,12
tests   88:1
texas   1:17,19 4:11
  4:13 131:9,13
  132:14
textbook   9:8,12
texts   90:18

[thank - utilized]                                                                 Page 20

thank  62:25 86:15
themself  52:2
thing  13:17 22:25
  24:3,5 61:7
things  10:20 21:20
  27:10 37:10 39:10
  39:12 47:9 55:17
  57:18 59:21 61:5
  89:1,4 94:2 108:12
  109:16 111:3
  113:13,20 118:2
  120:18,24 122:1,20
  122:21 123:1,17
  124:1 126:10,15,17
think  6:12 9:2 11:3
  12:6,8,9,21 14:12
  15:12 17:8 22:25
  24:21 37:7 41:11,17
  46:7 56:18 65:24
  66:12 77:3 78:13,16
  104:12,13,14,19
  105:2 108:2 109:11
  114:1,21 119:13
  120:4,13 122:17
  124:13 128:21
thought  5:15 37:18
  103:9
thoughtful  126:21
thousands  83:1
three  13:24 26:10,24
  26:25 43:25 117:3
time  4:19 7:11 13:9
  13:11 17:11 25:4,14
  26:14 27:7,9 28:19
  28:22 29:5 30:1
  32:4,21 38:5 40:6
  52:22 60:3,24 62:10
  62:25 82:24,25
  84:18 94:7,12
  116:12,23 120:18
  120:19 121:7,13
  122:6 130:16,16
  131:24
times  4:18 33:5
  36:22 40:20 101:24

113:21,21 117:21
  118:3,6
timestamps  29:1,2
timing  27:8
today  6:14,15 14:7
  116:25 117:23
  118:4 130:17
told  8:8,9,10 10:18
  10:20 37:23 40:20
  40:24 41:4 57:3,3
  128:6
top  9:11 13:22 14:3
  83:20 115:3 118:12
  127:8
topic  20:1
total  44:9 49:13
  59:22
track  28:19,22
traditional  8:24,25
  57:16
train  74:13 104:15
  106:2
training  8:18 18:4
  24:20,22 26:21,21
  28:12 29:24 43:9
  44:7,7,9,12,13 65:5
  71:13,15,15,19,20
  72:8,12,16,21,21
  74:19 90:10 102:18
  104:22 106:11,24
  120:20 122:3
transaction  16:19
transcribed  133:7
transcript  131:16
  133:5,12 134:5,11
  134:17
transcripts  87:1
transition  53:6
treatises  90:18
tremendous  81:18
  119:2
trial  27:9 115:23
true  72:5 99:8
  131:17

truthful  6:19
try  47:14 112:2
  122:19
trying  19:2 51:9
  63:1 65:12 77:8,11
  77:11 83:18 104:14
  105:1 126:25
twice  127:9
two  8:7 10:7 16:19
  17:8 42:12,15 43:25
  44:1,2 80:11,11
  91:4 116:8,14
type  71:15 98:7,17
  102:17,19 112:15
  115:14
types  23:18 66:3
  73:25 108:12
typical  23:17 24:12
  24:25 36:13 39:5
  48:5,14 50:13,20
  59:14 65:20 66:25
  72:7 73:5 75:8
  81:20 82:2,3,8 83:2
  104:14 106:4
typically  41:19 42:1
  59:3

─────── u ───────

u  112:21
uh  10:1 117:2
ultimately  87:21
um  4:23 5:10,13,15
  9:23 19:13,22 45:15
  61:12 79:21 80:7
  83:12 87:18 101:3
  104:10 119:20
  127:14
unaware  114:23
understand  5:20 6:4
  6:21 20:20,21,22
  30:2 31:24 45:5
  51:9 56:21 64:14
  66:4 69:17 70:3,12
  70:16 71:12,18,23
  72:1,25 73:7,9 77:2

77:6 81:5 82:6
  105:3 106:3 110:5
  122:23 123:3
  126:18 127:1,20
understanding
  11:17 18:5 29:20,22
  30:5,18,20 33:7
  38:14,16 43:4,13
  49:9 55:2 65:16,20
  75:19 85:9 87:19,24
  99:22 105:25
unethical  74:15
unfettered  49:5,11
  51:3,3,12 87:20
uniformity  76:23
  77:4,13
uniformly  76:25
  77:16 78:2
united  1:1 11:11
  131:1
universities  20:3
university  93:14,23
  112:25
unquote  12:19
unsworn  3:10
unusual  37:8 38:4
updates  20:14,15
upheld  89:17
use  28:21 46:16 48:1
  50:9 55:16 57:13
  61:5 69:2 86:11
  106:19 108:9 109:6
  118:24 128:1,9
uses  118:13
usually  19:24
  119:13
utilities  129:22
utility  49:16,17
  56:17 109:19
  122:16
utilization  121:7
utilize  9:21 129:18
utilized  9:22 28:18
  34:4

| v | | | |
|---|---|---|---|
| **v**  133:3 134:3 | **wait**  47:9 | **whatsoever**  53:9 | 82:4 83:7 85:5 |
| **vague**  13:7 99:16 | **waive**  4:1 130:21 | **wide**  49:9 | 98:16 99:1 |
| 102:25 | **walk**  105:19 | **wider**  9:3 | **working**  27:24 38:9 |
| **valid**  89:24 124:1 | **walking**  106:12 | **willing**  27:6 78:5 | 62:10,17 73:2 126:9 |
| **value**  16:19 106:23 | **walnut**  4:13 | **witness**  1:13 3:2 | **works**  18:18 23:12 |
| **variable**  25:24 | **want**  6:5,13 21:2 | 17:3 32:16 76:19 | 37:17 |
| 35:24 41:9 79:17 | 32:18,21 42:6 46:10 | 86:11,15 87:2 | **worry**  70:10 |
| 80:1,2,25 81:22 | 48:4 50:9,17 52:6 | 101:15 102:8 104:5 | **write**  9:9 |
| 82:4 118:18 | 52:17 53:7,13 57:22 | 116:22 130:20 | **written**  129:2 |
| **variance**  125:9 | 57:24 58:5 74:12 | 131:15,18 133:1,4 | **wrong**  83:17 |
| **vary**  48:8 | 77:6 81:5 98:21 | 133:11 134:1,4,15 | **wrote**  124:6 |

| | | | x |
|---|---|---|---|
| **vast**  57:15 | 106:12 | **word**  32:19 99:2 | |
| **verbal**  5:15 129:2 | **wanted**  28:16,17 | 100:8 107:7 109:6 | **x**  3:1,1,7,7 4:6 |
| **verbally**  5:11 | 55:18 | 109:23,24,25 111:4 | **xerox**  50:14,15,17 |

| | | | y |
|---|---|---|---|
| **verbiage**  108:9 | **wave**  105:15 | 111:11 118:22 | |
| **verbiages**  56:25 | **way**  15:5 29:16 | 124:5 125:15,20 | **yeah**  7:15 16:16 |
| **verification**  26:22 | 33:13 34:10 38:12 | 127:9,10 128:1,5,8 | 26:7 28:5,15 38:8 |
| 48:23,25 49:21 50:2 | 38:22 40:8 42:7 | 128:9,10,19 | 40:4,12 41:4 45:22 |
| 50:6 51:23 52:4,5 | 51:6,17 54:7,18,19 | **wording**  108:3 | 49:4 54:9 72:2 |
| 52:18,23 53:4 119:7 | 55:18 65:13,25 | **words**  10:19 20:24 | 76:21 77:13 78:22 |
| 119:22 123:17 | 66:19 67:3,9 74:24 | 34:15 60:17 65:4 | 86:13,24 87:2 92:15 |
| 124:9 125:12,13,17 | 75:11,21 82:12 86:3 | 108:20,22 | 96:8,8 100:13 103:3 |
| 125:25 126:25 | 90:6 94:24 96:16 | **work**  5:3,18 7:23,25 | 109:3 110:3,5 |
| **verified**  126:3 | 97:8,16,24 98:4,11 | 12:22,23 13:9 21:16 | 111:16 123:2 |
| **verify**  48:22 50:10 | 98:19 99:10 100:3 | 25:9 26:1,3 27:13 | 126:19 |
| **veritext**  135:1 | 101:9 102:2,10 | 27:21 31:8,13,19,22 | **year**  4:21 7:6 27:9 |
| **versus**  13:16 | 104:16 109:21 | 32:15 33:5,11 34:25 | **years**  4:15 13:24 |
| **video**  107:18 | 119:16 127:11 | 35:20 36:14,14,19 | 17:4,7 |
| **view**  73:8 105:12 | **ways**  88:22 | 57:4 60:2 61:16 | **yep**  130:5 |
| **viewed**  77:19 97:3 | **we've**  113:24 130:11 | 62:12 80:14 98:8,8 | **yesterday**  19:13 |
| **violate**  54:21 | **wear**  41:3,12 101:20 | 98:15,17 99:1,6 | |

| | | | z |
|---|---|---|---|
| **violated**  5:14 | **web**  113:13,16,19 | 112:16 114:9,18 | |
| **visible**  101:24 | **week**  20:13 26:24 | 115:20,21,25 | **z**  92:20,21 |
| **vs**  1:4 131:4 | 35:19 36:6,10,10,11 | **workday**  98:9 | **zero**  80:24 81:3,10 |

| w | | | |
|---|---|---|---|
| | 36:17 80:14 98:16 | **worked**  8:3 9:15 | 83:4 84:2 |
| **wage**  11:19 14:22,25 | **weeks**  20:13 26:10 | 17:2 21:1,4,8,9 36:4 | **zip**  121:6 122:5 |
| 41:20 42:1 59:3,10 | 26:25 42:12,15 83:8 | 36:6,9,10,11,12,23 | 125:1 126:8 |
| 63:21 64:4,9 81:17 | 117:4 127:16 | 42:4,12,15,24 83:14 | **zoltner's**  112:12 |
| 81:20 90:10,16 | **weight**  124:20,20 | 84:19 90:12,15 93:6 | **zoltners**  92:18,23 |
| 92:24 93:7,8 97:22 | **went**  18:9,12,14,20 | 93:7,15,20 | 93:18 |
| 113:7 114:3,11 | 18:23,24 19:3 24:19 | **worker**  82:2,3 96:14 | |
| **wages**  71:8 | 24:20 25:20 33:17 | 96:21 97:7,13,21 | |
| | 67:16 69:12 | 98:7,9,15,17 99:9 | |
| | **west**  2:4 | **workers**  42:24 | |
| | | 76:24,24 77:15,15 | |