UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| DAVINA HURT, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>COMMERCE ENERGY, INC, *et al.*,<br><br>Defendants. | CASE NO. 1:12-CV-00758<br><br>OPINION & ORDER<br>[Resolving Docs. 709, 710, 723] |

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

This is a case about minimum wage and overtime pay under the Fair Labor Standards Act ("FLSA")[1] and overtime pay under the Ohio Minimum Fair Wage Standards Act ("Ohio Wage Act").[2] Plaintiffs are door-to-door workers who solicited residential customers for the Defendants' energy services.

Defendants move to exclude the expert reports, opinion, and testimony of Plaintiffs' expert Dr. Liesl Fox.[3] Plaintiffs oppose the motions.[4] On November 20, 2014, the Court held a hearing on these motions. For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motions.

## I. Background

The Court has previously issued an opinion detailing the factual background of this case and incorporates that background by reference.[5] Following a trial on the merits, a jury found Defendants

[1] 29 U.S.C. § 201 *et seq.*

[2] Ohio Rev. Code § 4111.01 *et seq.*

[3] Docs. 709, 710.

[4] Docs. 718, 717.

[5] *See* Doc. 89 at 1–6.

liable for violations of the FLSA and the Ohio Wage Act.[5/]

Defendants did not keep adequate records of the number of hours worked by each employee. Because Defendant did not keep sufficient records regarding what hours its employees had worked, the Court faces a difficult responsibility to determine how much each employee is owed in back wages and overtime.

Even with this lack of records, this case must still decide what damages are owed.[6/] Plaintiffs seek class damages calculated by reference to the number of weeks and hours worked by a typical class member.[7/]

In support of their position, Plaintiffs produced a report from their damages expert, Dr. Liesl Fox, Ph.D., who estimated class damages.[8/] As detailed below, Dr. Fox's estimate relies on a survey distributed by Plaintiffs' counsel to class members.[9/] Defendants' primary objection to Dr. Fox's report is that this survey was unreliable, and therefore any expert opinion derived from it is unreliable.[10/] Defendants also move to strike a supplemental report from Dr. Fox on the ground that it was untimely exchanged and impermissibly includes data that was not in the initial report.[11/]

## II. Legal Standard

[5/] *See* Doc. 808.

[6/] The Court bifurcated the liability and damages phases of the trial, so the liability jury did not assess damages. *See* Docs. 809, 812, 816, 817.

[7/] *See* Doc. 812.

[8/] Doc. 689.

[9/] Doc. 689-1.

[10/] *See generally* Doc. 710-1. Defendants have also moved to strike Plaintiffs' brief in opposition to this motion as it was filed a week late. *See* Doc. 723. Plaintiffs have explained that the late filing was due to an inadvertent error and have asked the Court to consider Plaintiffs' arguments against excluding Dr. Fox's report. Striking a brief "is a drastic remedy that should be used sparingly and only when the purposes of justice require." *Driving Sch. Assoc. Of Ohio v. Shipley*, No. 1:92-cv-83, 2006 WL 2667017, at *1 (N.D. Ohio Sept. 15, 2006). The Court finds that the late filing has caused no prejudice to Defendants. Thus, finding that the purposes of justice do not require striking Plaintiffs' brief, the Court **DENIES** Defendants' motion and will consider Plaintiffs' arguments.

[11/] Doc. 709.

Federal Rule of Evidence 702 controls the admission of expert testimony. Under Rule 702, testimony based on specialized knowledge is admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue."[12] As commentators have noted, Rule 702 liberalized the admissibility of expert testimony from the earlier *Frye* standard.[13] Under this liberal approach, expert testimony is presumptively admissible,[14] as long as it is both relevant and reliable.[15]

To testify as an expert, the witness must be qualified "by knowledge, skill, experience, training, or education."[16] The expert's testimony must also be "based on sufficient facts or data," be "the product of reliable principles and methods,"and be the product of reliable application of those principles and methods to the facts of the case.[17] "[T]he law grants a district court the same broad latitude when [the district court] decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."[18]

Further, experts need not confine their testimony to matters upon which they have personal knowledge.[19] Experts may base their opinions on facts and data that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject."[20] The underlying facts and data need not be admissible if experts in the field would reasonably rely on them.[21]

The Court's inquiry focuses "on the principles and methodology, not the conclusions they

---

[12] Fed. R. Evid. 702(a).
[13] *See, e.g.*, Weinstein's Federal Evidence § 702.02[1].
[14] *Id.*
[15] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).
[16] Fed. R. Evid. 702.
[17] Fed. R. Evid. 702(b)–(d).
[18] *Kumho Tire Co.*, 526 U.S. at 142.
[19] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993).
[20] Fed. R. Evid. 703.
[21] *Id.*

generate."[22] In making the determination of whether the expert's methodology is reliable, the Court may look to "the testability of the expert's hypotheses, whether the expert's methodology has been subjected to peer review and publication, the known or potential rate of error with respect to the expert's methodology, and whether the methodology is generally accepted in the scientific community."[23]

## III. Analysis

### A. Contents of the Reports

#### 1. Dr. Fox's Initial Report

Dr. Liesl M. Fox is Senior Consultant with Quantitative Research Associates.[24] She received a Ph.D. in biostatistics from the University of Alabama at Birmingham in 1997.[25] She has co-authored numerous statistical analyses of medical research and has been an expert witness on damages in several employment cases.[26]

In her initial report, Dr. Fox estimated that members of the Ohio Rule 23 Class had approximately $11.6 million in unpaid overtime and that members of the FLSA Opt-In Class had approximately $4 million in unpaid wages and $1.4 million in unpaid overtime.[27]

To calculate these figures, Dr. Fox relied heavily on a survey that Plaintiffs' counsel created and sent to class members. The survey was "sent via email to all FLSA opt-in plaintiffs, for which

---

[22] *Daubert*, 509 U.S. at 594–95.
[23] *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 535 (6th Cir. 2010) (citing *Daubert*, 509 U.S. at 593–94).
[24] Doc. 689-1 at 26.
[25] *Id.*
[26] *Id.* at 1–2, 26–31.
[27] *Id.* at 3.

Plaintiffs had a valid email address."[28] Plaintiffs sent the survey to 1,145 individuals.[29] The pool had 9,157 potential class members.[30] After receiving the email survey, 584 FLSA class members responded.[31] From the answers Plaintiffs' counsel received, Dr. Fox extrapolated results for the entire class and estimated class damages.

Dr. Fox divided the survey respondents into two groups. The first group, called "Badge Never Used" or "BNU," includes 399 class members who never obtained a completed application from a potential customer. Because Defendants failed to keep records of hours worked, "the actual length of time that the [BNU group] members worked for [Defendants] is unknown."[32] For the BNU group, the only date Defendants can pinpoint is the day the person first came to work for Defendants.

The second group includes 746 class members who obtained at least one completed application from a potential customer. Unlike the BNU group, there is at least some documentation of how long employees in this second group worked for Defendants: they began working when they received their badges and they continued work to at least the days they obtained completed applications. Dr. Fox refers to this second group as "Last Deal Date" or "LDD." With this group, Dr. Fox used the date of each employee's last completed deal to estimate how many days or weeks that employee worked for Defendants.

Two surveys were sent to each group, BNU and LDD. As Dr. Fox explained:

> The first survey focused on the opt-in plaintiffs' obligations as employees of Just Energy. Also included in that first survey was the question regarding length of employment with [Defendants]. The second survey asked the respondents how many

---

[28] Doc. 717 at 1.

[29] *See* Doc. 689-1 at 4–5 & n.10.

[30] *See id.*

[31] *Id.* at 5.

[32] *Id.* at 7.

hours per day and how many days per week they spent going door-to-door obtaining applications for [Defendants].[33/]

In addition, slightly different questions were asked of the BNU and LDD groups. "The BNU opt-in plaintiffs were also asked to self-report the total length of time they worked for [Defendants], while the LDD opt-in plaintiffs were asked to self-report the length of time they continued to work for Just Energy after their last application was signed."[34/]

From the former employees' responses, Dr. Fox estimated the median number of days worked for the BNU group was 14 days per person, and estimated a median of 50 hours worked per week.[35/] For the LDD group, Dr. Fox assumed the person worked continuously from the date the employee received their badge until the day the employee obtained their last signed application. From the survey responses, Dr. Fox estimated the median number of days worked for each LDD member after obtaining his last completed application was one additional day. She also estimated the LDD members worked a median of 72 hours worked per week.[36/]

Dr. Fox then estimated the damages owed to each person. For members of the LDD group for whom Defendants had compensation data, she calculated effective hourly salaries.[37/] For those without compensation data or whose effective hourly salaries were below minimum wage, she used the effective minimum wage.[38/] She then subtracted any compensation already paid, and calculated

---

[33/] *Id.* at 5; *see also* Doc. 822-2 (BNU - Survey 1); Doc. 822-3 (BNU - Survey 2); Doc. 823 (LDD - Survey 1); Doc. 822-5 (LDD - Survey 2).

[34/] Doc. 689-1 at 5. *Compare* Doc. 822-2 (BNU - Survey 1) *and* Doc. 822-3 (BNU - Survey 2) *with* Doc. 823 (LDD - Survey 1) *and* Doc. 822-5 (LDD - Survey 2).

[35/] Doc. 689-1 at 9.

[36/] *Id.*

[37/] *Id.* at 10–14.

[38/] *Id.*

the total estimated amount owed by Defendants.[39]

**2. Dr. Saad's Rebuttal Report**

Defendants responded to Dr. Fox's report with a report from their own damages expert, Dr. Ali Saad.[40] Dr. Saad has a Ph.D. in economics from the University of Chicago and is currently the Managing Partner of Resolution Economics LLC.[41] With his report, Dr. Saad most importantly criticizes Dr. Fox's reliance on the survey data. He argues that the survey was not sent to a representative sample of the class and the questions did not follow generally accepted survey methodology.[42] He further says that Dr. Fox did no analysis to determine whether the survey was reliable, and her assumptions regarding reliability were not supported.[43] Based on the limited information he had at the time about the survey responses, he concluded that the survey was not of a type that could have been used to extrapolate class damages.[44]

**3. Dr. Fox's Supplemental Report**

In response to Dr. Saad's report, Dr. Fox prepared a supplemental report.[45] In her supplemental report, Dr. Fox included data as to when each completed application obtained by a class member was received.[46] Using this data, the supplemental report revised the initial damages estimates downward to approximately $6.6 million for the Ohio Rule 23 Class, and $1.8 million in

---

[39] *Id.*
[40] Doc. 697.
[41] Doc. 697-1.
[42] *Id.* at 7–14.
[43] *Id.* at 6–7, 14–18.
[44] *Id.* at 24.
[45] Doc. 706.
[46] *Id.* at 5.

wages and $800,000 in overtime for the FLSA Opt-In Class.[47]

Dr. Fox's supplemental report also adds a new section that responds to and criticizes Dr. Saad's own expert report.[48]

**B. Objection to Dr. Fox's Initial Report**

In ruling on Defendants *Daubert* challenge, the Court centrally decides whether Plaintiffs' survey results and Dr. Fox's methodology in using those survey results were reliable. As described below, the Court finds they were not and thus **GRANTS** the motion to exclude her initial report.

**1. Dr. Fox's Qualifications**

Defendants first object that Dr. Fox is not qualified to give opinions using the survey results because she is not an expert in survey design or administration.[49] To be treated as an expert, a witness must establish that she "is qualified as an expert by knowledge, skill, experience, training, or education."[50] "[T]his requirement has always been treated liberally . . . ."[51]

Dr. Fox is qualified to give opinion evidence on economic and wage loss issues. She has a Ph.D. in biostatistics and has more than sufficient experience to do statistical analysis of survey data. Her lack of expertise in survey design would not disqualify her from using survey data in her analysis, provided she demonstrated that her opinion was "based on sufficient facts or data" and was "the product of reliable principles and methods" that were reliably applied.[52]

---

[47] *Id.* at 2–3.

[48] *Id.* at 8–13.

[49] Doc. 710-1 at 4–5.

[50] Fed. R. Evid. 702.

[51] *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citing *In re Paoli RR Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990)).

[52] Fed. R. Evid. 702(b)–(d).

**2. Flawed Survey Process**

Rather than have an independent expert design and conduct the survey, Plaintiffs' counsel did it themselves. Using independent experts to design and conduct the survey helps ensure that "data is properly gathered and accurately reported."[53] The survey designer should be able to "demonstrate an understanding of survey methodology, including sampling, instrument design (questionnaire and interview construction), and statistical analysis."[54] This arises out of the hearsay dangers inherent in using survey responses, specifically the risks of faulty memory and "insincere responses" (i.e., giving untrue answers to produce favorable results) by the respondents.[55] Although "some attorney involvement in the survey design is necessary to ensure that relevant questions are directed to a relevant population," the attorneys "should have no part in carrying out the survey."[56]

Here, Plaintiffs' counsel, rather than an expert, designed and conducted the survey. The cover email alerted every individual who received it that it was from Plaintiffs' counsel for use in a "lawsuit for unpaid wages and unpaid overtime" and that the responses would be used "[t]o properly seek recovery for [the recipient]."[57] This enhanced the likelihood that the respondents would inflate the hours they worked in order to increase the damages they would recover.[58] No pre-testing of the survey questions or the layout of the survey was done to determine whether it would

---

[53] *See* Pittsburgh Press Club v. United States, 579 F.2d 751, 758 (3d Cir. 1978).

[54] Shari Seidman Diamond, Fed. Judicial Ctr., Reference Guide on Survey Research, *in* Reference Manual on Scientific Evidence 229, 238 (3d ed. 2011).

[55] *See Pittsburgh Press Club*, 579 F.2d at 757–59; *Sirko v. Int'l Bus. Machs. Corp.*, No. CV 13-03192, 2014 WL 4452699, at *4 (C.D. Cal. Sept. 3, 2014).

[56] Diamond, Reference Guide on Survey Research, at 237–38.

[57] *See* Doc. 822-1 *passim*.

[58] *See Pittsburgh Press Club*, 579 F.2d at 758 ("[T]he Respondents should be . . . unaware [of the purposes of the survey].") (citing *Berman v. New Hampshire Jockey Club, Inc.*, 324 F. Supp. 1156, 1168 (D.N.H. 1971)); Diamond, Reference Guide on Survey Research, at 238 ("[A]ny potential bias is minimized by having . . . respondents blind to the purpose and sponsorship of the survey . . . .").

produce reliable answers.[59]

Furthermore, Plaintiffs' counsel fielded questions and comments from respondents who were confused by the questions, further inserting themselves into the survey process.[60] The comments from the respondents show that the responding former employees were aware of who was conducting the survey and were aware that the survey results would be used to benefit the employees. The survey design and use thus raise the risk of "insincere responses."[61] Correspondence from Plaintiffs' counsel to the respondents shows that some respondents were coaxed through the survey,[62] such that even if these respondents gave true answers, they may have introduced error into the sample because they understood the questions differently than the other respondents.[63] Although much of the correspondence appears to be benign—either from respondents correcting mistakenly entered responses or from attorneys simply directing respondents to the website without assisting them in formulating their answers—the obvious problems inherent in having attorneys conduct the survey call into doubt the reliability of the survey.

**3. Insufficient Analysis by Dr. Fox Regarding Representativeness and Bias**

---

[59] *Cf.* Floyd J. Fowler, Jr., Survey Research Methods 115–26 (4th ed. 2009) (explaining the lengthy process necessary to design "good survey instruments"); *see id.* at 126 ("There was a time when one might have thought that evaluation of [survey] questions was largely a subjective process, contingent on the taste and preference of the interviewers and researchers. We now know we can move beyond that.").

[60] *See* Doc. 822-1 (collecting correspondence between counsel and survey respondents).

[61] *See, e.g.*, *id.* at 21 ("I completed the survey. My time working for Just Energy was a horrible experience... [B]eing loaded into a van and dropped off in very dangerous neighborhoods to work 12 hr days."); *id.* at 31 ("I can tell you more information that may contribute to the case."); *id.* at 34 ("I completed the survey and was curious to how long before I see any unpaid wages?"); *id.* at 53 ("I completed the survey, just wondering how everything is coming along with the case, how is it looking, and when is it expected to be over?").

[62] *See, e.g.*, *id.* at 32 (email from Plaintiffs' counsel to respondent explaining how, hypothetically, a person could keep working for Just Energy after obtaining her last completed application from a customer).

[63] *Cf., e.g.*, Fowler, Survey Research Methods, at 88–89 (explaining that survey questions should "mean the same thing to every respondent"); *id.* at 129 (explaining that surveys should be administered such that different answers from respondents are attributable to differences in their experiences rather than the way the question is asked).

Even if the survey data were reliable, Dr. Fox did no analysis to show it. Specifically, there was no serious testing to determine whether the respondents were representative of the entire class, and Dr. Fox did not account for potential bias in the results.

A survey allows a statistician to use data from a sample of a given population to draw conclusions about the entire population.[64/] For the survey's results to be accurate, it must use a sampling method that ensures the sample is representative of the entire population,[65/] meaning that the sample accurately reflects the relevant parameters of the entire population.[66/] Usually this is done using some version of random sampling.[67/] In this case, Plaintiffs simply sent their survey to all opt-in members of the FLSA collective action for whom Plaintiffs' counsel had a valid email address. Dr. Fox seeks to use these results to infer the typical experiences of the entire Plaintiff class, which can thereby be used to determine class damages.

Plaintiffs have not presented any credible analysis suggesting that their sample was representative of the entire population. In claiming that the survey was representative, Dr. Fox relies upon receiving at least one response from a worker in each state where Just Energy operates.[68/] But this conclusory assertion lacks any semblance of the analytical rigor one would expect from an expert in statistics. This was merely a convenience sample where Plaintiffs' counsel selected the people they had at hand, rather than people who would be representative of the entire population.[69/]

---

[64/] *See generally* Diamond, Reference Guide on Survey Research, at 231–32.

[65/] *See generally id.* at 239–48; Fowler, Survey Research Methods, at 19–37.

[66/] *See generally* Richard D. DeVeaux et al., Stats: Data and Models 235–37 (2005).

[67/] *See id.* at 236–39; Fowler, Survey Research Methods, at 24–27.

[68/] Doc. 689-1 at 5 n.10.

[69/] *Cf.* DeVeaux et al., Stats, at 242 (describing why convenience sampling is unlikely to produce a representative sample and thus should not be used to draw conclusions about the entire population).

Dr. Fox also failed to account for possible biases in the survey. Bias is "a systematic failure of a sample to represent its population," which arises most often either when those who respond to the survey differ in some systematic way from those who do not, or when the survey design itself influences the responses.[70/] If a sample is biased, the conclusions drawn from it will also be biased.[71/] As described above, there was no pre-testing of the questions that would identify and help eliminate response bias. For example, the phrasing or ordering of questions may have suggested certain answers or caused respondents to systematically overestimate or underestimate their hours worked.. And Dr. Fox did nothing to determine whether there may have been non-response bias. For example, if the FLSA opt-in members who responded had higher or lower damages on average than those who did not respond, that difference would have biased the results in one direction or another.

Perhaps most important in considering whether the survey was systemically biased, the sample only covered FLSA opt-in members, who may be different from members of the Ohio Rule 23 class.[72/] In order to be a member of the FLSA collective action, an employee must have taken the affirmative step of filing an opt-in notice.[73/] This raises the question about why the FLSA opt-in members chose to take the effort of filing their notices while the majority of members of the Ohio Rule 23 class did not. One explanation would be that the FLSA opt-in members have higher damages on average than members of the Ohio Rule 23 class as a whole, and thus have stronger incentives to actively participate in this litigation. Another explanation would be that the FLSA opt-

[70/] *See* DeVeaux et al., Stats, at 243–46.

[71/] *See id.* at 245.

[72/] *See* Doc. 697-1 at 14 (arguing that "estimates from [FLSA] opt-ins, who are actively engaged in the lawsuit, will tend to be systematically higher than estimates derived from a group which contains both active [FLSA opt-in] and passive [Ohio Rule 23] members of the lawsuit").

[73/] 29 U.S.C. § 216(b).

in members bear some ill-will toward Defendants that make them particularly eager to give "insincere responses"out of spite. Either explanation would bias the survey's results upward. But Dr. Fox made no attempt to determine whether systematic biases existed.

Dr. Fox's cursory attempt to calculate confidence intervals around the results does not fix the problem, as the confidence intervals would be based around an already biased value.[74] The fact that Dr. Fox did not account for these potential sources of bias further renders her methodology and conclusions unreliable, and thus excludable.

**C. Objections to Dr. Fox's Supplemental Report**

Defendants have also filed a motion to strike Dr. Fox's supplemental report on the grounds that it was filed after the deadline for expert discovery and impermissibly incorporates new data that had previously been available.[75] They thus ask that the supplemental report be excluded under Rule 37(c).[76] This motion raises three issues. First, whether the incorporation of new data is proper. Second, whether the portion of the supplemental report that merely rebuts Dr. Saad's expert report is timely. And third, whether Defendants are entitled to costs associated with making this motion.

**1. Incorporation of New Data**

As described above, Dr. Fox's supplemental report continues to rely primarily on the flawed survey data to reach its conclusions.[77] It also, however, incorporates new data about the dates that completed applications were received, as well as data from sign-in sheets at certain Just Energy offices. Defendants say this is sandbagging that violates the disclosure principles of Rule 26, and in

---

[74] *See* DeVeaux et al., Stats, at 383.
[75] Doc. 709.
[76] *Id.* (citing Fed. R. Civ. P. 26(a)(2); Fed. R. Civ. P. 37(c)).
[77] Doc. 706.

any event the report is untimely under the Rules and the Court's scheduling order.[78/] Plaintiffs, by contrast, characterize Dr. Fox's supplemental report as merely correcting the initial report.[79/]

The Court need not resolve the question of whether the supplemental report is truly a necessary correction under Rule 26(e) or whether it is, as Defendants argue, an impermissible "do over." Although Dr. Fox's supplemental report incorporates new data, it still relies first and foremost on the same unreliable survey data as her initial report. The new data is used in a way that is inextricably linked with the objectionable survey. And the supplemental report uses the data in the same way as the initial report: it does not address the issues of whether the survey was representative or attempt to account for biases in any sort of analytically rigorous way.[80/]

The supplemental report is therefore excluded for the same reasons as the initial report, with the exception discussed below.

**2. Rebuttal to Dr. Saad's Expert Report**

Only one part of Dr. Fox's supplemental report is free from the taint of the survey data. That section, on pages 8 to 13, operates purely as a rebuttal to Dr. Saad's own expert report. Defendants object to this portion of the supplemental report on the grounds that it is untimely. Plaintiffs did not respond specifically to this argument.

In general, a rebuttal report must be exchanged 30 days after the disclosure of the opposing party's expert report unless the Court mandates some other date.[81/] The Court's discovery order in

[78/]Doc. 709-1.
[79/]Doc. 718 at 2–5 (citing Fed. R. Civ. P. 26(e)).
[80/]*See* Doc. 706 at 7.
[81/]Fed. R. Civ. P. 26(a)(2)(D)(ii).

this case did not specify a due date for rebuttal expert reports.[82] The default rule therefore applied. Dr. Saad's expert report was filed on May 29, 2014, which would have made Plaintiffs' rebuttal report due by June 27, 2014.[83] Furthermore, the Court gave a final cutoff date for expert discovery of June 30, 2014.[84] Plaintiffs filed Dr. Fox's supplemental report on July 2, 2014. Thus, it was untimely.

Federal Rule of Civil Procedure 37(c)(1) allows a court to exclude an untimely expert disclosure unless the non-moving party can show that the failure to disclose was either justified or harmless, or unless some other sanction is appropriate.[85] Plaintiffs argue that the supplemental report is justified because they only late realized that Dr. Fox could use the sign-in sheets and signed application data.[86] But this does not explain why Dr. Fox could not have earlier responded to Dr. Saad's report on its own terms. Even if Dr. Fox needed to revise her own report, Plaintiffs could have separately and timely filed her rebuttal to Dr. Saad's report.[87] Thus, Plaintiffs have failed to show that the late rebuttal was substantially justified.

Nevertheless, excluding Dr. Fox's rebuttal report is unnecessary. Defendants primarily argue that they are burdened because expert discovery is closed and the rebuttal was not disclosed until

---

[82] *See* Docs. 20, 104, 646.

[83] Defendants argue that, by agreement between the parties, rebuttal reports were due on June 17, 2014. *See* Doc. 709-1 at 12. However, the correspondence cited by Defendant shows that this agreement only applied to the disclosure of *Defendants'* rebuttal report. *See* Doc. 709-2 (On May 5, 2014, the parties finalized a schedule that included the entry: "June 17 - *Defendants'* Rebuttal Report Due.") (emphasis added). The correspondence between the parties makes no mention of a due date for Plaintiffs' rebuttal report, and thus the default 30-day rule continued to apply.

[84] Doc. 646.

[85] Fed. R. Civ. P. 37(c)(1); *see generally* Wright & Miller, 8B Fed. Prac. & Proc. Civ. § 2289.1 (3d ed. 2014).

[86] Doc. 718 at 5–6.

[87] *See* Doc. 709-2.

after they had already deposed Dr. Fox.[88] To remedy this situation, the Court will allow Defendants to re-depose Dr. Fox if they wish. The substance of the deposition would be limited the matters addressed in the rebuttal section of the supplemental report, and the duration of the deposition would be limited to one hour.

**3. Motion for Costs**

Under Rule 37(c), the Court may fashion an appropriate remedy that may include costs and fees.[89] Defendants have requested the Court award them their costs and fees associated with bringing this motion.[90] Plaintiffs have not responded to this request.

The Court has granted Defendants most of the relief they seek. Dr. Fox's supplemental report is excluded. The portion that is only a rebuttal to Dr. Saad's report is not excluded, but Plaintiffs will be able to depose Dr. Fox about the issues it raises. The Court finds this is an adequate remedy and therefore denies Defendants' motion for costs and fees.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motions. Defendants' motion to strike Plaintiffs' brief in opposition to Defendants' motion to exclude the initial report is **DENIED**. Because Dr. Fox's initial report relied on the unreliable survey conducted by Plaintiffs' counsel, the motion to exclude the initial report and any related opinions or testimony is **GRANTED**. The motion to strike Dr. Fox's supplemental report

[88] *See* Doc. 709-1 at 10. By contrast, the correspondence between counsel shows that Defendants made Plaintiffs aware of their plan to have Dr. Saad file a rebuttal report, and made accommodations to ensure that Dr. Saad's rebuttal would be produced in advance of his deposition so he could be questioned about it. *See* Doc. 709-2.

[89] *See* Fed. R. Civ. P. 37(c)(1); *see generally* Wright & Miller, 8B Fed. Prac. & Proc. Civ. § 2289.1 (3d ed. 2014).

[90] Doc. 709-1 at 13.

is **GRANTED IN PART** and **DENIED IN PART**. The portions that continue to rely on the unreliable survey are excluded, as are any related opinions or testimony. The portion of Dr. Fox's supplemental report (pages 8 to 13) that merely rebuts and criticizes Dr. Saad's expert report is not excluded, but Defendants may depose Dr. Fox about that section if they wish. Defendants' motion for costs and fees associated with the motion to exclude the supplemental report is **DENIED**.

IT IS SO ORDERED

Dated: January 29, 2015

s/ *James S. Gwin*
JAMES S. GWIN
UNITED STATES DISTRICT JUDGE