UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                            :
DAVINA HURT, ET AL.,                        :       CASE NO. 1:12-CV-00758
                                            :
                Plaintiffs,                 :
                                            :
v.                                          :       OPINION & ORDER
                                            :       [Resolving Doc. 810]
COMMERCE ENERGY, INC., ET AL.,              :
                                            :
                Defendants.                 :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

This is a case about minimum wage and overtime pay under the Fair Labor Standards Act ("FLSA")[1] and overtime pay under the Ohio Minimum Fair Wage Standards Act ("Ohio Wage Act").[2] Plaintiffs are door-to-door workers who solicited residential customers for the Defendants' energy services.

Following a trial on the merits, a jury found Defendants liable for violations of the FLSA and the Ohio Wage Act.[3] Defendants now renew the motion for judgment as a matter of law they made at trial.  In the alternative, Defendants move for a new trial, or to certify an interlocutory appeal of the liability phase of the trial.  For the following reasons, the Court **DENIES** the motion for judgment as a matter of law, **DENIES** the motion for a new trial, and **DENIES** the motion to certify an interlocutory appeal.

### I. Background

The Court has previously issued an opinion detailing the factual background of this case and

---

[1] 29 U.S.C. § 201 *et seq.*
[2] Ohio Rev. Code § 4111.01 *et seq.*
[3] *See* Doc. 808.  Throughout this opinion, citations to the draft trial transcript will be abbreviated as "Tr. [date] at [page]:[line]."

Case No. 1:12-CV-00758
Gwin, J.

incorporates that background by reference.[4] In short, Defendants sell electricity and natural gas to

residential and commercial customers in the United States and Canada. Under Defendant's selling

scheme, Plaintiffs would go door to door to obtain applications from potential customers. An

application could then become final contract after a verification call between the customer and a

third-party verifier and after the Defendant found the customer's credit satisfactory. Plaintiffs were

paid commission for every finalized contract; if an application was rejected for any reason before

the contract became final, the employee would not be paid.

Plaintiffs brought suit, alleging this commission-based compensation system deprived them

of minimum wage and overtime. Two classes were certified: a nationwide FLSA collective action

seeking minimum wage and overtime under federal law, and a Rule 23 class action seeking overtime

under Ohio law. Against these claims, Defendants argued that Plaintiffs were exempt from overtime

and minimum wage requirements because of the "outside salesperson" exemption.

The Court held a trial on Defendants' liability from September 29, 2014, to October 6, 2014.[5]

At the close of Plaintiffs' case, Defendants moved for judgment as a matter of law[6] on two

grounds. First, Defendants argued that the Ohio "Badge Never Used" ("BNU") group of

employees—those who attended at least one day of training but never obtained a completed

application from a customer—had not established that any member of the group had worked more

---

[4] *See* Doc. 89 at 1–6.

[5] The Court bifurcated the proceedings into a liability phase and a damages phase. Doc. 731.

[6] Defendants styled these oral motion as seeking "directed verdicts." The terminology of the Federal Rules of Civil Procedure regarding "directed verdict" and "judgment notwithstanding the verdict" (also called "j.n.o.v.") was updated in 1991 so that all such motions are now simply called "judgment as a matter of law." *See* 9B Wright & Miller, Federal Practice & Procedure Civil § 2521, at nn. 7, 13–19 & accompanying text (3d ed. 2014) (citing Fed. R. Civ. P. 50(a) Advisory Committee Note to 1991 Amendments).

Case No. 1:12-CV-00758
Gwin, J.

than forty hours in a week, and thus had failed to prove their claim for overtime wages.[7]  Second, Defendants argued that Plaintiffs' evidence established that Plaintiffs were exempt outside salespeople.[8]  The Court denied both motions, finding there was sufficient evidence for both issues to go to the jury.

At the close of Defendants' case, Defendants and Plaintiffs cross-moved for judgment as a matter of law regarding the application of the outside salesperson exemption.[9]  The Court denied both motions.

Defendants also raised several objections to the jury instructions.  Relevant to this motion, they argued that the Court erred in instructing the jury that it could consider whether the applications obtained by Plaintiffs were binding commitments in deciding whether the transactions were "sales" for purposes of the FLSA.[10]

Finally, Defendants also object to the Court twice instructing the jury during the trial that an employment contract cannot waive FLSA minimum wage and overtime requirements if those requirements would otherwise apply.[11]

## II. Judgment as a Matter of Law

Defendants renew their motion for judgment as a matter of law.  They raise three issues, which will be addressed in turn.  First, that there was insufficient evidence that the Plaintiffs qualified for the outside salesperson exemption.  Second, that no evidence supports the inference that any BNU group member worked more than 40 hours in any week.  And third, that the Court's

---

[7]/Tr. 10/1/2014 at 183:24–185:23.

[8]/*Id.* at 186:6–186:19.

[9]/Tr. 10/6/2014 at 21:10–21:20.

[10]/Doc. 804 at 3–7; Tr. 10/2/2014 at 165:25–167:5; Tr. 10/6/2014 at 7:23–9:25.

[11]/Doc. 810-1 at 5–6.

Case No. 1:12-CV-00758
Gwin, J.

instruction to the jury that the minimum wage requirements of the FLSA cannot be waived prejudiced their case. All three arguments lose.

Before moving on to the merits of this motion, the Court pauses to chastise both sides for their complete and utter failure to cite to the trial record or admitted exhibits in their briefing.[12] Judge Easterbrook once wrote, regarding summary judgment, that, "[d]istrict judges are not archaeologists. They need not excavate masses of papers in search of revealing tidbits—not only because the rules of procedure place the burden on litigants, but also because their time is scarce."[13] The same goes for post-trial motions. When the issues all relate to what happened at trial, the parties should point to specific evidence that appears *in the record* to support their positions, rather than relying on generalized statements and their own (occasionally faulty) memories as they did here. In the future, both parties and their counsel would do well to respect the Court's limited resources and not force it to do their jobs for them.

## A. Legal Standard

A motion for judgment as a matter of law under Rule 50(a) requires the trial court to decide "whether there was sufficient evidence presented to raise a material issue of fact for the jury."[14] The Court "must view the evidence in the light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences."[15] "'[S]ufficient evidence' will be found unless, when viewed in the light of those inferences most favorable to the nonmovant, there is either a complete absence of proof on the issues or no controverted issues of fact upon which

---

[12] In fact, the Court has learned from the court reporter that neither side has ever even bothered to obtain a transcript of the trial, other than of counsel's opening statements.

[13] *Nw. Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662–63 (7th Cir. 1994).

[14] *Monette v. AM-7-7 Baking Co.*, 929 F.2d 276, 280 (6th Cir. 1991).

[15] *Wayne v. Village of Sebring*, 36 F.3d 517, 525 (6th Cir. 1994).

Case No. 1:12-CV-00758
Gwin, J.

reasonable persons could differ."[16] The Court neither weighs the evidence, evaluates the credibility of the witnesses, nor substitutes its judgment for that of the jury.[17]

## B. Analysis

### 1. Outside Sales Exemption

Defendants first argue that they should receive judgment as a matter of law because Defendants established, and Plaintiffs failed to rebut, that Plaintiffs meet the definition of outside salespeople.[18] While Defendants' motion largely objects to the contents of the jury instructions themselves, which is discussed in more detail below, Defendants also raise arguments regarding the sufficiency of the evidence that are properly considered on motion for judgment as a matter of law.[19]

Generally, the FLSA requires employers to pay employees a minimum wage, as well as time-and-a-half overtime pay when the employee works more than forty hours in a week.[20] Not all employees, however, are protected by this requirement. One exception is that "any employee employed . . . in the capacity of outside salesman" is not entitled to minimum wage or overtime.[21] An outside salesperson is "any employee . . . whose primary duty is . . . making sales . . . and . . . who is customarily and regularly engaged away from the employer's place or places of business in

---

[16]/*Monette*, 929 F.2d at 280; *see also Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005) ("Judgment as a matter of law may only be granted if . . . there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party.").

[17]/*Wayne*, 36 F.3d at 525.

[18]/Doc. 810-1 at 2–4.

[19]/An incorrect jury instruction can provide the basis for a motion for judgment as a matter of law when a pure legal issue is dispositive as to the outcome of the case. *See, e.g.*, *Kladis v. Brezek*, 823 F.2d 1014, 1017 (7th Cir. 1987); *accord Libbey-Owens-Ford Co. v. Ins. Co. of N. Am.*, 9 F.3d 422, 426 (6th Cir. 1993). As the Court will explain, however, the evidence was sufficient for the jury to have found in favor of Plaintiffs on this issue regardless of whether the disputed instruction was included. Thus, it is unnecessary to resolve the correctness of the jury instructions at this point, and the Court instead reserves that discussion for its opinion on the motion for a new trial.

[20]/*See* 29 U.S.C. §§ 206, 207.

[21]/29 U.S.C. § 213(a)(1).

Case No. 1:12-CV-00758
Gwin, J.

performing such primary duty."[22]  A "sale," in turn, is defined as "any sale, exchange, contract to

sell, consignment for sale, shipment for sale, or other disposition."[23]  This "include[s] the transfer

of title to tangible property . . . ."[24]  The parties stipulated that Plaintiffs in this case were customarily

and regularly engaged away from the employer's place of business.[25]  This left for trial only the

question of whether Plaintiffs had the primary duty of making sales.

     Defendants say they "presented evidence that showed Plaintiffs were engaged to make sales

as defined by the statutes and regulations."[26]  But there was still sufficient evidence for the jury to

reach the opposite conclusion, even without the disputed instruction regarding the door-to-door

workers' ability to enter into a binding contract with a customer.  When considering whether

Plaintiffs bore the "external indicia" of outside salespeople—a list of non-exhaustive factors that the

jury could consider as part of the totality of the circumstances—the evidence could easily support the

jury's verdict.[27]

     Much of the evidence suggested that Plaintiffs were not actually outside salespeople.

Plaintiffs were hired without regard to their prior sales experience.[28]  Plaintiffs also presented

evidence that Defendants closely controlled the work schedules and locations of the vast majority of

---

[22]/29 C.F.R. § 541.500.

[23]/29 U.S.C. § 203(k).

[24]/29 C.F.R. § 541.501(b).  The parties stipulated that the natural gas and electricity sold by Defendants are tangible property.  *See* Doc. 818-1 at 14.

[25]/Doc. 763 at 4.

[26]/Doc. 810-1 at 2.

[27]/*See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2172–73 (2012); *see also* Doc. 89 at 11–18 (evaluating these indicia in ruling on a motion for summary judgment).

[28]/*E.g.*, Tr. 9/29/2014 at 113:1–113:4 ("Q. The company doesn't require that the plaintiffs have any previous sales experience before being hired into these positions, correct?  A. That would be correct."); Tr. 10/1/2014 at 149:2–149:19 ("Q. Am I correct that these workers who go door-to-door are hired off the street and there's no requirement whatsoever of any prior skill [to] get this job?  A. Yes. . . . Q. They're not required to have ever worked doing any sales, correct?  A. Correct."); *cf., e.g., Christopher*, 132 S. Ct. at 2176 ("Petitioners were hired for their sales experience.").

-6-

Case No. 1:12-CV-00758
Gwin, J.

their door-to-door workers.[29] Witnesses testified that workers would be driven to residential

neighborhoods by supervisors,[30] told which blocks to canvas,[31] and told how many doors to knock

on per day.[32] Many workers did not control their own schedules—once a group of door-to-door

workers was taken to the field by a supervisor, they were limited in when they could take breaks[33]

and had to keep working until the supervisor collected them at the end of the day.[34] And while

---

[29] *See, e.g.*, *Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747, 756 (W.D. Mich. 2003).

[30] *E.g.*, Tr. 9/30/2014 at 130:13–131:4 ("Q. So they would put you in a team, and then what happened? A. Then we got into the van. . . . Q. And did you go out to the neighborhoods at that point? A. Yes. Q. Who decided which neighborhoods you were going to go to? A. The crew leader."); *id.* at 203:12–204:10, 237:18–239:23 (descriptions from crew leaders regarding their responsibilities, including driving door-to-door workers to the field); *id.* at 243:9–243:13 ("Q. Were [sic] there anybody who drove themselves out to the field? A. I can only thin[k] of one person who had a second job, but no, everyone was required to go with the crew leader crew coordinator in the one car."); Tr. 10/1/2014 at 40:2–40:22 (crew coordinator stating that he would "drop [the door-to-door workers] off on their streets and basically pick them up at 9:00 when we were done . . . .").

[31] *E.g.*, Tr. 9/30/2014 at 67:5–67:17 ("Q. And explain what a street sheet is? A. A street sheet is just like a sheet that shows which doors you knocked on."); *id.* at 131:2–131:25 ("Q. Then once you got to the neighborhood did you get to choose which streets you worked on? A. No. . . . Q. Did they tell you what streets you were supposed to work on? A. Yes. Q. Did you ever work on a street that you were not supposed to? A. Yes. Q. And what happened? A. I got in trouble."); *id.* at 204:11–204:24 ("[i]t was the crew coordinator who generally picked the area."); Tr. 10/1/2014 at 40:2–40:22 (crew coordinator would assemble materials for workers, including "contracts, street sheets, maps, and assigned areas for all the people to position on their streets").

[32] *E.g.*, Tr. 9/30/2014 at 66:23–67:4 ("Q. Once you got to the neighborhood where you be knocking on [doors], what were your instructions from the company? A. To [knock] on at least a hundred doors regardless if you got a deal or not . . . ."); *id.* at 132:1–132:9 ("Q. How many houses would you go to in a typical day? A. Anywhere between 150 and 200. Q. Did anybody at Just Energy tell you that you had to go to a certain number of houses per day? A. Yes."); *id.* at 243:14–245:21("Q. Did you have a quota for the number of doors you had to knock on? A. Yes. . . . Q. You were supposed to knock on 50 doors an hour? A. Uh-huh. Yes."); Tr. 10/1/2014 at 15:7–16:3 (describing office manager calling door-to-door worker, saying "He wanted me to knock faster because I'm a slow walker and if I don't get deals he would assume I wasn't walking fast enough, and he wanted 200 doors a day"); *id.* at 44:16–44:18 ("Q. How many houses would you typically go to during a day? A. Basically we were told to do roughly between 100 to 200 doors every single day.").

[33] *E.g.*, Tr. 9/30/2014 at 67:22–68:9 ("Q. Could you leave on your own if you wanted to? A. No. Q. What about breaks? Could you take breaks? A. When they told us it was time to, yes."); Tr. 10/1/2014 at 14:12–15:3 ("Q. Was there a policy about breaks when you were out knocking door-to-door? A. .Yes, there was. Q. And what was that policy? A. Dennis said no breaks. He said, take a break when you get a deal at the—we were allowed to go in the customer['s] house, but he would say if the customer invites you in that's your chance to use their bathroom and ask for some water. So that was my break.").

[34] *E.g.*, Tr. 9/30/2014 at 67:18–67:23 ("Q. How long would you stay in the neighborhoods as a general proposition? A. From the time we get there, maybe 10:00, 11:00 from whenever the crew coordinator comes and picks us up. Q. Could you leave on your own if you wanted to? A. No."); *id.* at 132:24–133:3 ("Q. Did you get to decide when you were done knocking on doors for the day? A. No. Q. Who decided that? The team leader . . . ."); *id.* at 203:12–204:24 (crew coordinator describing setting daily schedules); *id.* at 237:18–239:23 (crew coordinator would pick up his workers at 8:00 or 9:00 each evening); Tr. 10/1/2014 at 12:25–13:3 ("Q. What happened after you were done
(continued...)

Case No. 1:12-CV-00758
Gwin, J.

working in the field, Plaintiffs were required to wear clothing or a pin bearing Defendants' brand

name.[35]

Some of the external indicia pointed the other way as well.  Notably, Plaintiffs acknowledge

that they were paid on a commission basis, a factor that supports Defendant's argument that Plaintiffs

were outside salespeople.[36]

In the end, though, most indicia could have supported a verdict for either party.  Plaintiffs

were given detailed scripts to follow when making a pitch to a potential customer, and practiced

those scripts at length.[37]  While the jury could also have counted this in Defendants' favor as

---

[34]/(...continued)
knocking around 9:00?  A.  I would wait for the van leader to figure out where I was and come pick me up.").

[35]/*E.g.*, Tr. 9/29/2014 at 164:14–165:4 (reading clothing regulations from orientation manual (Joint Exhibit 9B)); Tr. 9/30/2014 at 79:5–79:25 ("Q. Were you required to wear any particular type of clothing?  A. Yes.  Q. What were you required to wear? . . . .  A. I was required to wear the polo shirt with the Just Energy logo on it, jackets if needed—well, if it was cold outside you couldn't wear your own coat, you had to wear this, something with the Just Energy logo on it.  Hats, badge.  That was all part of the uniform."); *id.* at 117:8–117:16 ("Q. Did you have a Just Energy uniform?  A. Yes.  I had the polo shirt. . . . Q. Did you have any other Just Energy clothing or attire?  A. No, just my ID and a pin.  That's about it."); *id.* at 140:7–141:1 ("Q. Did Just Energy require you to wear certain clothing when you were out in the field?  A. Yes.  Q. And what kind of clothing was that?  A. A shirt.  I had a very heavy jacket, it was November."); *id.* at 184:4–185:23 ("Q. What did you wear in the field?  A. I had to wear [all their] clothing, khaki pants, nice shoes, and there was always the . . . button up shirt.  The baseball hat.  I also had a knitted hay.  There was a wind breaker coat and a lanyard with your ID on it, as well."); Tr. 10/1/2014 at 16:9–16:24 ("Q. Did you have to wear certain clothing to go out and go door-to-door?  A. Yes.  Q. And what was that?  A. I had to wear a Just Energy hat, my Just Energy badge, my Just Energy shirt, dark pants or khakis, [cargo] shorts maybe, and some decent shoes, comfortable to walk in, but professional, and when it got cold I had to purchase a Just Energy skully and a Just Energy fleece.").

[36]/*See, e.g.*, *Christopher*, 132 S. Ct. at 2173 (discussing "incentive compensation"); Doc. 818-1 at 5 (parties stipulated that "Plaintiffs are compensated on a commission basis and [Defendants] do not pay overtime for hours worked over 40 hours per week and do not pay minimum wage in situations where the commission earned during a particular workweek are insufficient to ensure that salespersons' wage rates meet or exceed the minimum wage.").

[37]/*E.g.*, Tr. 9/29/2014 at 169:22–170:2 ("Q. There's actually scripts that the company puts together for the plaintiffs on—to walk through all of this stuff with the homeowner, correct?  A. Yeah, to provide—it's a guideline, script, but the key points that the salesperson must touch upon when transacting in that sale."); 177:18–188:10 (reading the script regarding "objection handling" (Joint Exhibit 11)); Tr. 9/30/2014 at 11:3–12:12 ("Q. Can you walk us through the steps you would follow on a typical homeowner interaction?  A. We would knock on the door.  As soon as someone came to the door we would look at our scripts, see what it was we needed to do and say, when we needed to make eye contact, when we had to break eye contact, the way we need to stand, things of that sort.  Q. Okay.  And again, were those things that you practiced in the morning meetings, as well?  A. Yes.  Those are the things we practiced daily.  Q. And who would have given you instruction that you had to follow the scripts?  A. Whoever was in charge of the office, a regional manager, store manager, or crew coordinator."); *id.* at 62:5–62:9 ("Q. And what were you told about those sale scripts?  A. That it was verbatim that we follow the script."); *id.* at 68:19–69:23 (describing interactions with homeowners
(continued...)

Case No. 1:12-CV-00758
Gwin, J.

"specialized sales training" that would support application of the outside sales exemption,[38] this evidence somewhat points both ways, as it also indicates their task was not truly independent selling. Similarly, Plaintiffs were, by the very nature of their jobs, required to solicit new customers, which suggests they could have been outside salespeople.[39] But on the other hand, Plaintiffs did not independently generate their own leads or follow up on their sales, which suggests the opposite.[40] Instead, they would knock on the doors of the houses they were assigned to, and were prohibited from returning once the initial and introductory interaction with the customer was complete.[41]

Beyond evaluating these indicia, evidence that Plaintiffs obtained only non-binding applications from customers also supports the jury's decision.[42] Defendants assert that "it is not

_____

[37]/(...continued)
as dictated by the script); *id.* at 93:21–94:6 (describing being reprimanded for "not saying the script verbatim"); *id.* at 109:13–109:23 ("Q. Describe what those role playing exercises were like.  A. We would read from the script.  They wanted you to do everything on the scripte, and you had to read it precise."); *id.* at 134:7–134:21 (describing interactions with homeowners as dictated by the script); *id.* at 147:5–147:24 (recounting that some employees would go off-script when dealing with reluctant customers); *id.* at 170:1–172:4 (identifying that part of the reason for the scripts was to comply with regulations); Tr. 10/1/2014 at 16:25–17:21 (describing interactions with homeowners as dictated by the script); *id.* at 156:2–156:7 ("Q. How did you know what to say at the door?  A. They gave us a script to say that we were supposed to follow."); *id.* at 166:7–166:13 (describing orientation process that included group practice "going over the script"); *id.* at 201:16–202:11 ("Q. Do you expect them to follow sales scripts when they make presentations to customers?  A. Yeah.  We—part of the training process is they do have a presentation script that has been approved that they usually should follow in the very begin[ning] stages just to give them a [guideline] of the order of what to say."); Tr. 10/2/2014 at 11:11–12:6 (office manager expected salespeople to use the script "as a guideline" and eventually commit it to memory); *id.* at 79:4–79:5 ("Q. You follow the sales script verbatim, correct?  A. Yes, sir.").

[38]/*See, e.g.*, *Nielsen*, 302 F. Supp. 2d at 757.

[39]/*See Nielsen*, 302 F. Supp. 2d at 758.

[40]/*See id.*

[41]/*E.g.*, Tr. 9/29/2014 at 194:2–194:17 ("Q. And in fact the plaintiffs don't return they're not allwoed to return to the home after they've handed off that phone.  A. If—absolutely that's correct.  Q. They're done dealing with the homeowner at that point.  A. Absolutely.  Yes."); Tr. 9/30/2014 at 14:2–14:7 ("Q. Once you left the home at that point did you have any further interaction with the customer?  A. None whatsoever.  Q. Okay.  Did you ever personally follow up with a phone call or make any return visit, or anything of that sort?  A. No."); *id.* at 72:8–72:15 ("Q. Once you leave once the phone is passed to the customer, do you ever return to the home?  A. No.  Q. Do you ever make any personal follow up with that customer?  A. No.  Q. For any purpose?  A. No, not at all."); *id.* at 74:5–74:7 ("Q. While an application was pending were you permitted to return and speak to the homeowner for any reason?  A. No, not at all.").

[42]/Defendants object that this is an improper factor for the jury to have considered.  The Court addresses that objection below in Section III.B.1.

-9-

Case No. 1:12-CV-00758
Gwin, J.

disputed in the evidentiary record that binding agreements were signed by customers."[43] In fact, this point was very much disputed at trial. Evidence showed that Defendants retained "sole discretion" to accept or reject a customer's application.[44] The applications obtained by Plaintiffs were merely proposals until Defendants accepted them. This factor suggests that Plaintiffs were not actually making sales.[45]

Further, this situation is unlike the hypothetical the Supreme Court offered in *Christopher* of "a manufacturer's representative who takes an order from a retailer but then transfers the order to a jobber's employee to be filled."[46] The Supreme Court said that, in such a situation, it would be the manufacturer's representative, not the jobber, who had made the sale.[47] Here, by contrast, Defendants were not just filling orders obtained by Plaintiffs. Rather, after receiving a completed application, Defendants still had to determine whether or not to accept it. This is far more of an active role in completing the sale than the straightforward task of fulfilling an otherwise finalized order.

In short, there was sufficient evidence for the jury to have found either way on the outside sales exemption. Thus, Defendants' motion for judgment as a matter of law on this issue loses.

## 2. BNU Claims

Defendants' second ground in moving for judgment as a matter of law pertains to one

---

[43]/Doc. 810-1 at 3.

[44]/Tr. 9/29/2014 at 187:11–190:5 (reviewing terms and conditions of contract signed by customers (Joint Exhibit 24)); Tr. 9/30/2014 at 42:1–43:6 (same); Tr. 10/1/2014 at 74:11–75:24 (reviewing terms of Plaintiffs' commission-based compensation agreements, which acknowledge Defendants' "unfettered discretion to reject any energy contract submitted" (Plaintiffs Exhibit 6)); *id.* at 128:14–129:22 (reviewing terms of agreement with customer, which "is conditional upon acceptance by [Defendants]." (Joint Exhibit 15)); *see also* Doc. 89 at 10–11.

[45]/*See infra* Section III.B.1.

[46]/*Christopher*, 132 S. Ct. at 2173–74.

[47]/*Id.*

Case No. 1:12-CV-00758
Gwin, J.

particular group: BNUs (i.e., those employees who attended at least one day of training, but never received a completed application from a customer) who have claims for overtime wages as part of the Rule 23 class.[48/]  Defendants argue that there is no evidence that anyone from this group worked more than 40 hours in a week, and thus that Plaintiffs failed to prove their case that the BNUs are entitled to overtime wages under Ohio law.[49/]

Defendants made this motion at trial, and the Court denied it.[50/]  Then, as now, there was some evidence from which the jury could infer that some members of this group worked enough days to have racked up 40 hours or more in a week.[51/]  There was certainly evidence from which the jury could have reached the opposite conclusion as well.[52/]  But either conclusion was reasonable.

Furthermore, the Court has not certified a sub-class of BNUs.  Plaintiffs presented sufficient evidence to prove liability on a classwide basis—namely, that Defendants did not pay their door-to-door workers minimum wage or overtime and that Plaintiffs were not exempt outside salespeople. From the time the class was certified, the Court has recognized that while liability can be determined on a classwide basis in this case, damages will more likely need to be done on an individualized basis.[53/]  Some members of the liability class will likely be unable to establish that they worked enough hours to qualify for overtime. Defendants will have ample opportunities to challenge the

---

[48/]Doc. 810-1 at 4–5.

[49/]Id.. Similar to the FLSA, Ohio law requires employers to pay employees time-and-a-half pay for all hours worked in excess of forty per week.  See Ohio Rev. Code § 4111.03.

[50/]Tr. 10/1/2014 at 183:24–186:2.

[51/]See Tr. 9/29/2014 at 119:19–121:16 ("Q. Are you aware that there are individuals who worked weeks without earning any commissions? . . . A. There might be a few."); Tr. 10/1/2014 at 127:24–128:12 ("Q. How long would [BNUs] typically work?  A. Well, they tried to make it through that first wave, right, so anywhere from one to three weeks.").

[52/]See Tr. 10/2/2014 at 111:23–112:6 (Q. So have you ever observed people come in for a day of orientation and never come back? A. Yes. A lot. . . . Q. And have you ever seen people go out to the field for just a day and never come back? A. Oh, yeah, all the time.").

[53/]See Doc. 88; Doc. 719 at 7.

Case No. 1:12-CV-00758
Gwin, J.

individual damages claims of BNUs during the damages phase.

Defendants recognize as much, but argue that because the parties' damages experts considered the BNUs to be a distinct group separate from the rest of the class, the Court should treat them separately and order judgment against them.[54/]  Defendants' reliance on the damages experts' opinions, however, only supports Plaintiffs' position that sub-class certification is an issue for the damages phase of this case, not the liability phase.

### 3. Prejudice

Defendants also request judgment as a matter of law because the Court instructed the jury that employees cannot waive their rights under the FLSA.[55/]  The merits of this argument are discussed below as they relate to Defendants' motion for a new trial.  For the purposes of Defendants' motion for judgment as a matter of law, it is sufficient to note that Defendants never based their Rule 50(a) motions at trial on this ground.[56/]  A Rule 50(b) motion for judgment as a matter of law merely renews a prior motion, and thus "can be granted only on grounds advanced in the preverdict [Rule 50(a)] motion."[57/]  To the extent this argument is even cognizable as part of a Rule 50 motion—which is doubtful, as it does not involve any questions that the jury could have resolved—Defendants have forfeited it.

### III. New Trial

In the alternative to judgment as a matter of law, Defendants move for a new trial on two grounds.  First, that the jury instructions erred by including language about the authority of a

---

[54/]Doc. 818 at 9.

[55/]Doc. 810-1 at 5–6.

[56/]See Tr. 10/1/2014 at 183:20–186:20 and Tr. 10/6/2014 at 19:18–22:5 for Defendants' other grounds in moving for judgment as a matter of law.

[57/]Fed. R. Civ. P. 50(b) Advisory Committee Note to 2006 Amendment.

Case No. 1:12-CV-00758
Gwin, J.

salesperson to create a binding contract. And second, that the Court erred by instructing the jury that

the minimum wage and overtime requirements of the FLSA cannot be waived.  Both arguments lose.

## A. Legal Standard

Under Federal Rule of Civil Procedure 59(a), "[a] new trial may be granted . . . in an action

in which there has been a trial by jury, for any of the reasons for which new trials have heretofore

been granted in actions at law in the courts of the United States."

> Generally courts have interpreted this language to mean that a new trial is warranted
> when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict
> being against the weight of the evidence; (2) the damages being excessive; or (3) the
> trial being unfair to the moving party in some fashion, i.e., the proceedings being
> influenced by prejudice or bias.[58]

## B. Analysis

### 1. Binding Sales and State Regulations

Defendants' primary objection in this motion is that the jury instructions regarding what

constitutes a "sale" for purposes of the FLSA were incorrect.[59] Jury instructions must "adequately

inform the jury of relevant considerations and provide a basis in law for aiding the jury to reach its

decision."[60]  Jury instructions that, when "viewed as a whole, were confusing, misleading, or

prejudicial" require a new trial.[61] But mere error in the jury instructions does not itself require a new

trial if the error is harmless.[62]

At the close of the trial, the Court instructed the jury that Plaintiffs would be exempt outside

---

[58] *Holmes v. City of Massillon*, 78 F. 3d 1041, 1045–46 (6th Cir. 1996).

[59] *See* Doc. 818-1 at 14–15.

[60] *King v. Ford Motor Co.*, 209 F.3d 886, 897 (6th Cir. 2000) (quoting *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 166 (6th Cir. 1993)) (internal quotation marks omitted).

[61] *See Benaugh v. Ohio Civil Rights Comm'n*, 278 F. App'x 501, 513–14 (6th Cir. 2008).

[62] *Troyer v. T.John.E. Prods., Inc.*, 526 F. App'x 522, 525 (6th Cir. 2013) (citing *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir. 2000)).

Case No. 1:12-CV-00758
Gwin, J.

salespeople if they had a primary duty of making sales.  The Court explained:

> Within the meaning of the Fair Labor Standards Act, "sale" or "sell" includes an "sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition," as well as "the transfer of title to tangible property."  In this case, both parties agree that natural gas and electricity are tangible property.  Your decision should be a functional, rather than formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works.

> In determining whether a particular transaction qualifies as a sale for purposes of the Fair Labor Standards Act, you are required to consider the extent to which the employee has the authority to bind the company to the transaction at issue.  However, when governmental regulatory requirements limit an employee's ability to bind his employer, compliance with those governmental regulatory requirements do not disqualify the transaction from constituting a sale for purposes of the outside salesperson exemption.

> The various laws of the states where Plaintiffs worked, among other things, require retail electric and gas services  establish reasonable and non-discriminatory creditworthiness standards and allows  retail electric and gas services to require a deposit or other reasonable demonstration of creditworthiness from a customer as a condition of providing service.  However,  none of the laws of any of these states require retail electric and/or gas services to conduct a credit check.

> On the other hand, if the employer retains and/or exercises discretion to accept and/or reject any transaction for reasons that are unrelated to regulatory requirements applicable to the industry, the transaction should not be considered a sale for purposes of the Fair Labor Standards Act.

> You may, but are not required to, also consider certain factors or indicia that tend to suggest that Plaintiffs were primarily engaged in making sales.  The touchstone for making a sale  is obtaining and giving a commitment to provide the gas or electricity. No single one of these factors is dispositive, nor is this an exhaustive list of factors you may consider.  You should look at these, or other, factors together and ask whether, under the totality of the circumstances, they suggest Plaintiffs were actually engaged in making sales.

> Factors you may consider include:
> (1)    The extent to which the job was advertised as a sales position and the employee was recruited based on sales experience and abilities .
> (2)    The extent to which the employee received specialized sales training.
> (3)    The extent to which the employee is compensated based wholly or in significant part on commissions.
> (4)    The extent to which the employee has the responsibility of independently soliciting new business.
> (5)    The extent to which the employee is directly supervised in carrying our his or

-14-

Case No. 1:12-CV-00758
Gwin, J.

> her job duties.
>
> (6) Other factors that have been discussed in this case as circumstantial evidence that the employees were or were not engaged in making sales.[63]

Specifically, Defendants say the Court erred in telling the jury that, when deciding whether Plaintiffs were making "sales," the jury should consider the extent of the employee's ability to bind the company to the transaction and whether any government regulations prohibited the employee from making a final sale.[64]  Defendants also say the Court's summary of Ohio law was incorrect, because they view the regulations as requiring credit checks of potential customers before finalizing contracts.[65]

In its summary judgment opinion, the Court explained in detail that the non-binding nature of the applications Plaintiffs obtained from customers is relevant to whether Plaintiffs were making sales within the meaning of the FLSA.[66]  The Court also explained at trial its conclusion that Ohio law does not require Defendants to do credit checks that would have prevented Plaintiffs from obtaining binding contracts.[67]

In *Christopher v. SmithKline Beecham Corp.*, the Supreme Court found that pharmaceutical representatives were exempt outside salespeople even though they did not actually accomplish "sales" of drugs to patients.[68]  Because Congress meant to define sales broadly to "accommodate

---

[63]/Doc. 818-1 at 14–16.

[64]/*See* Doc. 810-1 at 2–4.

[65]/Doc. 810-1 at 3; Doc. 818 at 8–9.  Defendants have not raised any objection to the Court's instructions with respect to the laws of other states at issue, and in their briefing at trial only directly addressed Ohio's regulations.  *See* Doc. 795.  Because Defendants have not objected to the Court's instructions on the basis of any other state's laws, the Court will consider only the Ohio regulations in this opinion.

[66]/*See* Doc. 89 at 8–11.

[67]/Tr. 10/2/2014 at 32:9–44:3.

[68]/*Christopher*, 132 S. Ct. at 2159.

-15-

Case No. 1:12-CV-00758
Gwin, J.

industry-by-industry variations in methods of selling commodities,"[69] the Supreme Court said that

courts should consider the impact of regulatory requirements as to whether certain transactions "are

tantamount, in a particular industry, to a paradigmatic sale of a commodity."[70]  Thus, because federal

regulations prevented the pharmaceutical representatives from engaging in the actual sale of drugs

to the patient, the Supreme Court found it was enough that the representatives "promoted" sales to

doctors who in turn made "nonbinding commitments" to prescribe the drugs to their patients.[71]

Other courts that have considered situations where employees obtained only non-binding

commitments have concluded that the employees were not necessarily making sales. In *Clements v.

Serco*, the Tenth Circuit held that Army recruiters were not exempt outside salespeople in part

because they lacked the authority to enlist a recruit; instead, they were merely "cultivat[ing] a list of

persons who seemed receptive to the idea of joining the Army," and the Army retained discretion as

to whether or not to actually accept the applicant.[72]  Similarly, in *Wirtz v. Keystone Readers*, the Fifth

Circuit held that "student salesmen" who "obtain[ed] orders" for magazine subscriptions by door-to-

door solicitation were not making sales because, once again, they effectively only gathered lists of

interested customers, and no contract became final until the employer verified the order and the

customer's qualifications.[73]  In *Burling v. Real Stone Source, LLC*, the District of Idaho concluded

that even an employee who negotiated and drafted sales proposals with customers, as well as

conducting other promotional activities designed to facilitate sales, was not making sales because the

---

[69]*Id.* at 2171.

[70]*Id.* at 2171-72.

[71]*Id.* at 2172.

[72]*Clements v. Serco, Inc.*, 530 F.3d 1224, 1225–28 (10th Cir. 2008) (internal quotation marks and citation omitted).

[73]*Wirtz v. Keystone Readers Serv., Inc.*, 418 F.2d 249, 259–61 (5th Cir. 1969).

Case No. 1:12-CV-00758
Gwin, J.

employer retained the final discretion to approve or reject any given proposal.[74] And unlike the situation in *Nielsen v. Devry, Inc.*, where the Western District of Michigan found that "field representatives" who guided applicants through the process of being admitted and matriculating to DeVry University were engaged in sales, the interactions between Plaintiffs and potential customers in this case ended before the transaction was "consummated," and Plaintiffs were prohibited from following up with customers to ensure the sales were completed.[75]

The distinguishing characteristic in *Christopher* was that the pharmaceutical representatives were legally prohibited from actually selling drugs to patients. Because of the regulatory scheme, the best the pharmaceutical representatives could do was to promote drugs to doctors, who would in turn prescribe them to patients. Thus, while making a sale for the purposes of the FLSA does not necessarily require a transfer of title, the alleged selling activity must be viewed in the context of the particular industry at issue—including whether the industry is subject to a "unique regulatory environment"—and the jury must determine whether within that particular industry, the employee has the job of making "arrangements that are tantamount . . . to a paradigmatic sale of a commodity."[76] Indeed, the Sixth Circuit has recently distinguished *Christopher* on just this issue, finding that *Christopher* is not necessarily controlling outside of a situation where obtaining only a "nonbinding commitment" is the result of a "unique regulatory environment."[77]

Unlike the pharmaceutical representatives in *Christopher*, the Plaintiffs in this case were not

---

[74] *Burling v. Real Stone Source, LLC*, No. CV-08-43-E-EJL, 2009 WL 1812785, at *3–7 (D. Idaho June 24, 2009).

[75] *See Neilsen*, 302 F. Supp. 2d at 754–60.

[76] *Christopher*, 132 S. Ct. at 2171–72; *see also id.* at 2172 n.23 ("[W]hen an entire industry is constrained by law or regulation from selling its products in the ordinary manner, an employee who functions in all relevant respects as an outside salesman should not be excluded from that category based on technicalities.").

[77] *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 583–84 (6th Cir. 2014).

-17-

Case No. 1:12-CV-00758
Gwin, J.

prohibited from completing a contract by state or federal regulations.  Ohio law did not require Defendants to retain unlimited rejection authority.  Ohio regulations also do not *require* an energy supplier to conduct a credit check, only for it to "establish reasonable and nondiscriminatory creditworthiness standards."[78]  By contrast, the energy supplier only "*may* require a deposit or other reasonable demonstration of creditworthiness from a customer as a condition of providing service."[79] The regulations contemplate that an energy supplier *could* require a satisfactory credit check before initiating service, but is not *required* to do so.  It could use some other method, such as accepting a deposit.

The jury instructions on this point say nothing different. The Court explained to the jury that state laws required Defendants to establish reasonable and non-discriminatory creditworthiness standards, but that they did not require Defendants to conduct a credit check.[80] This instruction is entirely consistent with the statutory language.  It was then up to the jury to decide, based on the evidence presented, how this regulatory environment impacted whether Plaintiffs were "making sales."

The instructions did not require the jury to find for either side.  The instructions merely listed numerous factors that the jury could consider to decide whether Plaintiffs had the primary duty of making sales, and among those factors were whether Plaintiffs obtained binding contracts and whether any regulatory environment prevented them from doing so.  The instructions also specified other factors that the jury could consider in order to reach a conclusion based on the totality of the

---

[78]/Ohio Admin. Code 4901:1-21-07; Ohio Admin. Code 4901:1-29-07.

[79]/Ohio Admin. Code 4901:1-21-07; Ohio Admin. Code 4901:1-29-07 (emphasis added).

[80]/Doc. 818-1 at 15.

-18-

Case No. 1:12-CV-00758
Gwin, J.

circumstances.[81] Given the relevant statutes, regulations, and case law, the jury instructions on these

issues "adequately inform[ed] the jury of relevant considerations and provide[d] a basis in law for

aiding the jury to reach its decision."[82]

## 2. Waiver of FLSA Rights

Defendants also request a new trial because the Court instructed the jury that employees

cannot waive their rights under the FLSA.[83] "In a trial by jury in a federal court, the judge is not a

mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of

determining questions of law. . . ."[84] When counsel for either party makes an argument that is

improper, the trial judge may step in to ensure the integrity of the proceedings.[85] However, conduct

by a judge that shows "outright bias or belittling of counsel," or a trial that is "infected with the

appearance of partiality" can require a new trial.[86]

The jury in this case was instructed at the close of trial:

> The right to receive minimum wage and overtime compensation under the [FLSA]
> cannot be waived. In other words, any agreement between a worker and his employer
> that the worker shall not be paid minimum wage or overtime is not enforceable if the
> worker is otherwise entitled to minimum wage or overtime under the law. However,
> if a worker is an exempt outside salesperson, that worker is not entitled to minimum
> wage and is not entitled to overtime compensation for hours worked in excess of forty
> hours.[87]

---

[81]*Id.* at 15–16.

[82]*King*, 209 F.3d at 897 (internal quotation marks omitted).

[83]Doc. 818 at 10.

[84]*Quercia v. United States*, 289 U.S. 466, 469 (1933).

[85]*Cf., e.g.*, *United States v. Young*, 470 U.S. 1, 7–10 (1985) (concluding that a trial judge has the responsibility
to "maintain decorum" in a proceeding by "deal[ing] promptly" with counsel who make disparaging comments directed
at opposing counsel).

[86]*See* *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 808 (6th Cir. 1999), *overruled on other
grounds*, *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (en banc).

[87]Doc. 818-1 at 13 (citing *Beck v. City of Cleveland*, 390 F.3d 912, 923 (6th Cir. 2004)).

Case No. 1:12-CV-00758
Gwin, J.

Defendants admit that this is a correct statement of law.[88] They argue, however, that the Court prejudiced their case by giving the jury this instruction twice during trial as well as at the close.

The two times the Court had to instruct the jury on this issue were prompted by statements by defense counsel. The first time was during Defendants' opening statement. Defense counsel referred to advertisements for Plaintiffs' positions that "fully disclosed and described . . . exactly how [the salespeople] were going to get paid," emphasizing the commission system and that Plaintiffs had entered into contracts agreeing to this method of payment.[89] At side-bar, the Court noted its concern with Defendants' implication that Plaintiffs' knowledge of the commission structure could have some bearing on whether there was an FLSA violation.[90] Finding that Defendants' argument was irrelevant and potentially confusing, at the request of Plaintiffs, the Court advised the jury that "an employee cannot waive the rights to FLSA overtime or minimum wage."[91]

Later on the first day of trial, in response to defense counsel's questioning a witness about the terms of the Plaintiffs' employment contracts, the Court once again warned Defendants at a side-bar to avoid implying that Plaintiffs had somehow waived their FLSA rights simply because they had agreed to a commission-based compensation structure.[92] The Court expressed continuing concern that Defendants were introducing irrelevant evidence for this purpose.[93]

The second time the Court instructed the jury on the non-waivability of the FLSA came during the playback of a video deposition. During this playback, the witness—Peter Potje, a door-to-

---

[88] Doc. 810-1 at 5; Doc. 818 at 10; *see also* Tr. 10/2/2014 at 159:12–160:14.
[89] Tr. 9/29/2014 at 90:4–91:8.
[90] *Id.* at 91:12–92:5.
[91] *Id.* at 92:6–92:23.
[92] *Id.* at 232:12–234:15.
[93] *Id.*

Case No. 1:12-CV-00758
Gwin, J.

door salesman—testified in response to a question from defense counsel that he understood the lawsuit to be about "whether someone who has [signed independent contractor agreements] might still get paid minimum wage for time spent."[94/]  Plaintiffs objected to this testimony.[95/]  Finding Potje's statements to be not only improper testimony on a matter of law, but also an incorrect statement of the law, the Court made a corrective instruction that an employee cannot agree to waive his rights under the FLSA to minimum wage and overtime pay.[96/]

Cases where a trial judge has been found to have engaged in conduct that requires a new trial have typically involved a great number of comments that amount to berating of one party or its counsel.[97/]  Here, there is no allegation by Defendants that the Court's tone or demeanor expressed bias against Defendants' position.  The allegation is that the Court gave correct instructions of law. It did so in order to cure improper or incorrect statements, one made by defense counsel and one made by a witness.[98/]  The Court finds no support for Defendants' argument that a correct statement of the law can prejudice a party's case. Instead, the cases support the position that the Court may comment to "ensure that the issues [are] not obscured, to ensure that testimony [is] not misunderstood, and to move the case along."[99/]  In this case, the Court's brief instructions were well within its discretion to determine a question of law, ensure the integrity of the proceedings, avoid

---

[94/]Tr. 10/1/2014 at 233:18–233:25.

[95/]*Id.* at 234:2–235:13.

[96/]*Id.* at 234:19–235:12, 236:9–236:23.

[97/]*E.g.*, *United States v. Hickman*, 592 F.2d 931, 934–36 (6th Cir. 1979) (When the district judge interjected over 250 times during the trial using an anti-defendant tone, and then limited defense cross-examination before taking over cross-examination himself, "the only impression which could have been left in the mind of the jury was that the trial judge was a surrogate prosecutor.").

[98/]*See, e.g.*, *United States v. Houston*, 110 F. App'x 536, 542 (6th Cir. 2004) (finding no error when the district judge made statements to the jury to following counsels' statements regarding irrelevant legal issues).

[99/]*Johnson v. Philip Morris, Inc.*, 70 F.3d 1272, 1995 WL 704264, at *4–5 (6th Cir. Nov. 29, 1995) (unpublished table opinion).

-21-

Case No. 1:12-CV-00758
Gwin, J.

confusion of the issues, and keep the trial moving at a reasonable pace.

Defendants also assert that the Court made statements to the jury about the lack of a fraud claim by the Plaintiffs, thereby implanting the term "fraud" in their heads and biasing the jury against Defendants.[100] A review of the record, however, shows that the Court only twice referred to fraud. The first time the Court mentioned fraud was during a side-bar,[101] which could not possibly have caused any prejudice to Defendants as it was done outside the presence of the jury.[102] The second time was in response to Defendants' repeated questioning of door-to-door workers about their knowledge of the commission-based compensation agreements, which the Court had ruled irrelevant and instructed Defendants to stay away from. At this time, the Court instructed the jury that Plaintiffs "[did] not make a claim that the Defendant[s] defrauded the Plaintiffs."[103] The Court's comment was thus in effect invited by Defendant by continuing to delve into matters the Court had ruled irrelevant and possibly confusing to the jury. Further, if anything, this brief curative instruction would have *helped* Defendants, as it instructed the jury *not* to believe that Defendants had engaged in fraud. As such, the Court fails to see how this comment could have prejudiced Defendants' case.

## IV. Interlocutory Appeal

In the alternative, Defendants seek the Court's leave to take an interlocutory appeal pursuant to 29 U.S.C. § 1292(b) in order to challenge the correctness of the jury instructions regarding the

---

[100]/*See* Doc. 810-1 at 5–6; Doc. 818 at 10.

[101]/*See* Tr. 9/29/2014 at 234:8–234:15 ("THE COURT: I'm not sure—what do you say I don't understand? They haven't brought a fraud claim and I wouldn't instruct them, I wouldn't instruct on a fraud claim and they haven't brought a fraud claim.").

[102]/*See United States v. Middleton*, 246 F.3d 825, 849 (6th Cir. 2001); *United States v. Morrow*, 977 F.2d 222, 225 (6th Cir. 1992).

[103]/*See* Tr. 9/30/2014 at 24:17–25:1.

Case No. 1:12-CV-00758
Gwin, J.

outside sales exemption.[104/]

## A. Legal Standard

Litigants are generally not entitled to appellate review of court orders prior to a final judgment on the merits.[105/]  In "exceptional cases," however, district courts may grant parties leave to take interlocutory appeals.[106/]  To appeal under § 1292(b), a party must show: (1) the issue concerns a controlling question of law; (2) substantial ground for difference of opinion on that issue exist; and (3) immediate appeal would materially advance the ultimate termination of the litigation.[107/]  "The burden of showing exceptional circumstances justifying an interlocutory appeal rests with the party seeking review."[108/]

## B. Analysis

### 1. Controlling Legal Issue

"A legal issue is controlling if it could materially affect the outcome of the case,"[109/] "such as when 'reversal of the District Court's Order would terminate the action.'" [110/]  Here, Defendants say that the application of *Christopher* to the FLSA's outside salesperson exemption presents a controlling issue of law in this case.[111/]

A resolution of an interlocutory appeal in Defendants' favor, however, would not resolve this

---

[104/]Doc. 810-1 at 7.

[105/]*Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897, 902–03 (2015); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 474–75 (1978).

[106/]*In re City of Memphis*, 293 F.3d 345, 350 (6th Cir. 2002) (citations omitted); *see also* 28 U.S.C. § 1292(b).

[107/]*Negron v. United States*, 553 F.3d 1013, 1015 (6th Cir. 2009); *In re City of Memphis*, 293 F.3d at 350.

[108/]*Trimble v. Bobby*, No. 5:10-cv-00149, 2011 WL 1982919, at * 1 (N.D. Ohio May 20, 2011) (citing *In re City of Memphis*, 293 F.3d at 350).

[109/]*In re City of Memphis*, 293 F.3d at 351.

[110/]*United States S.E.C. v. Geswein*, 2 F. Supp.3d 1074, 1086 (N.D. Ohio. 2014) (quoting *Howe v. City of Akron*, 789 F. Supp. 2d 786, 810 (N.D. Ohio 2010)).

[111/] Doc. 810-1 at 9–10.

Case No. 1:12-CV-00758
Gwin, J.

case.  The question of the outside salesperson exemption's applicability is not purely legal and requires factual findings.  Further, with this motion Defendants challenge only one of the numerous non-dispositive factors that the jury was able to consider when determining whether the exemption applies.  Even if Defendants' appeal were successful, the remedy would likely be a retrial.  Thus, this factor weighs against granting the interlocutory appeal.

**2. Substantial Grounds for Different Opinion**

The second factor requires that the Court determine whether substantial grounds exist for different opinion on the issue.  Substantial grounds for a difference of opinion exist when "(1) the question is difficult, novel and either a question on which there is little precedent or one whose correct resolution is not substantially guided by previous decisions; (2) the question is difficult and of first impression; (3) a difference of opinion exists within the controlling circuit; or (4) the circuits are split on the question."[112]

Here, Defendants seek to appeal whether the jury instructions correctly related what factors the jury could consider in determining whether the outside sales exemption applies.  The Court recognizes that *Christopher* is a relatively recent decision that has caused some uncertainty in FLSA litigation.  Nevertheless, the jury instructions were not written on a blank slate.  As already discussed, the Court's instructions were based on and consistent with numerous other cases.  And the Sixth Circuit itself has recently distinguished *Christopher* based on its unique facts and circumstances, and determined that it should not necessarily control other FLSA cases.[113]

The legal issues here are not particularly difficult, nor is there a clear split of authority.  Some

---

[112] *In re Miedzianowski*, 735 F.3d 383, 384 (6th Cir. 2013)  (citing *City of Dearborn v. Comcast of Mich. III, Inc.*, No. 08–10156, 2008 WL 5084203, at *3 (E.D. Mich. Nov. 24, 2008)).

[113] *See Killion*, 761 F.3d 5at 583–84.

-24-

Case No. 1:12-CV-00758
Gwin, J.

disagreement will almost always exist on any given legal issue, but in this case, the disagreement is not so substantial as to require an immediate decision from the Sixth Circuit to resolve it.  Thus, this factor weighs against granting the interlocutory appeal.

**3. Material Advancement of Ultimate Termination of the Litigation**

Finally, the Court must consider whether an immediate appeal would materially advance the ultimate termination of the litigation. Such circumstances exist where appellate review could "appreciably shorten the time, effort, and expense exhausted between the filing of a lawsuit and its termination."[114]

The highly fact-intensive nature of the inquiry required to apply the outside salesperson exemption almost guarantees that a ruling from the Sixth Circuit in Defendants' favor would not terminate this case; at most, a new trial on liability would have to be held.  The risk that the Court will be reversed at a later date, rather than immediately, is not unique to this case.  Nor is it unique to this case that Defendants could possibly win on retrial, thereby making further proceedings in the district court unnecessary.

This factor works somewhat in Defendants' favor, however, since the upcoming damages phase will require some form of individualized proof of the number of under-compensated hours worked by each class member.  The Court would not stay the proceedings during the pendency of the appeal.  Thus, if the Court were to allow the interlocutory appeal as to the liability phase issues while the damages phase is ongoing, it could somewhat shorten this litigation overall.

Nevertheless, the resolution of the jury instruction issues on appeal would not "substantially

---

[114] *Berry v. Sch. Dist. of City of Benton Harbor*, 467 F. Supp. 721, 727 (W.D. Mich. 1978).

-25-

Case No. 1:12-CV-00758
Gwin, J.

alter the course of the district court proceedings."[115/]  Even if the appeal were granted, the damages

phase would continue unabated.  The only change to come from an interlocutory appeal would be

to require any retrial on liability to be held sooner rather than later.  The Court therefore finds that

this factor also weighs against granting the interlocutory appeal.

### V. Conclusion

For the foregoing reasons, the Court **DENIES** Defendants' motion for judgment as a matter

of law, **DENIES** Defendants' motion for a new trial, and **DENIES** Defendant's motion to certify an

interlocutory appeal.

IT IS SO ORDERED

Dated: March 10, 2015                                    s/          *James S. Gwin*
                                                        JAMES S. GWIN
                                                        UNITED STATES DISTRICT JUDGE

---

[115/]*W. Tenn. Chapter of Assoc. Builders & Contractors, Inc. v. City of Memphis*, 138 F. Supp. 2d 1015, 1026 (W.D. Tenn. 2000); *cf. White v. Nix*, 43 F.3d 374, 378–79 (8th Cir. 1994) ("When litigation will be conducted in substantially the same manner regardless of [the court of appeals'] decision, the appeal cannot be said to materially advance the ultimate termination of the litigation.").